# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

JERRY N. JONES, MARY FRANCES    )
JONES, and OLGA MENYHART,    )
    )
    Plaintiffs,    )
    )     **04-4184-CV- C-NKL**
    )    Case No:_____
    v.    )
    )
HARRIS ASSOCIATES L.P.,    )
    )
    Defendant.    )

## COMPLAINT

Plaintiffs, Jerry N. Jones, Mary Frances Jones, and Olga Menyhart for the use and benefit

of the Oakmark Fund, the Oakmark Equity and Income Fund, the Oakmark Global Fund, and the

Oakmark International Fund, sue Defendant, Harris Associates L.P., and allege:

### I. JURISDICTION AND VENUE

1.    This action is a derivative action brought by Plaintiffs on behalf of the Oakmark

Fund, the Oakmark Equity and Income Fund, the Oakmark Global Fund, and the Oakmark

International Fund (collectively, the "Funds") pursuant to §§ 36(b) of the Investment Company

Act of 1940 ("ICA"), as amended, 15 U.S.C. §§ 80a-35(b).

2.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15

U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

3.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28

U.S.C. § 1391(b). Defendant is an inhabitant of or transacts business in this district, Defendant

resides in this district, a substantial part of the events or omissions that give rise to Plaintiffs'

claims occurred in this district, and/or Defendant may be found in this district.

4.    All conditions precedent have been performed or have occurred.

## II. BACKGROUND

5.    Plaintiffs are shareholders in the Funds, which are open-end registered investment companies,[1] or mutual funds, created, sold, advised, and managed with other funds as part of a fund family or complex by Defendant and its affiliates (the "Oakmark Complex" or the "Fund Complex").  Defendant and its affiliates, as the underwriters, distributors, advisors, and control persons of the Funds, owe fiduciary and other duties to Plaintiffs and all shareholders of the funds in the Fund Complex.

6.    Plaintiffs and the other shareholders of the Funds pay Defendant and its affiliates, or other third parties, fees for providing pure investment advisory services and administrative services.  For the pure investment advisory services, the Funds pay Defendant a fee based on a percentage of the net assets of each of the funds in the Fund Complex.  The Funds pay separate fees for some or all of the administrative services provided to the Funds by Defendant's affiliates or other third parties.

7.    The pure investment advisory services Defendant provides to the Funds are identical to the investment advisory services Defendant provides to other clients, such as institutional clients, and entail identical costs.  In fact, the costs of advisors, analysts, research data, the physical plant, and other aspects of Defendant's investment advisory services are shared between the mutual funds and the other clients.

8.    Despite the equivalence of the investment advisory services Defendant provides to the Funds and the other clients, the fees Defendant receives from the Funds for pure investment

---

[1] The Oakmark Global Fund and the Oakmark International Fund closed to new investors as of December 15, 2003, but was open-ended at the time of purchase.

advisory services are much higher than the fees Defendant or its affiliates receive from other clients for the identical services.

**Section 36(b) of the Investment Company Act of 1940**

9.    In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-l et seq. (the "ICA "). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors such as Defendant. In the 1960s, it became clear to Congress that investment advisors to equity mutual funds were gouging those funds with excessive fees, particularly by not taking economies of scale into account. As a result, § 36(b), 15 U.S.C., § 80a-35(b), was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.

10.    Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. . . .

11.    In the past decade, the assets managed by Defendant within the Fund Complex have grown dramatically. In 1993, the Fund Complex had $295.3 Million in average net assets. By 2003, the Fund Complex had exploded to over $11.7 Billion in average net assets, almost 40 times the assets in 1993. Meanwhile, advisory fees for the Fund Complex increased from $2.45

3

million (or 0.83% of assets) in 1993 to $107.3 million (or 0.91% of assets) in 2003.
Accordingly, despite the Fund Complex's dramatic growth, no economies of scale or incremental
savings were realized by the shareholders. Rather, fees actually grew as a percentage of assets.

