05/23/2002 THU 16:22  [TX/RX NO 5201] ☒045

H/1/02

FILED

02 APR -1 PM 2:

U.S. DISTRICT COURT
SOUTHERN DISTRICT BELL
EAST ST. LOUIS OFFICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

GUY E. MILLER,
RONALD H. BECHERER,
RICHARD AND DOROTHY NELSON,
LOIS CAMPBELL
MONTIE J. HILL, AND
DENNIS D. PRICE,

       Plaintiffs,

v.

MITCHELL HUTCHINS ASSET
MANAGEMENT, INC., ALLIANCE
CAPITAL MANAGEMENT, L.P., and
ALLIANCE FUND DISTRIBUTORS, INC.,

       Defendants.

CASE NO. 01-CV-0192-DRH

---

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Guy E. Miller, Ronald H. Becherer, Richard and Dorothy Nelson, Lois Campbell, Montie J. Hill, and Dennis D. Price sue Defendants, Brinson Advisors, Inc. (formerly known as Mitchell Hutchins Asset Management, Inc.), Alliance Capital Management, L.P., and Alliance Fund Distributors, Inc., and allege:

## I.
## INTRODUCTION

1.    Plaintiffs are shareholders in various open-end registered investment companies (or mutual funds) created, sold, advised, and managed with other funds as part of fund families or complexes by Defendants (collectively the "Funds"). Defendants, as the underwriters, distributors, advisors, and control persons of the Funds, owe fiduciary and other duties to Plaintiffs and all shareholders of the Funds.

05/23/2002 THU 16:22  [TX/RX NO 5201] 图046

2.      Each of the Funds owned by Plaintiffs is a member of a fund complex governed by a common board of directors or trustees (the "Fund Complex" or, where appropriate, the "Alliance Complex," the "Brinson Complex," or the "Fund Complexes").  Within these Fund Complexes, Plaintiffs and other shareholders pay Defendants (a) advisory fees for providing pure investment advice ("Investment Advisory Services") and (b) management fees for administrative services.   These fees are based on a percentage of the net assets of each fund in the Fund Complexes.

3.      The pure Investment Advisory Services Defendants provide to the Fund Complexes are identical to the Investment Advisory Services Defendants provide to other clients, such as institutional clients and other mutual funds, and entail the precise same costs (in fact, the advisors, analysts, research data, physical plant, and other aspects of Defendants' Investment Advisory Services are shared between the mutual funds and the other clients).

4.      In some instances, Defendants charge separate advisory fees for the Investment Advisory Services and the administrative services.   In other instances, Defendants charge a combined fee for the Investment Advisory Services and the administrative services.   In either case, the fees Defendants receive from the Funds for pure Investment Advisory Services are directly comparable to (although considerably higher than) the fees Defendants receive from other clients for the identical services.

5.      Defendants also charge distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders pursuant to distribution plans that Defendants have adopted with respect to the Fund Complexes pursuant to Rule 12b-1, 17 C.F.R. § 270.12b-1 ("Distribution Plans").  The distribution fees are based on a percentage of the net assets of each fund in the Fund Complexes.   Defendants purportedly collect these fees in order to grow or

2

图040                                                  05/23/2002 14:31 FAX 6783775804

05/23/2002 THU 16:22  [TX/RX NO 5201] 041

stabilize the assets of the Funds so that the Funds can benefit from economies of scale through reduced advisory fees.

### Investment Company Act of 1940

6.   In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (the "ICA"). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors such as Defendants. In the 1960s, it became clear to Congress that investment advisors to equity mutual funds were gouging those funds with excessive fees. As a result, § 36(b) was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.

7.   Section 36(b) provides in pertinent part:

[T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person . . . .

8.   Although § 36(b) was enacted to remedy excessive fees charged by equity funds, it is legally applicable to all types of mutual funds. Most cases interpreting § 36(b), including *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982), have (unlike this case) involved money market funds. Money market funds have a completely different cost structure, rendering them incomparable to actively managed funds that invest in

3

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑048

securities, which are held for longer periods of time and fluctuate in value. *See* Securities and Exchange Commission, Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) (the "SEC Report"), at 18 (excluding money market funds from study because of different cost structure) [Ex. 1].

9.    In addition, since *Gartenberg* was decided in 1982, the widespread use of computers (with exponentially greater computing power than those of 20 years ago), the availability of research on the Internet, and the ability of fund advisers to transact business with current and potential shareholders on the Internet has dramatically lowered the costs of providing advisory and distribution services in ways the *Gartenberg* court could not have foreseen nor considered.

10.    In the past decade, the assets managed by Defendants within the Fund Complexes have grown dramatically.

a.    In 1990, the entire Alliance Complex had approximately $4.6 billion in assets under management, and Alliance received 1.01% of those assets, or $46.5 million, in fees. In 2000, the Alliance Fund Complex's assets had soared to over $71 billion (a multiple of 15) while fees jumped to 1.63% of those assets, or almost $1.2 billion (a multiple of 25).

b.    In 1991, the entire Brinson Complex had $262 million in assets under management, and Brinson received 1.14% of those assets, or approximately $3 million, in fees. In 2000, the Brinson Fund Complex's assets had soared to over $7 billion (a multiple of over 28) while fees jumped to 1.29% of those assets, or over $96 million (a multiple of 32).

☑049                                                              05/23/2002 14:31 FAX 6183778804  ☑049

05/23/2002 THU 16:22 [TX/RX NO 5201] 🖾049

11.    While the Funds have grown dramatically in size, the nature of the services rendered by Defendants have changed little, if at all.  Meanwhile, the distribution and advisory fees paid to Defendants have grown dramatically.  In addition, Defendants have become even more profitable because of previously unthinkable advances in technology.  As a result, the advisory fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) are disproportionately large in relationship to the services rendered to Plaintiffs.

12.    The gross disproportionality of the fees paid to Defendants is also demonstrated by a comparison of the fees they receive from other clients (including other mutual funds) for the same services.  In some cases Defendants charge the Funds fees at a rate 500% (and more) greater than that charged to these other clients.  In particular, Defendants charge these other clients as little as 11 basis points (.11%) for the identical services for which Plaintiffs are charged between 50 and 93 basis points (.50% and .93%).  [Further allegations regarding comparative fees are set forth *infra* at ¶¶ 65 to 81.]

13.    In addition, Defendants, in violation of their fiduciary duties to Plaintiffs, have retained excess profits resulting from economies of scale.  These economies of scale are a product of the dramatic growth in assets managed by Defendants, caused in part by marketing programs paid for with the distribution fees charged to Plaintiffs and in part by Defendants' ability to provide the identical Investment Advisory Services they provide Plaintiffs to other clients at little or no additional cost.  The excess profits resulting from these economies of scale belong to Plaintiffs and the other shareholders of the Funds.

14.    The existence of economies of scale has been recently confirmed by both the Securities and Exchange Commission (the "SEC") and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that

🖾049                                                    05/23/2002 14:31 FAX 6182779804

05/23/2002 THU 16:22  [TX/RX NO 5201]

economies of scale exist in the provision of Investment Advisory Services. *See* SEC Report at

30-31 [Ex. 1]; Governmental Accounting Office, Report on Mutual Fund Fees to the Chairman,

Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on

Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Ex. 2]. In addition, the

most significant academic research undertaken since the Wharton School study in the 1960s

establishes the existence of economies of scale that are not being passed along to mutual fund

shareholders in violation of Defendants' duty to do so under § 36(b) and Rule 12b-1. *See* John P.

Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26

J. Corp. L. 610 (2001) (the "Freeman & Brown Study") [Ex. 3]. [Further allegations regarding

economies of scale are set forth *infra* at ¶¶ 57 to 64.]

15.     The fees paid to Defendants are technically approved by the Funds' boards of

directors. A majority of the Funds' boards are comprised of statutorily presumed "disinterested"

directors as that term is defined in § 10 of the ICA. Regardless of whether these presumably

"disinterested" directors meet the requirements of § 10 of the ICA, there is a lack of

conscientiousness by the directors in reviewing the advisory and distribution fees paid by each of

the Funds. In addition, even if statutorily disinterested, the directors are in all practical respects

dominated and unduly influenced by Defendants in reviewing the fees paid by Plaintiffs and

other shareholders of the Funds. In particular, Defendants do not provide the directors with

sufficient information for the directors to fulfill their obligations, a factor supporting a finding

that Defendants have breached their fiduciary duties.    [Further allegations regarding the

independence and conscientiousness of the directors are set forth *infra* at ¶¶ 88 to 98.]

