FILED _____ ENTERED
LOGGED _____ RECEIVED

IN THE UNITED STATES DISTRICT COURT        FEB 16 1999
FOR THE DISTRICT OF MARYLAND

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DEPOSIT BOX

| | |
|---|---|
| DAVID MIGDAL, et al. : | |
| : | |
| Plaintiffs, : | SECOND AMENDED COMPLAINT |
| : | UNDER SECTION 36(b) |
| v. : | OF THE INVESTMENT |
| : | COMPANY ACT OF 1940 |
| : | |
| ROWE PRICE-FLEMING INTERNATIONAL, : | |
| INC., et al. : | CA No. AMD-98-2162 |
| : | |
| Defendants. : | |

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters, based upon the investigation made by and through their attorneys, which includes, <u>inter alia</u>, review of Securities and Exchange Commission ("SEC") filings, financial publications, and other publicly available materials.

### Nature Of The Action

1.  Plaintiffs, shareholders of the International Stock Fund and the Growth Stock Fund (collectively, the "Funds"), both of which are in the T. Rowe Price Fund Complex, which is comprised of a series of funds categorized according to investment objective (<u>i.e.</u>, the "International Stock Fund Complex" and the "Domestic Stock Fund Complex"), bring this action pursuant to Section 36(b) of the Investment Company Act of 1940, as amended (the "ICA"), 15 U.S.C. § 80a-35(b), against Rowe Price-Fleming International, Inc. ("Price-Fleming"), which is the International Stock Fund's investment adviser, T. Rowe Price Associates, Inc. ("T. Rowe Price"), which is the Growth Stock

Fund's investment adviser, T. Rowe Price Investment Services, Inc., T. Rowe Price Services, Inc., and T. Rowe Price Retirement Plan Services, Inc., all of which received payments from funds within the T. Rowe Price Fund Complex. By this action, plaintiffs seek to void the management, advisory, service, and other agreements between the defendants and the funds within the T. Rowe Price Fund Complex (the "Agreements"), and to recover the fees and payments received by these defendants pursuant to the Agreements.

2.   This action is brought pursuant to ICA Section 36(b). Defendants' liability results from (a) their breach of fiduciary duties caused by their subversion of the ICA's protections for public stockholders -- the requirement that 40% of the directors of an investment company be independent of the investment adviser, i.e., "disinterested," and (b) the fact that the fees paid to T. Rowe Price and its affiliates are so disproportionately large that they bear no reasonable relationship to the services rendered, particularly in light of actual fund performance. Accordingly, the Agreements were not and could not have been the product of arm's-length bargaining.

3.   Section 10(a) of the ICA, 15 U.S.C. § 80a-10(a), mandates that at least 40% of the members of the governing board of every registered investment company not be "interested persons," i.e., be independent of the investment adviser. Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), mandates that every agreement with an investment adviser or principal

underwriter be approved by a majority of the disinterested, independent directors. In Burks v. Lasker, 441 U.S. 471 (1979), after describing the inherent conflict of interest between an investment adviser and an investment company, the United States Supreme Court noted that "the cornerstone of the ICA's efforts to control conflicts of interest . . . is the requirement that at least 40% of a fund's board be composed of independent outside directors." 441 U.S. at 482. (Footnote omitted.) In other words, the independent directors are to serve as "watchdogs" for shareholders as "the structure and purpose of the ICA indicate that Congress entrusted to the independent directors . . . the primary responsibility for looking after the interests of the fund's shareholders." Id. at 484-85. (Footnote omitted.)

    4. In addition to defendants' fees being so disproportionately large that they (a) bear no reasonable relationship to the services rendered and (b) could not have been the product of arm's-length bargaining, plaintiffs allege that because 40% of the members of each of the boards of the funds within the T. Rowe Price Fund Complex are not independent, as required by Section 10(a) of the ICA, the Agreements were in fact not the product of arm's- length bargaining. As a result, the Agreements could not be properly approved as required by Section 15(c) of the ICA. Consequently, funds within the T. Rowe Price Fund Complex have paid defendants fees pursuant to invalid contracts, thereby entitling plaintiffs to seek recovery of those fees pursuant to Section 36(b) of the ICA on behalf the

International Stock Fund and Growth Stock Fund, as well as the other funds within the T. Rowe Price Fund Complex, all of which are similarly situated, independent of the issue of the excessiveness of the fees.

