LAW OFFICES OF JAMES V. BASHIAN, P.C.
James Bashian, Esq.(6331)
Fairfield Commons, 271 Route 46 West,
Suite F-207
Fairfield, NJ 07004
(973) 227-6330

FILED
DEC 11 1998

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT COURT OF NEW JERSEY

| | |
|---|---|
| SHELDON KRANTZ, | 98 Civ. 3722 (KSH) |
| Plaintiff, | **FIRST AMENDED COMPLAINT UNDER SECTION 36(b) OF THE INVESTMENT COMPANY ACT OF 1940** |
| v. | |
| PRUDENTIAL INVESTMENTS FUND MANAGEMENT LLC and PRUDENTIAL INVESTMENT MANAGEMENT SERVICES LLC, | |
| Defendants. | |

Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through his attorneys, which investigation included, <u>inter alia</u>, a review of United States Securities and Exchange Commission ("SEC") filings, press releases, news articles, and other publicly available materials.

<u>Nature Of The Action</u>

1. Plaintiff, a shareholder of Prudential Jennison Growth Fund (the "Fund"), brings this action pursuant to Section 36(b) of the Investment Company Act of 1940, as amended (the "ICA"), 15 U.S.C. § 80a-35(b), against Prudential Investments

Fund Management LLC, the investment adviser to the Fund (the "Adviser"), and Prudential Investment Management Services LLC, the Fund's principal underwriter (the "Distributor"). The Fund is an investment company within a series of the Prudential Investment Portfolios, Inc., a diversified, open-end, management investment company ("Prudential Investment").

2. By this action, plaintiff seeks to recover the compensation received by the Adviser and the Distributor pursuant to management and distribution agreements (the "Agreements"), which were entered into in violation of Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), and to void the Agreements.

## Background

3. The investment company industry is one of the few businesses in which participants act as if there are no economies of scale. In fact, the participants act as if the reverse is true. Arthur Levitt, Chairman of the SEC, testified before Congress on March 19, 1997 that, notwithstanding the enormous amount of monies that have been cascading into mutual funds, "the fee structure of those funds appears to be going up, not down." <u>Levitt Tells Senate Appropriations Panel Concern About Mutual Fund Fee Structure</u>, 29 Sec. Reg & L. Rep. (BNA), 370 (Mar. 21, 1997).

4. After noting, in October, 1996, that "total assets under management now stand at more than $3 trillion [total assets under management have since increased to about $5 trillion], compared with about $450 billion at the beginning of the decade

and just $49 billion in 1980," and charting the increase in management fees over the past decades, one commentator stated as follows:

> Given the industry's explosive growth, it's hard to explain why management fees have also gone up on a percentage basis. The money-management business is a textbook case of an industry with tremendous operating leverage. It's not capital-intensive, and once assets hit a certain size, each additional dollar that comes in the door can be managed at little additional cost. If anything, management fees should be going down.

Amy Arnott, "The Rising Tide" (Morningstar Inc. 1996). Morningstar, Inc. ("Morningstar") is a leading publisher of analytical information relating to the investment company industry.

    5.   ICA Section 10(a), 15 U.S.C. § 80a-10(a), mandates that at least 40% of the members of the governing board of every registered investment company not be "interested persons," i.e., they must be independent of the investment adviser. Moreover, ICA Section 15(c), 15 U.S.C. § 80a-15(c), mandates that every agreement with an investment adviser or distributor be approved by a majority of the independent directors. The United States Supreme Court, in Burks v. Lasker, 441 U.S. 471 (1979), after describing the inherent conflict of interest between an investment adviser and an investment company, noted that "the cornerstone of the ICA's efforts to control conflicts of interest . . . is the requirement that at least 40% of a fund's board be composed of independent outside directors." 441 U.S. at 482.