12.     While the assets of the Fund Complex and the fees have grown dramatically in
size, the nature of the services rendered by Defendant has changed little, if at all. Indeed,
advances in computing and communication technologies in the past twenty years have resulted in
exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in
ways Congress could not have imagined when it enacted ICA § 36(b). Nonetheless, the advisory
fees paid to Defendant have grown dramatically. As a result, the advisory fees paid to Defendant
(and accepted by Defendant in violation of its statutory fiduciary duties) are disproportionately
large in relationship to the services rendered to Plaintiffs.

13.     In addition, Defendant, in violation of its fiduciary duties to Plaintiffs, has
retained excess profits resulting from economies of scale. These economies of scale are a product
of the dramatic growth in assets managed by Defendant. As assets under management increase,
the cost of providing services to the assets does not increase at the same rate. In fact, with very
large funds, such as the Funds at issue here, the cost of servicing additional assets approaches
zero, resulting in tremendous economies of scale. Accordingly, any fees received in connection
with the additional assets represent almost pure profit. The excess profits resulting from these
economies of scale belong to Plaintiffs and the other shareholders of the Funds.

14.     The fees paid to Defendant are technically approved by the Funds' board of
directors.[2] A majority of the board is comprised of statutorily presumed "disinterested" directors

---

[2] While the Funds at issue here are technically governed by a board of trustees rather than directors, the term "directors" is used throughout the complaint and should be read as synonymous with "trustees," as it is under the ICA.

4

as that term is defined in § 10 of the ICA. Regardless of whether these presumably "disinterested" directors meet the requirements of § 10 of the ICA, there is a lack of conscientiousness by the directors in reviewing the advisory fees paid by the Funds. In addition, even if statutorily disinterested, the directors are in all practical respects dominated and unduly influenced by Defendant in reviewing the fees paid by Plaintiffs and the other shareholders of the Funds. In particular, Defendant does not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendant has breached its fiduciary duties.

15.    Although the fees challenged in this lawsuit may appear to the Court to be very small on a shareholder-by-shareholder basis, they cause a dramatic decrease in Plaintiffs' investment returns over time. Arthur Levitt, past Chairman of the Securities and Exchange Commission ("SEC"), was critical of what he called the "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns. ... In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001).

### Nature of Claims

16.    In this action, Plaintiffs seeks to rescind the investment advisory agreements and to recover for the Funds the total fees charged by Defendant or, alternatively, to recover for the Funds the excess profits resulting from economies of scale wrongfully retained by Defendant and

---

*See* 15 U.S.C., § 80a-2(a)(12).

to recover other excessive compensation received by, or improper payments wrongfully retained

by, Defendant in breach of its fiduciary duty under the ICA § 36(b), 15 U.S.C. § 80a-35(b).

Because the conduct complained of herein is continuing in nature, Plaintiffs seek recovery for a

period commencing at the earliest date in light of any applicable statute of limitations through the

date of final judgment after trial.

17.    No pre-suit demand on the board of directors of the Funds is required, as the

requirements of F.R.C.P. 23.1 do not apply to actions under § 36(b) of the ICA. *Daily Income*

*Fund v. Fox,* 464 U.S. 523 (1984).

18.    Plaintiffs do not allege or seek relief for any claims based upon improper market

timing or late trading activity involving the Funds.

### III. PARTIES

19.    Plaintiffs Jerry N. Jones and Mary Frances Jones are residents of Columbia,

Missouri. They are shareholders at all relevant times of the Oakmark Equity and Income Fund

and the Oakmark Global Fund.

20.    Plaintiff Olga Menyhart is a resident of Tampa, Florida. She is a shareholder at

all relevant times of the Oakmark Fund and the Oakmark International Fund.

21.    Each of the Funds is a separate operating series of the Harris Associates

Investment Trust, a Massachusetts business trust that is registered with the Securities and

Exchange Commission under the Investment Company Act of 1940 as an open-end management

investment company.