16.     Although the fees challenged may appear to the Court to be very small on a

shareholder-by-shareholder basis, *see Gartenberg*, 694 F.2d at 929, they cause a dramatic

6

05/23/2002 THU 16:22  [TX/RX NO 5201] @051

decrease in Plaintiffs' investment returns over time.  Arthur Levitt, the immediate past Chairman

of the SEC, was critical of what he called the "tyranny of compounding high costs:"

> Instinct tells me that many investors would be shocked to know how seemingly
> small fees can, over time, create such drastic erosion in returns.  … In the years
> ahead, what will mutual fund investors say if they realize too late their returns
> have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at

Fordham University School of Law (Nov. 3, 2000), *in* 6 Fordham J. Corp. & Fin. L. 261, 267

(2001).

    17.    In this action, Plaintiffs seek to rescind advisory agreements and distribution plans

and to recover the total fees charged by Defendants or alternatively to recover the excess profits

resulting from economies of scale wrongfully retained by Defendants and to recover other

excessive compensation received by Defendants in breach of their fiduciary duty under the ICA

§ 36(b), 15 U.S.C. § 80a-35(b).

### Rule 12b-1 Distribution Plans

    18.    Defendants charge Plaintiffs and other shareholders distribution fees to promote

the sale of fund shares *to new shareholders*.  Prior to 1980, the use of shareholder funds to sell

new fund shares was prohibited.  The SEC had historically been reluctant to allow fund advisers

to charge their shareholders for selling shares to others:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the
> investors who purchase them and thus presumably receive the benefits of the
> investment, and not, even in part, by the existing shareholders of the fund who
> often derive little or no benefit from the sale of new shares.

*Statement on the Future Structure of the Securities Markets*, [Feb. 1972] Sec. Reg. & L. Rep.

(BNA) No. 137 pt. II, at 7.

05/23/2002 THU 16:22  [TX/RX NO 5201] @052

19.     After intense lobbying by the mutual fund industry (including PaineWebber, Brinson's predecessor), the Commission agreed to consider modifying its objections to allow current fund shareholders to pay distribution expenses.  In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued (correctly) that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

20.     Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in advisory fees and other expenses, the Commission tentatively approved Rule 12b-1, 17 C.F.R. § 270.12b-1.  However, numerous conditions were attached to the use of shareholder funds to pay distribution expenses.  For example, the Commission wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan."  *Meyer v. Oppenheimer Management Corporation*, 895 F.2d 861, 866 (2d Cir. 1990).  Unfortunately, that is precisely what Defendants have done: extracted additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to acquire new shareholders so that these new shareholders could pay additional advisory fees to Defendants.

21.     Defendants have adopted 12b-1 Distribution Plans for all of the Funds in the Fund Complexes.  These Distribution Plans must be reviewed annually by the Funds' directors.  In particular, the directors must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued."  17 C.F.R. § 270.12b-1(d).  In addition, minutes must be maintained to record all aspects of the directors' deliberation, and the directors must conclude "in light of their fiduciary duties under

8

06/23/2002 14:32 FAX 6193277880↓

05/23/2002 THU 16:22 [TX/RX NO 5201] ☐053

state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

22.     Despite the dramatic growth in assets managed by Defendants (see, *supra*, ¶ 10), both the advisory and distribution fees charged by Defendants have grown.  For example, the distribution fees paid by the PaineWebber Growth & Income Fund to Brinson increased from $3,232,266 in fiscal 1995 to $6,023,712 in fiscal 2000, while the advisory fee per share, rather than decreasing as it should have, increased from $0.14 per share in fiscal 1995 to $0.23 per share in fiscal 2000 (an increase of 64%).  The distribution fees paid by the Alliance Premier Growth Fund to Alliance Distributors increased from $1,950,049 in fiscal 1995 to $153,450,405 in fiscal 2000, while the advisory fee per share, rather than decreasing as it should have, increased from $0.12 per share in fiscal 1995 to $0.33 per share in fiscal 2000 (an increase of 175%).

23.     Accordingly, the Distribution Plans have produced no economies-of-scale benefits to the shareholders of the Funds.  Rather, the Distribution Plans have served only Defendants, just as the Commission feared when it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted," *Bearing of Distribution Expenses by Mutual Funds*, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).  As such, the Distribution Plans violate the intent and purpose of Rule 12b-1, and are entirely a waste of fund assets.

24.     Most (if not all) of the Funds in both the Brinson Complex and the Alliance Complex issue a class of institutional shares which are *excluded* from the burden of paying *any*

05/23/2002 THU 16:22  [TX/RX NO 5201] @054

12b-1 distribution fees, thereby demonstrating that the Distribution Plans are unnecessary and are only in place to gouge the retail mutual fund investors.

25.    In addition to failing to benefit Plaintiffs and other shareholders, the Distribution Plans have extracted additional compensation for advisory services to Defendants, thereby resulting in excessive fees paid to them.  For example, the distribution fees are based on the net asset value of the Funds and not on distribution activity, if any, by Defendants, such as number of shares sold.  Consequently, a significant portions of the fees paid to Defendants are derived from market increases in the net asset value of the fund, independent of any distribution activity by Defendants.  By way of example, the Dow Jones Industrial Average (the "Dow") rose form 2753 in 1990 to 11,497 by the end of 1999, an event that quadrupled asset-based fees with no additional work by or cost to Defendants.

26.    Despite the fact that Plaintiffs and the other Fund shareholders have enjoyed no benefits from the Distribution Plans, even though they contributed to the growth of fund assets by paying distribution fees, and despite the fact that the Distribution Plans have allowed Defendants to extract additional and excessive compensation from Plaintiffs and the other shareholders of the Funds, the directors of the Fund Complexes have continued to approve, year after year, continuation of the Distribution Plans in violation of both Rule 12b-1 and § 36(b). [Further allegations regarding the independence and conscientiousness of the directors are set forth *infra* at ¶¶ 88 to 98.]  Plaintiffs are entitled to recover the distribution fees they have paid to Defendants.

## II.
## PARTIES

27.    Plaintiff Guy E. Miller ("Miller") is a resident of O'Fallon, Illinois, and a shareholder at all relevant times of the PaineWebber PACE Large Company Value Equity

10

05/23/2002 THU 16:22  [TX/RX NO 5201] ☐055

Investments Fund (formerly known as the PaineWebber Growth and Income Fund) (the "PACE Fund"). The PACE Fund is a registered investment company under the Investment Company Act of 1940, and is a series of the PaineWebber PACE Select Advisors Trust (the "PACE Select Advisors Trust"), a Delaware business trust.

28.     Plaintiffs Richard and Dorothy Nelson ("Nelsons") are residents of Caseyville, Illinois, and shareholders of the Brinson Strategy Fund (formerly known as the PaineWebber Strategy Fund) (the "Brinson Strategy Fund"). The Brinson Strategy Fund is a registered investment company under the Investment Company Act of 1940 and a Massachusetts business trust.

29.     Plaintiff Lois Campbell ("Campbell") is a resident of Gaithersburg, Maryland, and a shareholder of the Brinson Tactical Allocation Fund (formerly known as the PaineWebber Tactical Allocation Fund) (the "Brinson Tactical Allocation Fund"). The Brinson Tactical Allocation Fund is a registered investment company under the Investment Company Act of 1940 and a Massachusetts business trust.

30.     Defendant Brinson Advisors, Inc. (formerly known as Mitchell Hutchins Asset Management, Inc.) ("Brinson") is a Delaware corporation and an Illinois licensed broker-dealer. Brinson is also registered as an investment adviser under the Investment Advisers Act of 1940 and is the investment adviser to, and distributor and principal underwriter of, the PACE Fund, the Brinson Strategy Fund, the Brinson Tactical Allocation Fund, and other Funds in the Brinson Complex.

31.     The PACE Fund, the Brinson Strategy Fund, and the Brinson Tactical Allocation Fund are all part of the Brinson Complex, a family of mutual funds advised and distributed by Brinson and governed by a common board of trustees or directors.