### Jurisdiction and Venue

5.  This action is brought pursuant to Section 36(b) of the ICA. Subject matter jurisdiction exists under 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. §§ 1331.

6.  Venue is properly laid in this District because many of the acts and transactions, and much of the conduct, constituting the violations of law complained of occurred herein. Defendants and the Funds maintain their business offices in this District.

7.  In connection with the acts, conduct, and other wrongs complained of, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephone communications.

### Parties

8.  Plaintiff David Migdal is, and continues to be, a shareholder of the International Stock Fund.

9.  Plaintiff Linda B. Rohrbaugh is, and continues to be, a shareholder of the Growth Stock Fund.

10. Defendant Price-Fleming serves as investment adviser with respect to all investments for the funds in the T. Rowe Price International Stock Fund Complex. Price-Fleming was incorporated in Maryland in 1979 as a joint venture between T.

Rowe Price and Robert Fleming Holdings Limited ("Fleming"). Together, T. Rowe Price, Fleming, and Jardine Fleming own Price-Fleming. T. Rowe Price has the right to elect a majority of the Board of Directors of Price-Fleming, and Fleming has the right to elect the remaining directors, one of whom will be nominated by Jardine Fleming. T. Rowe Price owns 50% of Price-Fleming.

11. As compensation for its services, Price-Fleming receives from the International Stock Fund fees that are paid monthly on the first business day of the next succeeding calendar month, at the rate of .85% per year. The fees are calculated by multiplying the .85% rate by the net asset value of the Fund. The performance benchmark for the International Stock Fund is the Morgan Stanley Capital Index ("MSCI EAFI"). The MSCI EAFE tracks the stocks of 1000 companies in Europe, Australia and the Far East. That the fees authorized by the directors of the International Stock Fund are disportionately large when compared with the services rendered by defendant Price-Fleming is evidenced by, among other things, the fees authorized by the boards of other similar funds. In contrast to the level of fees received by defendant Price-Fleming, the directors of a comparable, actively managed no-load international stock fund, the Vanguard International Growth Fund, have authorized fees only at the rate of .57% per year. The directors of the no-load, Vanguard International Stock Index Fund have authorized fees only at the rate of .38% per year. Both of these Vanguard international stock funds, like the International Stock Fund,

have as their performance benchmark the MSCI EAFE. Similarly, the TIAA-CREF International Equity Fund, a large no-load diversified international fund, has an expense ratio of only .49%, nearly 1/2 that of the International Stock Fund. As described below, these comparable funds have materially lower expenses and, at the same time, have outperformed the International Stock Fund.

12. Defendant T. Rowe Price, a Maryland corporation, serves as investment adviser with respect to the funds in the T. Rowe Price Domestic Stock Fund Complex. As compensation for its services, T. Rowe Price receives from the Growth Stock Fund fees that are paid monthly on the first business day of the next succeeding calendar month at the rate of .75% per year. The fees are calculated by multiplying the .75% rate by the net asset value of the Fund. The performance benchmark for the Growth Stock Fund is the Standard & Poor's 500 composite ("S & P 500"). That the fees authorized by the directors of the Growth Stock Fund are disportionately large when compared with the services rendered by defendant T. Rowe Price is evidenced by, among other things, the fees authorized by the boards of other similar funds. In contrast to the level of fees received by defendant T. Rowe Price, the directors of a comparable, actively managed no-load growth stock fund, the Vanguard U.S. Growth Fund, have authorized fees only at the rate of .42% per year. The directors of the no-load, Vanguard 500 Index Fund have authorized fees only at the rate of .19% per year. Both of these Vanguard growth stock

funds, like the Growth Stock Fund, have as their performance benchmark the S & P 500. Similarly, the directors of the TIAA-CREF Growth Equity Fund, a large no-load diversified growth fund, have approved an expense ratio of only .45% per year. As described below, these comparable funds have materially lower expenses and, at the same time, have outperformed the Growth Stock Fund.