(Footnote omitted.)  In other words, the independent directors are to serve as "watchdogs" for shareholders as "the structure and purpose of the ICA indicate that Congress entrusted to the independent directors . . . the primary responsibility for looking after the interests of the fund's shareholders."  Id. at 484-85.  (Footnote omitted.)

6. Notwithstanding the structural protections built into the ICA, investment advisers and their affiliates have been able to engage in widespread fee-gouging.

7. The principal reason for the subversion of the ICA is that the independent directors have largely been co-opted by the adviser, are no longer independent "watchdogs," and have ceased to be able to distinguish the interests of the adviser and its affiliates from the interests of the shareholders.

8. Jack Bogle, founder of the Vanguard Group, one of the largest mutual fund complexes in the world, responded during an interview conducted by Morningstar to the indicated question as follows:

> Q. We've talked about how the industry could do a better job.  How about the fund directors?
>
> A. Well, fund directors are, or at least to a very major extent, sort of a bad joke.  They've watched industry fees go up year after year, they've watched expense ratios go up year after year, they've added 12b-1 fees.  I think they've forgotten, maybe they've never even been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund advisor.  It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

"Morningstar interviews . . . Jack Bogle, Founder of the Vanguard Group," by Kathryn Haines and Russ Kinnel, www.morningstar.net, posted June 5, 1998.

9. More recently, in the October 1998 issue of <u>Mutual Funds</u>, published by <u>Time, Inc.</u>, Mr. Bogle again noted that "Mutual fund fees are exorbitantly excessive." J. Bogle, "Fund Fees Are Beyond Excessive," <u>Mutual Funds</u> at p. 80 (<u>Time, Inc.</u>, October 1998). Mr. Bogle went on to explain the reason why mutual fund fees are "exorbitantly excessive," stating:

> Simply put, the substantial economies of scale in this business are not being passed along to shareholders in the form of lower expenses. To the contrary, many fund management firms are earning extraordinary -- and, I would argue, excessive -- profits on a growing pot of assets.
>
> I find it almost unconscionable that an "independent" fund director, who is bound by law and fiduciary duty to represent shareholders, would continue to approve almost whatever fee is proposed to the fund board by the fund manager. Fund boards should be considering fee rate <u>reductions</u>.

<u>Id</u>.

10. A root cause of the transformation of the position of director from "watchdog" to that of a sinecure, is the practice of offering these individuals multiple directorships, <u>i.e.</u>, directorships of more than one fund managed by the same investment adviser. The "Fund Director's Guidebook," compiled by eminent practitioners representing the investment advisory industry, cautions that

> the increased responsibility and workload as well as potential conflicts that accompany

service on a number of boards must be considered when an individual serves on the board of more than one fund with the same or related sponsors.

Task Force - A.B.A. Sec. Bus. L., Fund Director's Guidebook, 52 The Bus. Law. 229, 240 (1996).

11. The National Association of Corporate Directors is a non-profit organization, the membership of which includes more than 1,700 executive officers who serve on, or deal with, corporate boards. It has issued the following guidelines when considering candidates for board membership:

> [T]he Commission recommends that boards in general consider the following guidelines for different categories of candidates:
>
> [a] CEOs and other senior executives of public corporations: Boards should prefer individuals who hold no more than one or two public-company directorships (including the position to be offered) in addition to membership on their own company board.
>
> [b] Other individuals with full-time positions: Boards should prefer individuals who hold no more than three or four public-company directorships (including the position to be offered) in addition to membership on their own organization's board.
>
> [c] Other individuals: Boards should prefer individuals who hold no more than five or six public-company directorships (including the position to be offered).

National Ass'n of Corp. Directors, Report of the NACD Blue Ribbon Commission on Director Professionalism, at 12 (1996). (Footnote omitted.)