22.    Defendant Harris Associates LP ("Harris") is a Delaware limited partnership and

is registered as an investment adviser under the Investment Advisers Act of 1940. Harris is the

investment advisor to each of the Funds. Harris also serves as the investment advisor to individuals and other institutions, including trusts, retirement plans, endowments and foundations, and manages a number of private partnerships.

## IV. GENERAL ALLEGATIONS

23.    The test for determining whether compensation paid to Defendant violates §36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982). In order to violate § 36(b), "the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.*

24.    In applying this test, all pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b). The *Gartenberg* court specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered. These factors include: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the advisor/manager; (3) economies of scale; (4) comparative fee structures; (5) fallout benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds; and (6) the care and conscientiousness of the directors. A review of these factors, and the facts in this case, demonstrates that the fees charged by Defendant to the Funds violate § 36(b).

### (1) The Nature and Quality of the Services Provided to the Funds

25.    The nature of the investment advisory services provided to the Funds is

straightforward: Defendant buys and sells, at its discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendant's institutional and other clients (albeit at a dramatically lower cost). On information and belief, the materials provided by Defendant to the directors of the Funds establish that the nature of these services has remained unchanged despite dramatic growth in the assets of the Funds and advisory revenues.

26.     Despite the fact that the Funds receive identical investment advisory services as Defendant's institutional and other clients, on information and belief Plaintiffs pay Defendant dramatically higher fees because these fees are not negotiated at arm's length as they are with the institutional and other clients. This disparity in fees evinces Defendant's willingness and determination to prefer their own financial interests to the interests of the Funds and the shareholders of the Funds.

27.     On information and belief, Defendant repeatedly puts its own financial interests ahead of the interests of the Funds and the shareholders of the Funds by participating in arrangements and schemes that benefit Defendant at the expense of the Funds and their shareholders. The cost of this conflict of interest, which does not exist in the case of the arm's-length relationships with institutional clients, is manifest not only in higher fees, but in other losses and expenses borne by the Funds and the shareholders of the Funds. These losses and expenses directly impact the quality of the investment advisory services Defendant provides to the Funds.

### *(2) The Profitability of the Fund to the Adviser/Manager*

28.     "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'"

*See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp L. 610, 661 (2001) (the "Freeman & Brown Study") (citing *Gartenberg*) [Ex. 1]. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services. However, upon information and belief, Defendant's reporting of its revenues and costs is intended to, and does, obfuscate Defendant's true profitability. For instance, upon information and belief, Defendant employs inaccurate accounting practices in its financial reporting, including arbitrary and unreasonable cost allocations.

29.    Defendant's true profitability can be determined on either an incremental basis or a full-cost basis. Defendant's incremental cost of providing advisory services to Plaintiffs is nominal while the additional fees received by Defendant are hugely disproportionate given that the nature, quality, and level of the services remain the same. On information and belief, a review of Defendant's full costs of providing advisory services will also demonstrate the enormous profitability to Defendant of managing the Funds.

### (3) Economies of Scale

30.    The existence of economies of scale in the mutual fund industry has been recently confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of advisory services. *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 [Ex. 2]; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Ex. 3].

31.    In addition, the most significant academic research undertaken since the Wharton
School study in the 1960s establishes the existence of economies of scale that are not being
passed along to mutual fund shareholders in violation of Defendant's duty to do so under § 36(b).
*See* Freeman & Brown Study" [Ex. 1]. As the Freeman & Brown Study noted: "The existence
of economies of scale has been admitted in SEC filings made by fund managers and is implicit in
the industry's frequent use of fee rates that decrease as assets under management increase. Fund
industry investment managers are prone to cite economies of scale as justification for business
combinations." Id. at 620 [Ex. 1].

32.    These economies of scale exist not only fund by fund but also exist with respect to
an entire fund complex and even with respect to an investment advisor's entire scope of
operations, including services provided to institutional and other clients. *See* Freeman & Brown
Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a
Mutual Fund, 49 Bus. Law 107 (1993)) [Ex. 1].