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑056

32.    Plaintiff Ronald H. Becherer ("Becherer") is a resident of New Athens, Illinois, and a shareholder of the Alliance Premier Growth Fund, Inc. (the "Alliance Premier Growth Fund").  The Alliance Premier Growth Fund is a registered investment company under the Investment Company Act of 1940 and a Maryland corporation.

33.    Plaintiff Montie J. Hill ("Hill") is a resident of O'Fallon, Illinois, and a shareholder of the Alliance Growth and Income Fund, Inc. (the "Alliance Growth and Income Fund").  The Alliance Growth and Income Fund is a registered investment company under the Investment Company Act of 1940 and a Maryland corporation.

34.    Plaintiff Dennis D. Price ("Price") is a resident of Troy, Illinois, and a shareholder of the Alliance Quasar Fund, Inc. (the "Alliance Quasar Fund").  The Alliance Quasar Fund is a registered investment company under the Investment Company Act of 1940 and a Maryland corporation.

35.    Defendant Alliance Capital Management, L.P. ("Alliance Capital" or, where appropriate "Alliance") is a corporation organized under the laws of the State of Delaware. Alliance Capital is registered as an investment adviser under the Investment Advisers Act of 1940 and advises the Alliance Premier Growth Fund, the Alliance Growth and Income Fund, the Alliance Quasar Fund, and other Funds in the Alliance Complex.

36.    Defendant Alliance Fund Distributors, Inc. ("Alliance Distributors" or, where appropriate and collectively with Alliance Capital, "Alliance") is a Delaware corporation, an Illinois licensed broker-dealer and is a wholly-owned subsidiary of Alliance Capital.  Alliance Distributors is the distributor and principal underwriter of the Alliance Premier Growth Fund, the Alliance Growth and Income Fund, the Alliance Quasar Fund, and other Funds in the Alliance Complex.

05/23/2002 THU 16:22 [TX/RX NO 5201] ☑057

37.     The Alliance Premier Growth Fund, the Alliance Growth and Income Fund, and the Alliance Quasar Fund are all part of the Alliance Complex, a family of mutual funds advised and distributed by Alliance and governed by a common board of trustees or directors.

## III.
## JURISDICTION AND VENUE

38.     This action is brought pursuant to §§ 36(b) and 12(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. §§ 80a-35(b) and 80a-12(b).

39.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

40.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3).   Defendants are inhabitants of or transact business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendants may be found in this district.

41.     All conditions precedent have been performed or have occurred.

## IV.
## GENERAL ALLEGATIONS

### The *Gartenberg* Test

42.     As set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) (decided long before today's computer and internet capabilities existed and before the in-depth studies by the GAO and SEC), the test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances."   *Id.* at 928.   In order to violate § 36(b), "the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable

05/23/2002 THU 16:22  [TX/RX NO 5201] ⑤ 058

relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.*

43.    In applying this test, all pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b).    The *Gartenberg* court, and this Court, have specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered.  A review of these factors, and the facts in this case, demonstrates that the fees charged by Defendants to the Fund Complexes violate § 36(b):

   **(1)  The Nature and Quality of the Services Provided to the Fund Shareholders**

44.    The ***nature*** of the Investment Advisory Services provided to Plaintiffs is straightforward:  Defendants buy and sell, at their discretion, stocks, bonds, and other securities for the Funds.  This is precisely the same service provided to Defendants' institutional clients (albeit at a dramatically lower cost).  The materials provided by Defendants to the Fund board members establish that the nature of these services has remained unchanged despite dramatic growth in underlying assets and advisory revenues.

45.    The ***quality*** of the Investment Advisory Services provided to the Funds by Defendants is also precisely the same (because the services are the same) as the quality of the Investment Advisory Services provided to Defendants' institutional clients.  The Funds receive no more, and no less, from Defendants than Defendants' institutional clients.    However, Plaintiffs pay Defendants dramatically higher fees because these fees are not negotiated at arm's length as they are with institutional clients.

14

05/23/2002 THU 16:22 [TX/RX NO 5201] ☑059

46.    The quality of Defendants' Investment Advisory Services has, in recent years, been lackluster at best.  However, the quality (or lack thereof) of the services has not been considered by the boards of directors of the Funds in setting the fees for the services.

47.    For example, over the last three years the Alliance Premier Growth Fund is in the 80th performance percentile of all domestic large cap growth funds; the Alliance Quasar Fund is in the 92nd performance percentile of all domestic small cap growth funds; and the Alliance Growth and Income Fund is in the 12th performance percentile (although it has recently fallen to the 27th performance percentile for the last 12 months).  In spite of these results, no merits based advisory fee reduction has been demanded or approved by the Alliance Complex's board of directors; and no fee adjustment distinction has been drawn between the better performing Growth and Income Fund and its disastrous sister funds, proving that quality is a non-factor in the board's fee decisions.

48.    Furthermore, while Alliance, in some instances, charges its mutual funds advisory fees at a rate as much as 6-7 times (or more) than its institutional clients, a review of Alliance's 2000 10K annual report shows that in the aggregate, advisory fees to mutual funds average – across the board in all categories – 2.1 to 3.3 times more than the arm's-length fees negotiated with Alliance's institutional clients.

49.    As for Brinson, the quality of the Investment Advisory Services it provided to the Brinson Complex was so bad that Brinson (*not* the Fund Complex's presumptively disinterested directors) determined that it was no longer fit to provide Investment Advisory Services to the Brinson Complex.  Instead, Brinson retained subadvisors.  As reflected in the minutes of the October 6, 2000 board meeting for the Brinson Complex, Brinson contracted with sub-advisors and agreed to pay them significantly lower advisory fees than those Brinson had previously

15

charged to manage their own funds. *See* Minutes of the Brinson Board Meeting on Oct. 6, 2000 (BA 01448-01576) [Ex. 13-L].

50.    Thus, the *nature* of the services rendered by Brinson changed dramatically in October 2000 when Brinson began to employ sub-advisers. Instead of continuing to provide its admittedly inferior Investment Advisory Services, Brinson now purportedly "provides portfolio management oversight principally by performing initial reviews of prospective sub-advisers and supervising and monitoring the performance of those sub-advisers." *See* PaineWebber Growth and Income Fund and PACE Large Company Value Equity Fund Combined Proxy Statement and Prospectus (Dec. 27, 2000) ("PaineWebber/PACE Combined Proxy & Prospectus"), at Q&A Section (BA 00765-00768), 20 (BA 00793) [Ex. 14].

51.    For example, Brinson hired three sub-advisers for the PACE Fund:  State Street Global Advisers (for 50% of the PACE Fund's assets), Institutional Capital Corporation (for 25% of the PACE Fund's assets) and Westwood Management Corporation (for 25% of the PACE Fund's assets).  State Street, ICAP, and Westwood receive sub-advisory fees equal to .15, .30% and .30%, respectively, of the net value of assets each subadvisor manages. Despite having sub-contracted its sub-advisory duties due to its own admittedly poor performance, Brinson still charges the fund the same .80% advisory fee, .60% of which is for pure Investment Advisory Services.  *See* Rule 30(b)(6) Dep. of Paul Schubert, Jan. 30, 2002 ("Schubert Dep."), at 117 [Ex. 4].  Brinson simply retains the amount of the fee not paid to the sub-advisers.  Therefore, Brinson receives .475% of the net asset value of the PACE Fund, more than *twice* the total fee paid to the sub-advisors who are actually managing the money, for merely choosing the sub-advisers and then "supervising" and "monitoring" them, which in reality amounts to virtually no services at all.

16

05/23/2002 THU 16:22 [TX/RX NO 5201] ☑061

52.     As a result of the restructuring, Brinson was able to discontinue some of the services it had previously provided to shareholders.  For instance, it closed its internal equity research program and no longer performs those services.  In breach of its duty to disclose, Brinson did not inform the Board members whether closing the equity research department resulted in any cost savings that should have been taken into account when the advisory fees were approved.  *See* Rule 30(b)(6) Dep. of Amy Doberman, Jan. 29, 2002 ("Doberman Dep."), at 157-59 [Ex. 5].  Brinson was also able to reduce by *half* the number of employees it had originally assigned to supervise and monitor its subadvisors but, again, this was not disclosed by Brinson to the Fund Complex board.  Doberman Dep. at 55-56 [Ex. 5].