13. Defendant T. Rowe Price Investment Services, Inc. ("Investment Services"), a Maryland corporation formed as a wholly-owned subsidiary of T. Rowe Price, serves as the distributor of funds within the T. Rowe Price Fund Complex. Investment Services receives fees and expenses pursuant to an underwriting agreement in connection with the distribution of shares.

14. Defendant T. Rowe Price Services, Inc. ("Services"), a wholly-owned subsidiary of T. Rowe Price, serves as the transfer and dividend disbursing agent for funds within the T. Rowe Price Fund Complex. Services receives fees and expenses in connection with the foregoing and administrative services.

15. Defendant T. Rowe Price Retirement Plan Services, Inc., a wholly-owned subsidiary of T. Rowe Price ("Retirement Plan Services"), provides services for certain types of retirement plans. In connection with these services, Retirement Plan Services receives fees and expenses from the funds within the T. Rowe Price Fund Complex.

16. All of the defendants are "affiliated" within the meaning of ICA Sections 2(a)(2) and 2(a)(3), 15 U.S.C. §§ 80a-2(a)(2) and 2(a)(3).

### Substantive Allegations

### General Description of the Funds

17. The International Stock Fund is a Maryland corporation. The fund is one of a series of funds in the T. Rowe Price International Trust Fund Complex. It invests primarily in the common stocks of established, non-U.S. companies.

18. The Growth Stock Fund is a Maryland corporation. The fund is one of a series of funds in the T. Rowe Price Domestic Stock Fund Complex. It invests primarily in the common stock stocks of well-established growth companies.

### Overview of Applicable Provisions Of The ICA

19. The funds in the T. Rowe Price Fund Complex are each an "investment company" within the meaning of the ICA. The ICA requires that an investment company, such as the Funds, be overseen by a board of directors of whom at least 40% may not be "interested" persons. 15 U.S.C. § 80a-10(a). Such directors are generally referred to as "independent" directors.

20. Most investment companies, as here, are externally managed -- they have no officers or employers apart from those supplied by the investment adviser or other service providers. For this reason, independent directors play an especially

important role in the management of funds. Under the ICA, they are required to, among other things: (a) approve any contracts between the fund and its sponsors, underwriters, or advisers; and (b) evaluate and approve fees paid to sponsors and their affiliates, including advisory and distribution fees.

21. The Agreements were not approved by a board of which 40% of the members were disinterested, i.e., independent of defendants.

### None of the Funds' Directors are "Disinterested"

22. The designated "disinterested" directors of the Funds, their aggregate annual compensation for serving as directors of funds within the T. Rowe Price Fund Complex, and the number of such funds on whose boards they serve are as follows:

a. Anthony W. Deering ("Deering"), Donald W. Dick, Jr. ("Dick"), and Paul M. Wythes ("Wythes") are the designated "disinterested" directors of the International Stock Fund.

b. Dick, David K. Fagin ("Fagin"), Hanne M. Merriman ("Merriman"), Hubert D. Vos ("Vos"), and Wythes are the designated "disinterested" directors of the Growth Stock Fund.

c. Deering serves as a director of at least 38 funds within T. Rowe Price Fund Complex the and receives annual compensation therefor of at least $81,000.

  d. Dick serves as a director of at least 32 funds within T. Rowe Price Fund Complex and receives annual compensation therefor of at least $81,000.

  e. Wythes serves as a director of at least 31 funds within T. Rowe Price Fund Complex and receives annual compensation therefor of at least $81,000.

  f. Fagan serves as a director of at least 23 funds within T. Rowe Price Fund Complex and receives annual compensation therefor of at least $65,000.