12. The relationship between fee-gouging and multiple directorships was documented in a study of trustee compensation

for 82 of the largest fund families. "[T]he study revealed a disturbing pattern: The more money trustees get, the more shareholders pay in expenses. This unexpected link between trustees' salaries and fund-family expenses raises serious questions about the role independent trustees play in protecting shareholders." Michael Mulvihill, "A Question of Trust" (Morningstar, Inc. 1996). (Emphasis added.)

13. The allegations in this complaint are remarkably simple, and illustrate these problems. Plaintiff alleges that none - much less 40% - of the members of the Fund's board are independent, as required by ICA Section 10(a). As a result, the Agreements were not negotiated at arm's-length and could not be properly approved as required by ICA Section 15(c). Consequently, the Fund has paid defendants' excessive fees pursuant to invalid, sweetheart contracts, thereby entitling plaintiff to seek recovery of those fees pursuant to ICA Section 36(b).

Jurisdiction And Venue

14. This action is brought pursuant to ICA Section 36(b), 15 U.S.C. § 80a-35(b). Subject matter jurisdiction exists under 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

15. Venue is properly laid in this District because many of the acts and transactions, and much of the conduct, constituting the alleged violations of law occurred herein. The defendants maintain their offices in this District.

16. In connection with the acts, conduct, and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephone communications.

## Parties

17. Plaintiff is, and continues to be, a shareholder of the Fund, an investment company registered under the ICA.

18. The Adviser serves as investment adviser to the Fund and is excessively compensated therefor. Its principle offices are located at 100 Mulberry Street, Newark, New Jersey 07102-4077.

19. The Distributor provides distribution, marketing, administrative, and other services and activities to the Fund. It is a Delaware limited liability company, and an affiliate of the Adviser. The Distributor is excessively compensated for its distribution, marketing, and administrative services.

## Claim For Relief

20. The Fund is an "investment company" within the meaning of the ICA. The ICA requires that an investment company such as the Fund be overseen by a board of directors or trustees of whom at least 40% may not be "interested" persons. 15 U.S.C. § 80a-10(a). Such directors or trustees are generally referred to as "independent" directors or trustees.

21. The ICA imposes strict criteria for independence. For example, an independent director or trustee may not have any

affiliation or material relationship with a fund's adviser, its underwriter, or a broker/dealer, or with any of their affiliates. ICA Section 2(a)(19), 15 U.S.C. § 80a-2(a)(19). Under the ICA, an affiliation with a person arises from, among other things, a relationship of control. ICA Section 2(a)(3), 15 U.S.C. § 80a(2)(a)(3).

22. Most investment companies, as here, are externally managed -- they have no officers or employees apart from those supplied by the investment adviser or other service providers. For this reason, independent directors play an especially vital role in the management of funds. Under the ICA, they are required to, among other things: (a) approve any contracts between a fund and its sponsors, underwriters, or advisers; and (b) evaluate and approve fees paid to sponsors and their affiliates, including advisory and distribution fees.

23. The defendants have received substantial fees pursuant to the Agreements. However, as set forth below, the Agreements were not approved by a board of which any (and certainly not 40%) of the members were independent of the Adviser.

24. The Fund has an eleven member board of directors. Three of the eleven directors are acknowledged affiliates of the Adviser.

25. Richard A. Redeker is the President of Prudential Investment, as well as a director of the Fund.

26. Robert F. Gunia is Executive Vice President and Treasurer of the Adviser, as well as a director of the Fund.

27. Mendel A. Melzer is Chief Investment Officer of 38 Prudential Investment mutual funds and annuities, as well as a director of the Fund.