33.    The clearest example of economies of scale occurs when total assets under
management increase due purely to market forces (without the institution of new advisory
relationships or new asset gathering). In such instances, as the GAO confirms, it is possible for
the advisor to service the additional assets with zero additional costs. See GAO Report at 9
(noting that growth from portfolio appreciation is unaccompanied by costs) [Ex. 3]. In other
words, an investment advisor can advise a fund that doubles in size purely because of market
forces with no increased costs because the services are unchanged. *See* GAO Report at 9 [Ex. 3];
Freeman & Brown Study at 619 n.43, 621 (noting that investment advisors have benefited by
garnering "increased fees from the general increase in market prices with no commensurate

efforts on their part" and also noting that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities, which, unlike growth from share sales to new investors, is costless) [Ex. 1].

34.    From 1993 through 2003, the assets under management in the Oakmark Complex grew from $295.3 million to nearly $11.7 billion.  However, this phenomenal growth in mutual fund assets not only produced no economies of scale, but fees actually increased faster than the growth in assets.  Fees went from $2.45 million (or 0.83% of assets) in 1993 to $107.3 million (or 0.91% of assets) in 2003.

35.    The economies of scale enjoyed by Defendant with respect to the Funds have not been shared with Plaintiffs as required by § 36(b).  As a result, the fees paid to Defendant for advisory services provided to the Funds are grossly disproportionate to those services, are excessive, and violate § 36(b).

*(4) Comparative Fee Structures*

36.    The fees advisors receive from mutual funds for investment advisory services are directly comparable to, though much higher than, the fees advisors receive from other clients for the identical services.  As the Freeman & Brown Study noted:  "None of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower."  Freeman & Brown Study at 653 [Ex. 1].  While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds.  The

11

portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." Freeman & Brown Study at 627-28 [Ex. 1]. Indeed, "a mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." Freeman & Brown Study at 629 n.93 [Ex. 1]. Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." Freeman & Brown Study at 671-72 [Ex. 1].

37.     More recently, New York's Attorney General surveyed two fund complexes and confirmed the existence of massive over-charging of fund advisory fees. Specifically, Mr. Spitzer testified before a Senate Subcommittee on January 27, 2004, as follows:

> Putnam's mutual fund investors were charged 40 percent more for advisory services than Putnam's institutional investors. In dollar terms, what this fee disparity means is that in 2002 Putnam mutual fund investors paid $290 million more in advisory fees than they would have paid had they been charged the rate given to Putnam's institutional clients, and these are for identical services.

> There was a similar disparity in the advisory fees charged by Alliance. Once again, mutual fund investors were charged significantly higher advisory fees than institutional investors. Specifically, Alliance's mutual fund investors paid advisory fees that were twice those paid by institutional investors. In dollar terms, this means that Alliance investors paid more than $200 million more in advisory fees than they would have paid had they been charged the rate given to Alliance's institutional clients.

38.     On information and belief, the shareholders of the Funds at issue here are plagued by the same discriminatory over-charging. Indeed, a number of relevant comparative fee structures clearly establish that Defendant is charging advisory fees to the Funds that are

12

disproportionate to the value of the services rendered. For example, upon information and belief:

a. Harris serves as the subadvisor to the CDC Nvest Growth and Income Fund. For its services, Harris receives a fee equal to 45 basis points (.45%) of the first $250 Million in assets, 40 basis points (.40%) of the next $250 Million in assets, and 35 basis points (.35%) of assets over $500 Million (the "Nvest G&I Fee Schedule"). By way of contrast, for its services to the Oakmark Equity and Income Fund, Harris receives a fee equal to 75 basis points (.75%) of the first $5 Billion in assets, 70 basis points (.70%) of the next $2.5 Billion in assets, 675 basis points (.675%) of the next $2.5 Billion in assets, and 65 basis points (.65%) of assets over $10 Billion. As of June 2004, the Oakmark Equity and Income Fund had over $7.727 Billion in assets. If the Oakmark Equity and Income Fund were to have average assets of this amount throughout 2004, it would pay a blended fee of 73.2 basis points (.732%). However, if the Oakmark Equity and Income Fund benefited from the Nvest G&I Fee Schedule, the Oakmark Equity and Income Fund would pay a blended fee of only 35.5 basis points (.355%). Under this fee schedule, the Oakmark Equity and Income Fund would pay less than half of what it will pay under its current schedule, which would save the shareholders of the Oakmark Equity and Income Fund over $29 million in fees this year.