53.     The Brinson Strategy Fund, the Brinson Tactical Allocation Fund, and other index funds within the Brinson Complex receive Investment Advisory Services of a totally different nature and quality.  These funds are index funds and, according to the SEC, index funds are typically managed for 45 basis points less than actively managed funds.  SEC Report at 31 ("[T]he operating expense ratio of an index fund was 45 basis points lower than an equivalent fund that was not an index fund.") [Ex. 1].  This is because "[w]hen a portfolio/fund is passively managed, there is no stock picking (active management) involved. ... An indexed portfolio is much simpler to manage than an actively managed portfolio.  The securities in the portfolio are fixed (except when changed by the index sponsor), and the manager's job is to minimize the tracking error with the index. ... Thus, little if any creativity is called for and personnel costs are kept to a minimum.  For these reasons, investment advisory fees for passive management are typically much lower than for active management."  Freeman & Brown Study at 639 [Ex. 3].

54.     Although the manager of an index fund should be paid far less than managers of active funds because of the nature and quality of the reduced services provided, Brinson violated

05/23/2002 THU 16:22 [TX/RX NO 5201] ☒062

its fiduciary duty by charging the *same* excessive fee it charged to actively managed funds and by failing to disclose that fact to the Brinson Complex board and the fund shareholders.

### (2) The Profitability of the Fund to the Adviser-Manager

55.    *Gartenberg* "demand[s] that the 'profitability of the fund to the adviser' be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'" Freeman & Brown Study at 661 [Ex. 3]. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services. Both the incremental and full costs of the services provided by Defendants to the Funds demonstrate the disproportionate and excessive profits Defendants receive for these services. A review of Defendants' incremental costs of providing advisory services to Plaintiffs demonstrates that the incremental costs are nominal while the additional fees received by Defendants are hugely disproportionate given that the nature, quality, and level of the services remain the same. In addition, a review of Defendants' full costs of providing advisory services, based on the financial information available to Plaintiffs (with virtually no discovery from Alliance and very limited discovery from Brinson), also demonstrates the enormous profitability to Defendants of managing the Funds, even given the questionable assumptions underlying the allocation of costs made by Defendants. *See* Schubert Dep. at 35, 40-42, 141 (showing that the one person responsible for allocating costs amongst the Funds has relocated to Zurich, Switzerland, leaving no written procedures or manuals or any identified person to allocate this past year's costs) [Ex. 4].

56.    In addition, as discussed below under "comparative fee structures" (*infra* at ¶¶ 65 to 81), Defendants have entered into advisory agreements with other mutual funds and institutional clients where Defendants have agreed to accept fees as low as 11 basis points

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑063

(.11%).  *See* Investment Advisory Agreement between Alliance Capital and Vanguard World Funds (June 22, 2001) [Ex. 15]; Vanguard U.S. Growth Fund Prospectus (Dec. 28, 2001) [Ex. 10].  This compares with 74 basis points (.74%) for the average fund in the Alliance Complex and 61 basis points (.61%) for the average fund in the Brinson Complex.  Because Defendants would not agree to provide advisory services for a fee of 11 basis points (.11%) if it were not profitable to do so, the immense profitability to Defendants of a fund paying six or seven times what other clients pay for the same services is self evident.

### (3)  Economies of Scale in Operating the Fund as it Grows Larger

57.    Courts and the SEC have uniformly stated that there are significant economies of scale benefiting mutual fund investment advisors.  *See Migdal v. Rowe Price Fleming Int'l, Inc.,* 248 F.3d 321, 326-27 (4th Cir. 2001).  These economies of scale exist not only fund by fund but, as Brinson admits, also exist with respect to the entire Fund Complexes and even with respect to an investment advisor's entire scope of operations, including services provided to institutional clients.  *See* Doberman Dep. at 86, 161-64 [Ex. 5].  Brinson's former general counsel, Victoria Schonfeld, also noted that mutual funds provide economies of scale.  *See* Freeman & Brown Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund,* 49 Bus. Law 107 (1993)) [Ex. 3].

58.    The clearest example of economies of scale is when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering).  In such instances, as Brinson admits and the GAO confirms, it is possible for the advisor to service the additional assets with *zero* additional costs.  *See* Schubert Dep. at 196-97 [Ex. 4]; GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by costs) [Ex. 2].  In other words, an investment advisor can

05/23/2002 THU 16:22 [TX/RX NO 5201] 064

advise a fund that doubles in size purely because of market forces with *no* increased costs because the services are unchanged. This fact is extremely important given that the bulk of recent growth in the mutual fund industry has come from portfolio appreciation. GAO Report at 9 [Ex. 2]. Accordingly, investment advisors have benefited by garnering "increased fees from the general increase in market prices with no commensurate efforts on their part." Freeman & Brown Study at 619 n.43 [Ex. 3].

59.    The foregoing is illustrated by reviewing the performance of the stock market during the decade of the 1990s. On January 1, 1990, the Dow was at 2753. When the decade closed on December 31, 1999, the Dow was at 11,497 (more than a four-fold increase). If a mutual fund merely held the stocks that comprise the Dow, and did nothing, its fees would have quadrupled.

60.    The Freeman & Brown Study also found that economies of scale exist in connection with advisory fees: "The existence of economies of scale has been admitted in SEC filings made by fund managers and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase. Fund industry investment managers are prone to cite economies of scale as justification for business combinations." Freeman & Brown Study at 620 [Ex. 3]. Moreover, "[t]he GAO's investigators recently found a general consensus that fund operations benefit from economies of scale, as well as strong evidence that economies of scale should exist." Freeman & Brown Study at 621 (also noting that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities, which, unlike growth from share sales to new investors, is *costless* ) [Ex. 3].

61.    Brinson has explicitly relied on economies of scale to justify merging funds to the directors and shareholders of those funds.    *See* Doberman Dep. at 193, 207-08 [Ex. 5];

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑065

PaineWebber/PACE Combined Proxy & Prospectus at Q&A Section (BA 00765), 19 (BA 00792) [Ex. 14].

62.     A review of Alliance's financial statements contained in its year 2000 Annual Report as filed with the SEC are illustrative of the economies of scale at work in its advisory business. The statements show:

a)  From 1996 through 2000, Alliance's institutional assets grew from approximately $120 billion to about $258 billion – a 20.4% growth rate.

b)  During this period, revenues from institutional advisory services grew from $271 million in 1996 to $541 million in 2000 – a growth rate of 18.8% – which demonstrates that economies of scale are being passed on to institutional clients.

c)  Mutual fund assets under management also grew at a fast rate.  Domestic mutual fund assets grew from $609 million in 1996 to $157 billion in 2000 – a growth rate of 18.1%

d)  This phenomenal growth rate in mutual fund assets not only produced *no* economies of scale for Alliance's retail mutual fund customers, fees actually *increased faster* than the growth in assets.  Fees went from $485 million in 1996 to $1.7 billion in 2000 – a growth rate of 36.8% – making a mockery of the concept of economies of scale. *See* Annual Report of Alliance Capital Management, L.P., for Fiscal Year 2000 on Form 10-K ("Alliance 2000 Annual Report") [Ex. 11].

63.     The advisory fees Alliance Capital charges other mutual funds further evidence the existence of economies of scale and also demonstrate that the advisory fee it charges the Alliance Premier Growth Fund is excessive.  For example, Alliance Capital sub-advises a fund in the Brinson Complex, the PACE Large Company Growth Equity Investments (the "PACE

05/23/2002 THU 16:22  [TX/RX NO 5201] ☒ 066

Growth Fund"), which has approximately $440 million in net assets.  Pursuant to Alliance Capital's contract with Brinson, Alliance Capital provides all necessary advisory services to 60% of the net assets of the PACE Growth Fund for an advisory fee of only 30 basis points (.30%). Alliance provides the same advisory services to the entire Alliance Premier Growth Fund for a fee of 93 basis points (.93%).  That is, for its advisory services to only $264 million in net assets of the PACE Growth Fund, Alliance Capital charges 30 basis points (.30%), but for its advisory services to $17.5 *billion* in net assets of the Alliance Premier Growth Fund, Alliance Capital charges an advisory fee of 93 basis points (.93%), a rate more than three times greater than it profitably charges the smaller and less efficient PACE Growth Fund.  The vast disparity between these rates demonstrates that the economies of scale achieved with asset growth are not factored into the advisory fees charged by Alliance Capital to Plaintiffs and, as a result, the advisory fees are disproportionate to the services rendered and are excessive.