  g. Merriman serves as a director of at least 22 funds within T. Rowe Price Fund Complex and receives annual compensation therefor of at least $65,000.

  h. Vos serves as a director of at least 22 funds within T. Rowe Price Fund Complex and receives annual compensation therefor of at least $65,000.

  i. The compensation received by each of Deering, Dick, Wythes, Fagin, Merriman and Vos represents a material portion of their annual salary or stream of directors fees. For example, the compensation received by Deering from defendants is more than 10% of his 1997 (or 1996) salary from the Rouse Company. The compensation received by Merriman from defendants is more than 10% of her 1997 directors' fees.

 23. The number of boards upon which each of the supposedly disinterested directors serve is excessive with the result that such directors (a) cannot devote sufficient time to

the affairs of any particular fund, including the Funds, and (b) are completely dependent on the adviser for information. The board meetings for all funds within a fund family meet on the same day and, during the day, the affairs of individual funds are scheduled to be considered at intervals that do not allow for sufficient consideration of fund affairs. The affairs of each fund are considered by the "disinterested" directors at board meetings only for brief periods of time; too brief given the amount of shareholder money in issue. Further, at board meetings, the designated "disinterested" directors rely exclusively on information provided by or arranged to be provided by T. Rowe Price and its affiliates. As these directors have so little time to fully inform themselves at board meetings as to fund matters, and rely exclusively on information provided by the Funds' advisors, they have abdicated their fiduciary responsibilities. As a consequence, the meetings did not provide a forum for informed judgments by the directors. Instead, the meetings served only to rubber-stamp the decisions made defendants.

24. Under Maryland law and the ICA, the Funds are not required to hold annual meetings of shareholders. As a matter of policy, the Funds have not convened shareholder meetings on an annual or any regular basis. Indeed, the last annual shareholder meeting for the International Stock Fund occurred in 1994. As defendants acknowledged in the Registration Statement they filed with the SEC on February 20, 1998, shareholders cannot themselves call a meeting "for the purpose of voting on the removal of any

fund director or trustee" unless they own at least 10% of all eligible votes of a fund. As a consequence of the Funds' policies regarding shareholder meetings, shareholders of the Funds have no practical mechanism to seek the removal of a director or the advisor of the Funds.

25. In addition, the so-called outside directors are entirely dependent upon T. Rowe Price for their positions and, as a practical matter, for continued tenure. T. Rowe Price caused each "outside" director initially to be appointed as a director of the Funds. By virtue of its control over the calling of shareholder meetings and the proxy solicitation mechanism, T. Rowe Price can terminate any director's tenure through the simple expedient of a proxy solicitation to the shareholders of its Funds opposing the reappointment of such director at an annual meeting that it calls. In contrast, it is impractical and prohibitively expensive for any such director targeted by T. Rowe Price to himself solicit proxies in opposition to T. Rowe Price. Although it is theoretically possible for the shareholders of the funds to vote to remove a director -- were the matter ever proposed to them -- no one outside of the advisor (i.e., T. Rowe Price or Price-Fleming) is in a position, economically or practically, to organize and finance a proxy solicitation of this kind. Thus, only defendants' have the practical ability to remove (or, for that matter, appoint) a director from any of their funds. In fact, during the relevant times, such directors

have not voted to terminate any of defendants' Agreements with the funds.

26. As a result of the foregoing, including service on multiple boards, receipt of significant compensation therefrom, and performance of their duties in a manner that lacks the care and conscientiousness necessary to fulfill their "watchdog" role, the directors of each fund within the T. Rowe Price Fund Complex are not independent and, thus, "interested persons" within the meaning of ICA §§ 2(a)(3), 2(a)(19)(A)(i), and 2(a)(19)(B)(i), 15 U.S.C. §§ 80a-2(a)(3), 80a-2(a)(19)(A)(i), and 80a-2(a)(19)(B)(i). Despite defendants' preference for captive "House Directors," there is no shortage of qualified persons who would, if asked by the defendants, gladly serve as truly independent directors of the Funds.