28. The remaining eight directors are not employed by the Adviser, but serve on multiple boards of the funds managed by the Adviser or its affiliates (the "Fund Complex") and receive substantial compensation therefrom:

| Name Of Director | Total 1997 Compensation Received From The Fund And The Fund Complex | Number of Funds |
|---|---|---|
| Edward Beach | $135,000 | 38 |
| Delayne D. Gold | $135,000 | 38 |
| Douglas H. McCorkindale | $ 70,000 | 20 |
| Thomas T. Mooney | $115,000 | 31 |
| Stephen P. Munn | $ 45,000 | 15 |
| Robin B. Smith | $ 90,000 | 27 |
| Louis A. Weil, III | $ 90,000 | 26 |
| Clay T. Whitehead | $ 45,000 | 15 |

29. The excessive number of boards upon which the Fund's directors serve and concomitant assembly-line, truncated board meetings, effectively prevents them from being able to fulfill their statutory role as watchdogs for the public investors. Rather, the Fund's board is effectively controlled by the Adviser and its affiliates and merely rubber-stamps proposals of defendants. As a result, each of the directors is an

"interested person" within the meaning of ICA Sections 2(a)(3), 2(a)(19)(A)(i), and 2(a)(19)(B)(i), 15 U.S.C. §§ 80a-2(a)(3), 80a-2(a)(19)(A)(i), and 80a-2(a)(19)(B)(i).

30. Beach, Gold, Mooney, and Weil also serve on the board of directors of The High Yield Fund, Inc. along with Redeker, Gunia, and Melzer.

31. The total compensation shown includes amounts deferred under the funds' deferred compensation plans. Including accrued interest, total deferred compensation amounted to $71,640, $143,909, and $139,097 for McCorkindale, Mooney, and Smith, respectively.

32. The foregoing compensation is greater than the collective investment these individuals have in each of the funds within the Fund Complex.

33. As alleged herein, ICA Section 10(a), 15 U.S.C. § 80a-10(a), requires that at least 40% of the members of the board of directors of every registered investment company not be "interested persons," i.e., be independent of the investment adviser. ICA Section 15(c), 15 U.S.C. § 80a-15(c), provides, in pertinent part, that it is "unlawful for any registered investment company having a board of directors to enter into" a contract or agreement with an investment adviser or distributor, "unless the terms of such contract or agreement . . . have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party . . .." As more than 60% of the directors of the

11

Fund are "interested persons" within the meaning of the ICA, the Agreements could not have been approved as required by Section 15(c) of the ICA. Accordingly, the Agreements are invalid and the excessive compensation paid to the Adviser and the Distributor wrongly received.

34. By reason of the foregoing, the Adviser and the Distributor have breached their fiduciary duty to the Fund by accepting compensation pursuant to the non-arm's-length Agreements. Plaintiff seeks, pursuant to Section 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by the Adviser and the Distributor, up to and including, "the amount of compensation or payments received from" the Fund.

**WHEREFORE**, plaintiff demands judgment pursuant to Section 36(b) as follows:

1. declaring that the Adviser and the Distributor violated Sections 10(a), 15(c), and 36(b) of the ICA, and that the Agreements are void <u>ab initio</u>;

2. awarding damages against the Adviser and the Distributor, consisting of all fees paid to each of them by the Funds beginning one year before this action was instituted, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

3.  such other and further relief as may be just and proper.

Dated:    December 10, 1998

                                                Law Offices of James V.
                                                  Bashian, P.C.

By: _____
      James V. Bashian, Esq. (6331)
      Fairfield Commons,
      271 Route 46 West,
      Suite F-207
      Fairfield, NJ 07004
      (973) 227-6330

Of Counsel:

Wechsler Harwood Halebian
  & Feffer LLP
Stuart D. Wechsler
Joel C. Feffer
Jeffrey M. Haber
488 Madison Avenue
New York, New York 10022
(212) 935-7400

Attorneys for Plaintiff

F:\complnj.amd

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the First Amended Complaint was served on December 10, 1998 by first class mail upon the following attorneys:

Joel M. Silverstein, Esq.
STERN & GREENBERG
75 Livingston Avenue
Roseland, New Jersey 07068

Sean M. Murphy, Esq.
ROGERS & WELLS LLP
200 Park Avenue
New York, New York 10166-0153

_____
JAMES V. BASHIAN