b. Harris serves as the subadvisor to the MassMutual Focused Value Fund (a mid-cap fund). For its services, Harris receives a fee equal to 50 basis points (.50%) of the first $100 Million in assets, 45 basis points (.45%) of the next $400 Million in assets, and 40 basis points (.40%) of assets over $500 Million (the "MassMutual Focused

13

Value Fee Schedule"). By way of contrast, for its services to the Oakmark Select Fund (also a mid-cap fund), Harris receives a fee equal to 100 basis points (1.00%) of the first $1 Billion in assets, 95 basis points (.95%) of the next $500 Million in assets, 90 basis points (.90%) of the next $500 Million in assets, 85 basis points (.85%) of the next $500 Million in assets, 80 basis points (.80%) of the next $2.5 Billion in assets, and 75 basis points (.75%) of assets over $5 Billion. As of June 2004, the Oakmark Select Fund had over $5.623 Billion in assets. If the Oakmark Select Fund were to have average assets of this amount throughout 2004, it would pay a blended fee of 85.7 basis points (.857%). However, if the Oakmark Select Fund benefited from the MassMutual Focused Value Fee Schedule, the Oakmark Select Fund would pay a blended fee of only 40.5 basis points (.405%). Under this fee schedule, the Oakmark Select Fund would pay less than half of what it will pay under its current schedule, which would save the shareholders of the Oakmark Select Fund over $25 million in fees this year.

c. Harris serves as the subadvisor to the MassMutual Overseas Fund. For its services, Harris receives a fee equal to 65 basis points (.65%) of the first $50 Million in assets, 60 basis points (.60%) of the next $50 Million in assets, and 50 basis points (.50%) of assets over $100 Million (the "MassMutual Overseas Fee Schedule"). By way of contrast, for its services to the Oakmark International Fund, Harris receives a fee equal to 100 basis points (1.00%) of the first $2 Billion in assets, 95 basis points (.95%) of the next $1 Billion in assets, and 85 basis points (.85%) of assets over $3 Billion. As of June 2004, the Oakmark International Fund had over $4.231 Billion in

14

assets. If the Oakmark International Fund were to have average assets of this amount throughout 2004, it would pay a blended fee of 94.5 basis points (.945%). However, if the Oakmark International Fund benefited from the MassMutual Overseas Fee Schedule, the Oakmark International Fund would pay a blended fee of only 50.3 basis points (.503%). Under this fee schedule, the Oakmark International Fund would pay slightly more than half of what it will pay under its current schedule, which would save the shareholders of the Oakmark International Fund over $18 million in fees this year.

### (5) Fallout Benefits

39.    Defendant indirectly profits because of the existence of the Funds through fallout benefits. Obvious, but difficult to quantify fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Funds.

40.    Other, easier to quantify, benefits include "soft dollars" payable from broker-dealers. Essentially, "soft dollars" are credits furnished to Defendant from broker-dealers and other securities-industry firms in exchange for routing the Funds' securities transaction orders and other business to paying firms. These soft-dollar credits should be used to purchase research and other goods or services that benefit the shareholders of the Funds. On information and belief, however, the soft-dollar arrangements benefit Defendant and result in increased costs to the shareholders of the Funds with little to no corresponding benefits to the shareholders of the Funds. On information and belief, the soft dollar arrangements are concealed from the shareholders of the Funds in breach of Defendant's fiduciary duty.

41.    On information and belief, Defendant also receives "kickbacks," either directly or indirectly, as transfer agency and custodian fees grow due to increases in the assets of the Funds and the number of shareholders.