64.    The economies of scale enjoyed by Defendants with respect to the Fund Complexes at issue in this case have not been shared with Plaintiffs as required by § 36(b) and Rule 12b-1.  *See Migdal*, 248 F.3d at 327.  As a result, the fees paid to Defendants for advisory services provided to the Funds are grossly disproportionate to those services, are excessive, and violate § 36(b).

### (4)  Comparative Fee Structures

65.    The Freeman & Brown Study noted: "None of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower."  Freeman & Brown Study at 653 [Ex. 3]. While a "manager may encounter different levels of fixed and variable research costs depending

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑067

on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds.  The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." Freeman & Brown Study at 627-28 [Ex. 3].  The "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds."  Freeman & Brown Study at 671-72 [Ex. 3].

66.    A number of relevant comparative fee structures (including Defendants' sub-advisory relationships) clearly establish that Defendants are charging advisory fees to the Funds in the Fund Complexes that are disproportionate to the value of the services rendered.

67.    For example, Alliance serves as sub-advisor to the PACE Growth Fund.  Alliance manages 60% of the assets of the PACE Growth Fund for an advisory fee of 30 basis points (.30%) of those assets (contrasted with 93 basis points (.93%) for its own growth fund, the Alliance Premier Growth Fund (see ¶ 63)).  The total advisory fee charged to the shareholders of the PACE Growth Fund by Brinson with respect to those same assets, however, is 80 basis points (.80%), with Brinson retaining the .50% override (see ¶ 51).

68.    Alliance also provides advisory services to the Vanguard U.S. Growth Fund (like the Alliance Premier Growth Fund, a large cap growth fund).  Vanguard, unlike Brinson, does not retain an "override" portion of the advisory fee.  See Investment Advisory Agreement between Alliance Capital and Vanguard World Funds (June 22, 2001) [Ex. 15].  The following table sets forth the advisory fee schedules for the Vanguard U.S. Growth Fund and the Alliance Premier Growth Fund:

| VANGUARD U.S. GROWTH FUND | | ALLIANCE PREM. GROWTH FUND | |
|---|---|---|---|
| Net Assets | Fee Rate | Net Assets | Fee Rate |
| First $300 million | .32% | | |
| Next $700 million | .20% | First $5 billion | 1.00% |
| Next $1 billion | .15% | Next $2.5 billion | .95% |
| Next $18 billion | .12% | Next $2.5 billion | .90% |
| Over $20 billion | .10% | Over $10 billion | .85% |

69.    For the fiscal year ended August 31, 2001, the advisory fees paid by the Vanguard U.S. Growth Fund shareholders to Alliance represented an effective annual rate of only 11 basis points (.11%) of the fund's average net assets.  *See* Prospectus for Vanguard U.S. Growth Fund (Dec. 28, 2001) [Ex. 10].  Shockingly, this advisory fee is *82 basis points lower* than the effective advisory fee charged by Alliance (.93%) for providing the exact same services to its own shareholders in the Alliance Premier Growth Fund.

70.    Defendants also provide advisory services to institutional clients for substantially lower fees.  The Freeman & Brown Study explains: "Strong analogies . . . can be drawn between equity advisory services in the fund industry as compared to the pension field where prices are notably lower." Freeman & Brown Study at 653 [Ex. 3].  "[A] mutual fund, as an entity, actually *is an* institutional investor.  When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." Freeman & Brown Study at 629 n. 93 [Ex. 3].

71.    Alliance Capital manages equity portfolios for the following institutional clients for the following advisory fees:

     a.    Alliance manages a $672 million large cap equity portfolio for the Kentucky Retirement System for 24 basis points;

     b.    Alliance manages a $1.7 billion active equities portfolio for the Minnesota State Board of Investment for 20 basis points;

     c.    Alliance managed until December 2001 a $4.8 billion portfolio for the Florida Retirement System for 15.3 basis points with a breakpoint at $100 million (the contract provides for 30 basis points for the first $100 million and 15 basis points thereafter);

     d.    Alliance managed a $4.86 million large cap growth fund for the Nevada Public Employees Retirement System for 22 basis points with a breakpoint at $100 million (30 basis points for the first $100 million and 20 basis points on the balance);

     e.    Alliance managed a $764 million large cap growth equity portfolio for the Oregon Retirement System for 20 basis points;

     f.    Alliance managed a $730 million large cap growth equities portfolio for the Missouri Retirement System for 18.5 basis points; and

     g.    Alliance managed a $975 million large cap growth equity portfolio for the Wyoming Retirement System for 10 basis points.

72.    Although some courts have stated (without explanation or analysis) that advising an institutional client is different than advising a mutual fund, Alliance admits that the Investment Advisory Services it provides to the Alliance Premier Growth Fund and those to its institutional clients are the same.  Alliance Capital's Annual Report states: "The assets of the Alliance Mutual Funds *are managed by the same investment professionals* who manage Alliance Capital's accounts of institutional investors and high net-worth individuals." Alliance 2000

05/23/2002 THU 16:22 [TX/RX NO 5201] ☐070

Annual Report at 10 (emphasis added) [Ex. 11].  In addition, the prospectus for the Alliance Stock Funds states:

> These [institutional] accounts have substantially the same investment objectives and policies and are managed in accordance with essentially the same investment strategies and techniques as those for Alliance Premier Growth Fund . . . [with] a nearly identical composition of investment holdings and related percentage weightings.

Alliance Stock Funds Prospectus (Feb. 1, 2002) at 46 [Ex. 6].

73.    In particular, the Alliance Premier Growth Fund is managed by Mr. Alfred Harrison.  Mr. Harrison is also the named portfolio manager for several large pension funds, including the Florida State Board of Administration.  The Florida pension fund was about $5 billion in size at the beginning of the year 2000.  The mutual fund and pension funds, including Florida's pension fund, have similar investment objectives and have virtually the identical stocks in their portfolios.

74.    Even though the Alliance Premier Growth Fund and the Florida pension fund have the same portfolio manager, the same investment objectives and identical, or nearly identical, portfolios, they have dramatically different fee schedules.  The fee schedule for the Florida pension fund is 30 basis point (.30%) for the first $100 million and 15 basis points (.15%) for assets over $100 million.  Compare this fee schedule to that of the Alliance Premier Growth Fund set forth above in ¶ 68, which begins at 100 basis points (1.00%) and levels off at 85 basis points (.85%) for assets over $10 *billion*.

75.    The fee schedule for the Alliance Premier Growth Fund was approved by the fund Board of Directors with no consideration of other investment advisors or competitive forces.  Yet Alliance was providing identical investment advisory services to pension funds at roughly one-

05/23/2002 THU 16:22  [TX/RX NO 5201] @071

sixth the price. As an illustration, consider the following table, which shows annual fees charged at different asset levels for both the Florida pension fund and the Alliance Premier Growth Fund.

| Assets Under Management ($ millions) | Weighted Average Investment Advisory Fee | |
|---|---|---|
| | Florida Pension Fund | Alliance Prem. Gr. Fund |
| $100 | 0.300% | 1.000% |
| $1,000 | 0.165% | 1.000% |
| $2,500 | 0.156% | 1.000% |
| $5,000 | 0.153% | 1.000% |
| $7,500 | 0.152% | 0.983% |
| $10,000 | 0.152% | 0.962% |
| $12,000 | 0.151% | 0.944% |
| $12,500 | 0.151% | 0.940% |
| $15,000 | 0.151% | 0.925% |

76.    At $5 billion in assets (Florida's year 2000 portfolio size) the pension fund pays about 16.5 basis points per year. The mutual fund, having just reached the first breakpoint at $5 billion, pays 100 basis points per year, or a $50,000,000 advisory fee on the first $5 billion in assets — a multiple of 6.5 times what Florida pays. Similarly, if the Florida portfolio were as large as the Premier Growth fund ($18 billion in 2000) it would pay annual investment advisory fees of 15.1 basis point where the mutual fund paid 93 basis points, a multiple of 6.2 times the Florida fee.