27. As alleged herein, Section 10(a) of the ICA, 15 U.S.C. § 80a-10(a), requires that at least 40% of the members of the board of directors of every registered investment company not be "interested persons," i.e., be independent of the investment adviser. Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), provides, in pertinent part, that it is "unlawful for any registered investment company having a board of directors to enter into" a contract or agreement with an investment adviser or principal underwriter "unless the terms of such contract or agreement . . . have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party . . .." As at least 40% of

the boards of each fund within the T. Rowe Price Fund Complex is not independent within the meaning of the ICA, the Agreements could not have been approved as required by Section 15(c) of the ICA. Accordingly, the Agreements are invalid and, therefore, the compensation paid to defendants wrongly received.

### The Advisory Fees Paid By The Funds Are Excessive

28. In addition to the Agreements violating ICA Section 36(b), Sections 10 and Section 15, the fees paid to defendants, described in ¶¶ 11 and 12 above, are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining. This excessiveness is further illustrated by examining the performance of the Funds.

29. The performance of the International Stock Fund, when measured both against its benchmark and its peers, has been abysmal, making the excessive fees approved by the individual defendants particularly egregious. For the 3 months ending December 31, 1998, the International Stock Fund underperformed its benchmark, the MSCI EAFI, by 2.02%. For the one-year period ending December 31, 1998, it underperformed its benchmark by 3.80%. In stark contrast, peers of the International Stock Fund were outperforming the benchmark MSCI EAFI. For example, while the International Stock Fund was underperforming the benchmark by 3.80%, the Janus Worldwide Fund outperformed the benchmark MSCI EAFI by 11.13%, for a performance gulf between these two comparable funds of 14.93%. The Artisian International Fund

outperformed the benchmark by 27.89% and the Montgomery International Growth Fund outperformed the benchmark MSCI EAFI by 13.59%. The Vanguard International Growth Fund outperformed the benchmark as well, by .21%

30. The performance of the Growth Stock Fund, when measured both against its benchmark and its peers, has been abysmal, making the excessive fees approved by the directors particularly egregious. For the 3 months ending December 31, 1998, the Growth Stock Fund underperformed its benchmark S & P 500 by 1.14%. For the one-year period ending December 31, 1998, the Growth Stock Fund underperformed its benchmark by 5.13%. For the one-year period ending December 31, 1997, the Growth Stock Fund underperformed its benchmark by 6.79%. For the preceding 3-year and 5-year periods, the Growth Stock Fund underperformed its benchmark by 3.62% and 3.76%, respectively. In stark contrast, peers of the Growth Stock Fund were outperforming the benchmark S & P 500. For example, while the Growth Stock Fund was underperforming the benchmark in 1998 by 5.13%, the Vanguard U.S. Growth Fund, which has an expense ratio of about 1/2 that of the Growth Stock Fund, outperformed the benchmark S & P 500 during that same period by 11.03%. The Vanguard Growth Index Fund, which has an expense ratio of less than 1/3 that of the Growth Stock Fund, outperformed the benchmark S & P 500 during that same period by 13.65%. The TIAA-CREF Growth Equity Fund, which has an expense ratio 40% lower than the Growth Stock Fund, outperformed the benchmark S & P 500 by 8.25%. Even no-load funds with

expense ratios comparable to the Growth Stock Fund have vastly outperformed this Fund. Thus, the comparable White Oak Growth Stock Fund outperformed the S & P 500 benchmark in 1998 by 18.88%. In stark contrast with the underperformance of the Growth Stock Fund, the White Oak Growth Fund also outperformed the S & P 500 benchmark for the preceding 3-year and 5-year periods by 7.95% and 8.01 % respectively.