42.    On information and belief, Defendant receives further fallout benefits from securities lending arrangements. Essentially, Defendant loans out the securities of the Funds and receives compensation as the lending agent of the Funds.

43.    A highly profitable fallout benefit to Defendant is the ability to sell investment advisory services paid for by the Funds at virtually no additional cost. Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendant. Without payment by Plaintiffs and other shareholders of the Funds of millions of dollars in advisory fees, Defendant would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients. This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business. However, although Plaintiffs and other shareholders of the Funds pay all of the costs associated with the investment advisory services, Defendant resells these services to third parties without compensating shareholders through reduced fees or in any other way.

44.    On information and belief, Defendant does not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Funds or to the Funds' directors. The directors are thus unable to quantify or even meaningfully consider the benefits. Plaintiffs and other shareholders of the Funds have paid for these benefits and are entitled to compensation in the form of reduced advisory fees.

### (6) The Independence and Conscientiousness of the Directors

45. At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of the ICA. As the GAO Report noted, the structure of most mutual funds embodies a potential conflict of interest between the fund's shareholders and its adviser. This conflict arises because the fees paid by the shareholders represent revenue to the adviser. The United States Supreme Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

46. The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendant and reviewing the reasonableness of the advisory fees received by Defendant. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services. See GAO Report at 14 [Ex. 3]. These responsibilities are intensive, requiring the directors to rely on information provided by Defendant. Defendant, in turn, has a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations. *See* 15 U.S.C., § 80a-15(c).

47. The ICA contains a presumption that the disinterested directors are in fact disinterested. However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the Funds, the lack of adequate information provided to the directors in connection with their approvals of the advisory agreements, and the control of management over the directors in reviewing the fees paid by the Funds are not presumed but, rather, are

important factors recognized in the *Gartenberg* line of cases in determining whether Defendant

has breached its fiduciary duties. In addition, the SEC has specifically recognized that even

disinterested directors may not be independent but, rather, may be subject to domination or

undue influence by a fund's investment adviser.

     48.    Two noteworthy industry insiders have commented on the general failure of

mutual fund boards to fulfill their responsibilities under the ICA. Jack Bogle, founder of the

Vanguard Group, made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of a
> bad joke. They've watched industry fees go up year after year,
> they've added 12b-1 fees. I think they've forgotten, maybe they've
> never been told, that the law, the Investment Company Act, says
> they're required to put the interest of the fund shareholders ahead of
> the interest of the fund adviser. It's simply impossible for me to see
> how they could have ever measured up to that mandate, or are
> measuring up to it.

Warren Buffet, famous investor and chairman of Berkshire Hathaway, Inc., made the following

comment, which was recently quoted by a United States District Court:

> I think independent directors have been anything but independent.
> The Investment Company Act, in 1940, made these provisions for
> independent directors on the theory that they would be the watchdogs
> for all these people pooling their money. The behavior of
> independent directors in aggregate since 1940 has been to rubber
> stamp every deal that's come along from management—whether
> management was good, bad, or indifferent. Not negotiate for fee
> reductions and so on. A long time ago, an attorney said that in
> selecting directors, the management companies were looking for
> Cocker Spaniels and not Dobermans. I'd say they found a lot of
> Cocker Spaniels out there. *Strougo v. BEA Assoc.*, 188 F. Supp.2d
> 373, 383 (S.D.N.Y. 2002) (citation omitted).