77.    Although Brinson's breach of fiduciary duty has been continuous, the funds in the Brinson Complex must be considered separately before and after the reorganization that occurred in October 2000 because the nature and quality of Brinson's services changed. Prior to October 2000, the performance of the funds in the Brinson Complex was consistently below industry averages. The board of directors for the Brinson Complex apparently was not concerned with the quality of services being provided by Brinson, but Brinson itself recognized that its services

05/23/2002 THU 16:22  [TX/RX NO 5201] ☐072

were inadequate and that a replacement investment advisor was essential to the potential future health and success of the funds in the Brinson Complex.  Nonetheless, Brinson continues to charge the PACE Fund the same advisory fee today despite the fact that Brinson fired itself and then entered into contracts with subadvisors (including Alliance) where significantly lower fees were negotiated — in sharp contrast to the Funds — at arm's length.  The monetary difference between the fees charged to the Funds (and Plaintiffs) and the sub-advisory fees is retained by Brinson.  The amount which Brinson retains is greater than the amount paid to the sub-advisors who actually do the advisory work.

78.    Similarly, the Brinson Strategy Fund charges 75 basis points (.75%) for managing a pure index fund while State Street Bank provides enhanced index advisory services to the PACE Fund *for only 15 basis points (.15%)*.  Incredibly, despite the simple and mechanical formula for stock selection in an index fund (see, *supra*, ¶ 53), and despite the fact that those selections are made available to the public free of charge prior to any purchase or sale in the Brinson Strategy Fund, Brinson charges an arbitrary and exorbitant fee five times greater than that charged by State Street.  Astonishingly, the board of directors approved the fee for the Brinson Strategy Fund without asking a single question about how the fee was determined, the nature or quality of services that would be provided to the Brinson Strategy Fund, whether breakpoints were appropriate, or *any other factor* to be considered in evaluating the fairness of the advisory fee and, in particular, whether it may have been the product of arm's length bargaining.

79.    Brinson also provides advisory services to customers of UBS PaineWebber, its affiliated broker-dealer.  In what is known as the Access Program, Brinson provides advisory services for .35% of the first $100 million in aggregate customer accounts referred to it by

PaineWebber and, recognizing the existence of economies of scale, .25% of any amount in excess of $100 million. *See* Doberman Dep. at 238 [Ex. 5]. Brinson's willingness to manage assets owned by thousands of PaineWebber clients for 25 basis points (.25%) was not disclosed by Brinson to the Brinson Complex board and evidences how disproportionate the fees it charges to its retail mutual fund clients are compared with the fees it charges for the same advisory services to other customers.

80.    Like Alliance, Brinson and its affiliates, including Brinson Partners, manage equity portfolios for institutional clients at far lower costs. For example, Brinson Partners manages the following portfolios:

a.    Brinson Partners manages a small $343 million equity portfolio for the Kansas Public Employees Retirement System for 27.2 basis points with a breakpoint at $5 million (the fee schedule provides for a fee of 75 basis points on the first $5 million in assets, 60 basis points on the next $10 million, 40 basis points on the next $25 million, 25 basis points on the next $260 million, and 20 basis points on the balance over $300 million);

b.    Brinson Partners manages a $944 million mid-cap equity portfolio for the Kentucky-Teachers Retirement System of Kentucky for 18.5 basis points with a breakpoint at $100 million (the fee schedule provides for a fee of 23 basis points on the first $100 million in assets and 18 basis points on the balance over $100 million);

c.    Brinson Partners manages a $900 million large cap equity portfolio for the Missouri Retirement System for 18.9 basis points;

d.    Brinson Partners manages a $734 million large cap equity portfolio for the Missouri School Employees for 18.7 basis points; and

29

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑074

e.  Brinson Partners manages a $679 million equity portfolio for the Minnesota State Board of Investment for 23.3 basis points.

81.  This gross disparity in advisory fees evidenced by comparative fees charged to institutional and other clients (including other mutual funds) for identical services establishes that the fees charged to Plaintiffs are grossly disproportionate to the services rendered by Defendants.

**(5) Fallout Benefits, i.e., Indirect Profits to Defendants Attributable in Some Way to the Existence of the Funds**

82.  Defendants indirectly profit because of the existence of the Funds through fallout benefits.  Obvious, but difficult to quantify, fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Funds.

83.  Other, easier to quantify, benefits include commissions payable to Defendants or their affiliates and "soft dollars" payable form other broker-dealers.  These soft-dollar arrangements are required to be reviewed and approved by the disinterested directors. Essentially, "soft dollars" are credits furnished to Defendants from broker-dealers and other securities-industry firms in exchange for routing securities transaction orders and other business to paying firms.  These soft-dollar credits may be used to purchase research and other goods or services (much like frequent flier miles are accumulated by air passengers).

84.  Defendants also receive "kickbacks," either directly or indirectly, as transfer agency and custodian fees grow due to increases in the assets of the Funds and the number of shareholders.

30

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑075

85.     <u>Defendants receive further fallout benefits from securities lending arrangements.</u> <u>Essentially, Defendants loan out the securities of the Funds and receive compensation as the</u> <u>lending agents of the Funds.</u>

86.     <u>A highly profitable fallout benefit to Defendants is the ability to sell Investment</u> <u>Advisory Services paid for by the Funds at virtually no additional cost.  Much like computer</u> <u>software, once the investment research and resulting recommendations are paid for, that research</u> <u>and those recommendations may be sold to other clients at virtually no cost whatsoever to</u> <u>Defendants.  Without payment by Plaintiffs and other shareholders of the Funds of billions of</u> <u>dollars in advisory and distribution fees (especially distribution fees that are nothing more than a</u> <u>means to extract additional compensation for advisory services), Defendants would have to pay</u> <u>to conduct that research independently in order to provide Investment Advisory Services to other</u> <u>clients, including institutional clients.  This is a natural byproduct of the extraordinary economies</u> <u>of scale inherent in the investment advisory business.  However, although Plaintiffs and other</u> <u>shareholders of the Funds pay all of the costs associated with the Investment Advisory Services,</u> <u>Defendants resell these services to third parties without compensating Plaintiffs through reduced</u> <u>fees or in any other way.</u>

87.     <u>Defendants do not provide sufficient information regarding the existence and</u> <u>extent of these and other fallout benefits to the directors so that the directors can quantify, or</u> <u>even meaningfully consider, the benefits.  Plaintiffs and other shareholders of the Funds have</u> <u>paid for these benefits and are entitled to compensation in the form of reduced advisory fees and</u> <u>the elimination of distribution fees.</u>

### (6) The Independence and Conscientiousness of the Directors

88.    At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of the ICA.  As the GAO Report noted, the structure of most mutual funds embodies a potential conflict of interest between the fund's shareholders and its adviser.  This conflict arises because the fees paid by the shareholders represent revenue to the adviser.  The United States Supreme Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest.  *Burks v. Lasker*, 441 U.S. 471 (1979).  The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendants and reviewing the reasonableness of the advisory and distribution fees received by Defendants.  Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services.  *See* GAO Report at 14 [Ex. 2].  These responsibilities are intensive, requiring the directors to rely on information provided by Defendants.  Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.

89.    The ICA contains a presumption that the disinterested directors are in fact disinterested.  However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the Funds, the lack of adequate information provided to the directors in connection with their approvals of the advisory agreements and Distribution Plans, and the control of management over the directors in reviewing the fees paid by the Funds are *not* presumed but, rather, are important factors recognized in the *Gartenberg* line of cases in

32

05/23/2002 THU 16:22 [TX/RX NO 5201] ☑077

determining whether Defendants have breached their fiduciary duties.  In this case, Defendants have breached their fiduciary duties.

90.    As part of their scheme to receive excessive fees, Defendants did not keep the directors fully informed regarding all aspects of their fees and other compensation.  As discussed previously, Defendants provided virtually no information to the directors regarding the economies of scale enjoyed or fallout benefits received by Defendants.

91.    The *only* information provided to the boards of directors by Brinson from which the existence of economies of scale could by gleaned is the consolidated pre-tax profitability data for the Brinson Complex contained in the yearly profitability reports.  *See* Doberman Dep. at 165, 196 [Ex. 5]; Schubert Dep. at 42-43, 72-73 [Ex. 4]; Annual Study of Profitability Memorandum, July 18, 2000, at 5 (BA 00009) [Ex. 12-C].  This information is simply not enough to be meaningful.  Significantly, the documents given to the board provide no explanation as to how the board should evaluate economies of scale with regard to the consolidated pre-tax profitability data and do not explain how the shareholders benefit from distribution plans.