31. The poor performance of the International Stock Fund and the Growth Stock Fund, measured both as against their benchmarks and their peers, cost Fund shareholders hundreds of millions of dollars in lost fund value. (e.g., a 1% increase in value of the International Stock Fund is worth nearly $100 million to Fund shareholders; a 1% increase in the value of the Growth Stock Fund is worth nearly $50 million to Fund shareholders.) Notwithstanding the Funds' poor performance, defendant T. Rowe Price had a banner year in 1998, with revenues of $886 million, a $131 million increase over 1997 revenues. Earnings in 1998 grew 20% over 1997 earnings. Assets under management in the T. Rowe Fund Complex swelled to $94.4 billion. In 1998, net cash inflows to the Funds was $3.7 billion. Despite these huge increases for T. Rowe Price, and notwithstanding the mediocre performance of the Growth Stock Fund and the International Stock Fund, the "outside directors" have continually permitted defendants to charge excessive advisory fees. In 1998, a year in which the International Stock Fund underperformed the benchmark MSCI EAFI by nearly 4%, Price-

16

Fleming charged that Fund a fee of approximately $86.2 million. In 1998, a year in which the Growth Stock Fund likewise underperformed the benchmark S & P 500, T. Rowe Price charged that Fund a fee of approximately $37.8 million. By reason of the foregoing, defendants have breached their fiduciary duty to the Funds and each of the other funds within the T. Rowe Price Fund Complex by accepting excessive compensation pursuant to the Agreements, none of which were negotiated at arm's-length.

### Claim for Which Relief Is Sought

32. Plaintiffs repeat and reallege all relevant paragraphs, as if fully set forth herein.

33. As alleged above, defendants have violated ICA Section 36(b) by entering into Agreements in violation of ICA Sections 10(a) and 15(c). Accordingly, the compensation paid to defendants pursuant to the Agreements was wrongly received.

34. Irrespective of the illegality of the Agreements, the fees paid by the Funds and the other funds within the T. Rowe Price Fund Complex pursuant to the Agreements are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining.

35. By reason of the foregoing, defendants have breached their fiduciary duty to the Funds by accepting compensation pursuant to agreements that could not have been, and were not, negotiated at arm's-length. Plaintiffs seek, pursuant to Section 36(b)(3) of the ICA, the "actual damages resulting

from the breach of fiduciary duty" by the defendants up to and including, the amount of compensation or payments received from the Funds and the other funds that are part of the T. Rowe Price Fund Complex.

WHEREFORE, plaintiffs demand judgment pursuant to ICA Section 36(b) as follows:

a.  declaring that defendants violated Sections 10(a), 15(c), and 36(b) of the ICA, and that the Agreements are void ab initio;

b.  preliminarily and permanently enjoining defendants from further violations of the ICA;

c.  awarding damages against defendants, consisting of all fees paid to defendants by each of the funds within the T. Rowe Price Fund Complex, beginning one year before this action was instituted, together with interest, costs, disbursements, attorneys' and experts fees, and such other items as may be allowed to the maximum extent permitted by law; and

d.  such other and further relief as may be just and proper.

February 16, 1999

_____
Ronald B. Rubin

Rubin & Monahan, Chartered
One Church Street
Suite 301
Rockville, Maryland 20850
(301) 610-9700

Attorneys for Plaintiffs

Of Counsel:

Wechsler Harwood Halebian & Feffer LLP
Joel C. Feffer
Jeffrey M. Haber
488 Madison Avenue
New York, New York 10022
(212) 935-7400

### Certificate of Service

I hereby certify that copies of the foregoing Second Amended Complaint were sent by first class mail, postage prepaid, this 16th day of February 1999, to:

        Daniel A. Pollack, Esq.
        Anthony Zaccaria, Esq.
        Pollack & Kaminsky
        114 West 47th Street
        New York, NY 10036

        Robert J. Jossen, Esq.
        Guy Petrillo, Esq.
        Swidler Berlin Shereff Friedman LLP
        919 Third Avenue, 20th Floor
        New York, NY 10022

        David Clarke, Jr., Esq.
        Piper & Marbury, LLP
        1200 19th Street, N.W.
        Washington, D.C. 20026

        _____
        Ronald B. Rubin