Mr. Buffet also stated, in a letter to shareholders in the 2002 Berkshire Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an "independent"
> mutual-fund director will suggest that his fund look at other managers,

even if the incumbent manager has persistently delivered substandard performance. When they are handling their own money, of course, directors will look to alternative advisors – but it never enters their minds to do so when they are acting as fiduciaries for others. . . . Investment company directors have failed as well in negotiating management fees . . . . If you or I were empowered, I can assure you that we could easily negotiate materially lower management fees with the incumbent managers of most mutual funds. And, believe me, if directors were promised a portion of any fee savings they realized, the skies would be filled with falling fees. Under the current system, though, reductions mean nothing to "independent" directors while meaning everything to managers. So guess who wins? . . . [I]n stepping up to [their] all-important responsibilities, tens of thousands of "independent" directors, over more than six decades, have failed miserably. (They've succeeded, however, in taking care of themselves; their fees from serving on multiple boards of a single "family" of funds often run well into six figures.) 2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

49.    As part of their scheme to receive excessive fees, Defendant did not keep the directors fully informed regarding all material facts and aspects of its fees and other compensation, and the directors failed to insist upon adequate information. For example:

a.    On information and belief, Defendant provided virtually no information to the directors regarding the advisory fees charged to pension and other institutional clients or to other mutual funds being advised or sub-advised by Defendant.

b.    On information and belief, Defendant provided virtually no information to the directors regarding the economies of scale enjoyed or fallout benefits received by Defendant.

c.    On information and belief, the profitability data given to the board of directors provide no explanation as to how the board should evaluate economies of scale.

d.    On information and belief, the directors rarely, if ever, question any

19

information or recommendations provided by Defendant.

50.     The foregoing assures that the directors do not understand Defendant's true cost structure and, in particular, the economies of scale enjoyed by Defendant in providing investment advisory services to the Funds and its institutional and other clients.

51.     On information and belief, the disinterested directors of the Funds have not received the benefit of any measures to enhance their ability to act independently, which has caused the directors to be dependent on Defendant and has allowed Defendant to dominate and unduly influence the directors.  In addition, the directors' failure to insist on adequate information evinces a lack of care and conscientiousness on their part.

**COUNT I**
**ICA §36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excessive Investment Advisory Fees)**

52.     Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

53.     The fees charged by Defendant for providing advisory services to the Funds are and continue to be disproportionate to the services rendered and are not within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances, including the advisory fees that Defendant charges its other clients.

54.     In charging and receiving excessive or inappropriate compensation, and in failing to put the interests of Plaintiffs and the other shareholders of the Funds ahead of its own interests, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

55.     Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting

20

from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" the Funds.

**COUNT II**
**ICA § 36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excess Profits from Economies of Scale)**

56.    Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

57.    Defendant has received and continues to receive excess profits attributable to extraordinary economies of scale.

58.    By retaining excess profits derived from economies of scale, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

59.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, the "amount of compensation or payments received from" the Funds.

WHEREFORE, Plaintiffs demand judgment as follows:

a.    An order declaring that Defendant has violated and continues to violate § 36(b) of the ICA and that any advisory agreements entered into are void ab initio;

b.    An order preliminarily and permanently enjoining Defendant from further violations of the ICA;

c.    An order awarding damages against Defendant including all fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statute of limitation through the trial of this case, together with interest, costs, disbursements,

21

attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

    d.        Such other and further relief as may be proper and just.

Dated: 8-16-04

                    By:  s/ Wm. Dirk Vandever
                    Wm. Dirk Vandever, Esq.
                    THE POPHAM LAW FIRM, P.C.
                    323 W. 8th Street
                    Suite 200
                    Kansas City, Missouri  64105
                    (816) 221-2288
                    Fax: (816) 221-3999

                    Guy M. Burns,
                    Jonathan S. Coleman,
                    Becky Ferrell-Anton,
                    JOHNSON, POPE, BOKOR
                    RUPPEL & BURNS, L.L.P.
                    100 North Tampa Street, Ste. 1800
                    Tampa, FL  33602
                    (813) 225-2500
                    Fax:  (813) 223-7118

                    Michael J. Brickman
                    James C. Bradley
                    Nina H. Fields
                    RICHARDSON, PATRICK,
                    WESTBROOK & BRICKMAN, LLC
                    174 East Bay Street
                    Charleston, SC  29401
                    (843) 727-6500
                    Fax: (843) 727-3103

                    *Attorneys for Plaintiffs*