92.    The minutes of the board meetings of the Brinson directors also reflect the lack of conscientiousness of the directors in approving the fees charged by Defendants.  For example, the minutes of the board meetings at which profitability is discussed contain the same boilerplate language regarding economies of scale year after year, suggesting that the meetings are a mechanical process during which the board "rubber stamps" the fees rather than delving into the specific facts.  *See* Minutes of the Brinson Board Meeting on July 9, 1998, at 3 [Ex. 13-A]; Minutes of the Brinson Board Meeting on July 28, 1999, at 2 [Ex. 13-B]; Minutes of the Brinson Board Meeting on July 27, 2000, at 2 [Ex. 13-C].  Brinson has admitted that the board's review

33

05/23/2002 THU 16:22  [TX/RX NO 5201]  ☑078

of the profitability of the *entire* complex of Brinson Funds takes only thirty minutes.  *See* Schubert Dep. at 95-96 [Ex. 4].

93.    Defendants provide no information to the directors regarding the advisory fees charged to pension and other institutional clients or to other mutual funds being advised or sub-advised by Defendants.  This assures that the directors do not understand Defendants' true cost structure and, in particular, the economies of scale enjoyed by them in providing Investment Advisory Services to institutional clients and other funds.  The directors' failure to insist on this information evidences a lack of care and conscientiousness on their part.

94.    Defendants have failed to provide, and the boards of directors of the Funds have failed to request and evaluate, information reasonably necessary to an informed determination of whether the Distribution Plans should be implemented and continued.  For example, the profitability analyses and other reports provided to the Brinson Complex directors make no effort to evaluate any alleged benefits to the Funds or Plaintiffs and other shareholders of the Funds, and the board demanded no additional data.  In addition, as with the minutes regarding economies of scale, the minutes regarding approval of and continuation of the Distribution Plans also contain the same boilerplate language year in and year out, thus establishing that the directors merely "rubber stamp" the Distribution Plans as well, and this review takes all of approximately ten or fifteen minutes.  *See* Schubert Dep. at 177-78 [Ex. 4]; Minutes of the Brinson Board Meeting on Nov. 12, 1998, at 17 [Ex. 13-D]; Minutes of the Brinson Board Meeting on Nov. 11, 1999, at 23 [Ex. 13-E]; Minutes of the Brinson Board Meeting on Nov. 8, 2000, at 63 [Ex. 13-F].  In rubber stamping Defendants' recommendation to first implement and then continue the Distribution Plans, the boards of directors also failed to review the prior performance of the distribution plans and conclude that, since economies of scale were not

34

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑079

passed on to Plaintiffs, the only beneficiaries of the distribution fees paid pursuant to the Distribution Plans were Defendants -- the SEC's very fear prior to enacting Rule 12b-1.

95.     The directors' lack of conscientiousness is also demonstrated by the fact that the directors rarely, if ever, question any information or recommendations provided by Defendants. For example, the Brinson directors utterly failed to negotiate the advisory fee structure presented by Brinson (then Mitchell Hutchins) in connection with the launch of the Brinson Strategy Fund (or even bothered to inquire about the nature or quality of services to be rendered to this index fund). Similarly, the Brinson directors failed to question the information and recommendations provided by Brinson pertaining to its October 2000 reorganization or the advisory fees it would receive in its dramatically diminished role. See Doberman Dep. at 184—87; 202-04; 205-06 [Ex. 5]; Schubert Dep. at 160 [Ex. 4].

96.     While the Alliance discovery was halted and is not as fully developed as the Brinson discovery, a review of publicly filed information supports the fact that the Alliance directors either did not receive the proper information or simply chose to ignore the facts. Either way, the excessive and disproportionate fees charged by Alliance are not legally sustainable.

97.     The SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser. For this reason, "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently." *Bearing of Distribution Expenses by Mutual Funds*, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444 at *36 (Oct. 28, 1980).

98.     The disinterested directors of the Funds did not receive the benefit of any such measures to enhance their ability to act independently. Rather, their dependence on Defendants,

35

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑060

and the domination and undue influence exerted by Defendants, is evidenced by the following facts:[1]

    a.    All Funds in each Fund Complex share a common advisor.

    b.    All Funds in each Fund Complex share a common distributor.

    c.    All Funds within the Fund Complexes are governed by a common and interlocking board of directors.

    d.    The Funds within the Fund Complexes share, directly or indirectly, common Distributions Plans.

    e.    Many Funds within a Fund Complex share prospectuses, shareholder reports and other items of overhead.

    f.    All Funds within the Fund Complexes have access to a line of credit available for insuring liquidity (e.g., to meet shareholder redemptions) and the fees pertaining to such credit facility are shared equally by each of the Funds within the Fund Complexes.

    g.    The selection of an auditor for a fund is one of the most important aspects of a disinterested director's responsibilities.   The selection of a common auditor is evidence of the domination and control of the disinterested directors by Defendants:

    1)    For example, the Alliance Premier Growth Fund is audited by PricewaterhouseCoopers, LLP.  The auditor for AXA Financial, Inc. (Alliance's parent company) is also PricewaterhouseCoopers, LLP.

    2)    Brinson also coincidentally utilizes a common auditor.  Prior to the acquisition of PaineWebber by UBS in 1999, the Funds in the Brinson Complex

---

[1] Although this Court has deferred the issue of standing until class certification, these facts also support Plaintiffs' standing to pursue claims against the entire Fund Complexes.

05/23/2002 THU 16:22  [TX/RX NO 5201] ☑081

used PricewaterhouseCoopers and Ernst & Young. Subsequent to the merger, however, all of the Funds within the Brinson Complex are audited by Ernst & Young, the same auditor for UBS AG and UBS/PaineWebber.

## CLASS ACTION ALLEGATIONS

99. Pursuant to Rules 23(a), 23(b)(1)(A), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action as a class action, as fund shareholders in each Fund Complex, on behalf of themselves and all other similarly situated fund shareholders in each Fund Complex. Plaintiffs have paid distribution, advisory, and other fees to Defendants for "common" distribution, advisory, and other purported services within the Fund Complexes. The requirements of Rules 23(a), 23(b)(1)(A), 23(b)(2), and 23(b)(3) are satisfied and Plaintiffs seek certification of two classes of all shareholders in all Funds in the Brinson Complex and the Alliance Complex from April 1, 1991 to the present.

### Rule 23(a)

100. The proposed classes, consisting of millions of shareholders of funds, are so numerous that joinder of all members is impracticable.

101. There are questions of law and fact common to each class, including:

a.    Whether the distribution plans and agreements and advisory agreements of each fund were implemented and continued in accordance with the ICA;

b.    Whether the distribution plans and agreements of each fund produced and passed on economies-of-scale benefits to the Funds and their shareholders;

c.    Whether the distribution and advisory fees paid to Defendants are unlawful; and

37

05/23/2002 THU 16:22 [TX/RX NO 5201] ☒082

    d.    Whether the distribution and advisory fees paid to Defendants are excessive.

102.    Plaintiffs' claims are typical of the claims of the members of the classes. Plaintiffs have sustained damages in the same capacity as other members of the classes, namely as shareholders of the Funds. Further, Plaintiffs and all members of the classes have sustained damages as a result of the same wrongful conduct of Defendants, and Plaintiffs and all members of the classes are entitled to the same relief.

103.    Plaintiffs will fairly and adequately protect the interests of the classes. Plaintiffs have retained counsel competent and experienced in class action litigation.

### Rule 23(b)(1)(A)

104.    The prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications with respect to individual members of the classes that would establish incompatible standards of conduct for Defendants.

### Rule 23(b)(2)

105.    Defendants have acted and refused to act on grounds generally applicable to the classes, having charged all Fund shareholders unlawful and excessive distribution and advisory fees. Therefore, declaratory relief and injunctive relief are appropriate with respect to the classes as a whole.

### Rule 23(b)(3)

106.    The questions of law and fact common to the members of the classes predominate over any questions affecting only individual members. Therefore, a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

107.    The following considerations support certification of the classes:

a.    The relatively small amount of damages that many individual members of the classes may have sustained would not justify their prosecution of separate actions;

b.    Concentrating this litigation in this forum is desirable because Plaintiffs and many members of the classes reside or are located in Illinois, certain material events occurred in Illinois, and Defendants are doing business, licensed as broker/dealers, or even headquartered, in Illinois; and

c.    No difficulties will be encountered in managing Plaintiffs' claims as a class action, the classes are readily definable, and the prosecution of this class action will reduce the possibility of repetitious litigation and inconsistent adjudications.

### COUNT I
### ICA § 36(b)
### BREACH OF FIDUCIARY DUTY
### (Excessive Investment Advisory Fees)

108.    Plaintiffs repeat and reallege paragraphs 1 through 107, inclusive, of this complaint.

109.    The fees charged by Defendants for providing advisory services to the Funds are disproportionate to the services rendered and are not within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances, including the advisory fees that Defendants charge their institutional clients, other mutual funds, and each other. In every instance, the fees charged by Defendants to Plaintiffs are dramatically higher than those negotiated in *any* arm's length negotiation, even when providing services to the very same funds.

110.    In charging and receiving excessive advisory fees, and failing to put the interests of Plaintiffs and the shareholders of the Funds ahead of their own interests, Defendants breached their statutory fiduciary duty to Plaintiffs.

39

05/23/2002 THU 16:22  [TX/RX NO 5201] @084

111.    Defendants have breached their ICA § 36(b) fiduciary duty to the Funds by accepting excessive or inappropriate compensation.  Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

**COUNT II**
**ICA § 36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excess Profits from Economies of Scale)**

112.    Plaintiffs repeat and reallege paragraphs 1 through 111, inclusive, of this complaint.

113.    Defendants have received excess profits attributable solely to extraordinary economies of scale created by market forces and, ironically, at least in part at Plaintiffs' expense in the form of payment of distribution fees benefiting only Defendants.

114.    Defendants have breached their ICA § 36(b) fiduciary duty to the Funds by retaining these excess profits derived from economies of scale.

115.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

**COUNT III**
**ICA § 36(b)**
**(Excess Rule 12b-1 Distribution fees and Extraction of**
**Additional Compensation for Advisory Services)**

116.    Plaintiffs repeat and reallege paragraphs 1 through 115, inclusive, of this complaint.

117.    The distribution fees charged and received by Defendants were designed to, and did, extract additional compensation for Defendants' advisory services in violation of

40

05/23/2002 THU 16:22  [TX/RX NO 5201] ⓪085

Defendants' fiduciary duty under § 36(b). Although the distribution fees may have contributed to the growth in assets of the Funds, the resulting economies of scale benefited only Defendants, and not Plaintiffs or the Funds, as feared by the SEC.

118.    In failing to pass along economy of scale benefits from the distribution fees, and in continuing to assess distribution fees pursuant to plans of distribution despite the fact that no benefits inured to Plaintiffs, Defendants have violated the ICA and their ICA § 36(b) fiduciary duty not to accept excessive or inappropriate compensation. Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

## COUNT IV
## ICA § 12(b)
### (Unlawful Distribution Plans)

119.    Plaintiffs repeat and reallege paragraphs 1 through 118, inclusive, of this complaint.

120.    Plaintiffs and other shareholders in the Funds each paid service or distribution fees to Defendants

121.    When Defendants first initiated the Distribution Plans, they represented that the distribution fees were being collected in order to, at least in part, grow the assets of the Funds in order to reduce the cost to Plaintiffs of providing advisory services. Only one of the following alternatives could possibly have occurred:

a.    The Funds grew as a result of the payment of distribution fees and market forces, in which case economies of scale were generated but not passed on to Plaintiffs or the Funds; or

41

     b.    The distribution fees did not contribute to economies of scale, produced no other material benefits for Plaintiffs and the other shareholders of the Funds, and should not have been approved or continued.

122.    Either way, Defendants have violated § 12(b) of the ICA and Rule 12b-1, 17 C.F.R. § 270.12b-1, by accepting excessive or inappropriate compensation in violation of the fiduciary duty owed by them to the Funds.  Plaintiffs seek damages resulting from the adoption and continuation of these unlawful Distribution Plans.

WHEREFORE, Plaintiffs demands judgment as follows:

     a.    Declaring that Defendants violated § 12, § 36(b), and Rule 12b-1 of the ICA and that any advisory or distribution agreements entered into are void ab initio;

     b.    Preliminarily and permanently enjoining Defendants from further violations of the ICA;

     c.    Awarding damages against Defendants including all fees paid to them by Plaintiffs, all members of the putative class, and the Funds for all periods not precluded by any applicable statutes of limitation, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

     d.    Such other and further relief as may be proper and just.

05/23/2002 THU 16:22  [TX/RX NO 5201] ⌐087

Dated: April 1, 2002

Respectfully submitted,

CARR, KOREIN, TILLERY, LLC

By: _____

Steven A. Katz
Douglas R. Sprong
Diane Moore Heitman
#10 Executive Woods Court
Belleville, IL 62226
(618) 277-1180
Fax: (618) 277-4676

Thomas R. Grady
GRADY & ASSOCIATES, L.P.A.
720 Fifth Avenue South, Suite 200
Naples, FL 34102
(239) 261-6555
Fax: (239) 261-1192

Michael J. Brickman
James C. Bradley
RICHARDSON, PATRICK, WESTBROOK
    & BRICKMAN, LLC
174 East Bay Street
Charleston, SC 29401
(843) 727-6500
Fax: (843) 727-3103

Guy M. Burns
Jonathan S. Coleman
JOHNSON, BLAKELY, POPE, BOKOR
    RUPPEL & BURNS, P.A.
100 North Tampa Street, Suite 1800
Tampa, FL 33602
(813) 237-4127
Fax: (813) 223-7118

*Attorneys for Plaintiffs*

05/23/2002 THU 16:22 [TX/RX NO 5201] ☑088

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to the following counsel this 1st day of April, 2002.

Frank N. Gundlach
Glenn E. Davis
ARMSTRONG TEASDALE, L.L.P.
One Metropolitan Square, Suite 2600
St. Louis, MO 63102

James H. R. Windels
David B. Toscano
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017

Daniel A. Pollack
POLLACK & KAMINSKY
114 West 47th Street, Ste. 1900
New York, NY 10036

*Attorneys for Defendants*



_____

44

05/23/2002 THU 16:22 [TX/RX NO 5201] 🗹 069

**RECEIVED**

APR - 1 2002

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

## EXHIBIT LIST

1. Securities and Exchange Commission, *Division of Investment Report on Mutual Fund Fees and Expenses* (December 2000)

2. General Accounting Office, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000)

3. John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610  (2001)

4. Rule 30(b)(6) Deposition of Paul Schubert, Jan. 30, 2002

5. Rule 30(b)(6) Deposition of Amy Doberman, Jan. 30, 2002

6. Alliance Stock Funds Prospectus, Feb. 1, 2002

7. Brinson Strategy Fund Prospectus, Nov. 5, 2001

8. Brinson Tactical Allocation Fund Prospectus, Nov. 5, 2001

9. PaineWebber PACE Select Advisors Trust Prospectus, Nov. 5, 2001

10. Vanguard U.S. Growth Fund Prospectus, Dec. 28, 2001

11. Annual Report of Alliance Capital Management, L.P., for Fiscal Year 2000 on Form 10-K

12. Annual Profitability Reports to the Brinson Board of Directors

    A. June 30, 1998 Report (BA 00211 – 00309)
    B. July 9, 1999 Report (BA 00116 – 00207)
    C. July 18, 2000 Report (BA 00005 – 00112)

13. Minutes of the Brinson Board Meetings

    A. July 9, 1998 Meeting (BA 02554 – 02589)
    B. July 28, 1999 Meeting (BA 02192 – 02232)
    C. July 27, 2000 Meeting (BA 01688 – 01717)
    D. Nov. 12, 1998 Meeting (BA 02468 – 02530)
    E. Nov. 11, 1999 Meeting (BA 01964 – 02035)
    F. Nov. 8, 2000 Meeting (BA 01296 – 01395)
    G. May 1998 Meeting (BA 06428 – 06526)
    H. May 1999 Meeting (BA 02246 – 02351)

I. May 2000 Meeting (BA 01731 – 01841)
J. Sept. 1999 Meeting (BA 02080 – 02179)
K. Sept. 2000 Meeting (BA 01591 – 01682)
L. Oct. 6, 2000 Meeting (BA 01448 - 01576)

14.    PaineWebber Growth and Income Fund and PACE Large Company
Value Equity Fund Combined Proxy Statement and Prospectus (Dec.
27, 2000) (BA 00764-00824)

15.    Investment Advisory Agreement between Alliance Capital and
Vanguard World Funds (June 22, 2001)