ORIGINAL

FILE COPY

Wechsler Harwood LLP
Joel C. Feffer (JF-2608)
Daniella Quitt (DQ-1963)
488 Madison Avenue
New York, New York 10022
(212) 935-7400

Bull & Lifshitz, LLP
Joshua M. Lifshitz
18 East 41st Street, 11th Floor
New York, New York 10017
(212) 213-6222

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
CHANA YAMPOLSKY and          :
DAVID YAMPOLSKY,             :
                             :
            Plaintiffs,      :
                             :
      -against-              :          COMPLAINT
                             :
MORGAN STANLEY INVESTMENT    :     03 CV    5710
ADVISERS INC. and MORGAN     :
STANLEY DISTRIBUTORS, INC.,  :
                             :      JUDGE STANTON
            Defendants.      :
---------------------------------x

Plaintiffs, for their complaint, allege the following

upon personal knowledge as to themselves and their own acts, and

as to all other matters upon information and belief, based upon

the investigation made by and through their attorneys.

Nature of the Action

1.    Plaintiffs bring this action pursuant to

Section 36(b) of the Investment Company Act of 1940, as amended

(the "ICA"), 15 U.S.C. § 80a-35(b).  This claim is brought on

behalf of the Morgan Stanley American Opportunities Fund (the

"Fund") against its investment adviser, Morgan Stanley Investment Advisers Inc. (the "Adviser") and its principal underwriter, Morgan Stanley Distributors Inc. (the "Distributor"), for breach of fiduciary duty in respect of their compensation.

2.    In April 2003, the United States Securities and Exchange Commission (the "SEC") accused Morgan Stanley & Co. Incorporated, the parent corporation of both the Adviser and Distributor ("Morgan Stanley"), of paying other firms to provide favorable research coverage for its clients and, in essence, prostituting its own research analysts in order to enhance the profitability of its investment banking business by helping to convert the capital markets into a giant Ponzi scheme.  Morgan Stanley paid $125,000,000 to settle the SEC's charges.  The day after Morgan Stanley's settlement with the SEC was publicly disclosed, Philip J. Purcell, Morgan Stanley's Chairman of the Board and Chief Executive Officer ("Purcell"), told a conference of institutional investors that "we [Morgan Stanley] have maintained our standards . . . as well as our reputation" and "I don't see anything in the settlement that will concern the retail investor about Morgan Stanley.  Not one thing."

3.    In addition to serving as Morgan Stanley's Chairman and CEO, Purcell is currently a trustee of the Fund and has been a trustee of the Fund since 1994, although he does not have any investment in the Fund.  Because of his lofty position

at the pinnacle of Morgan Stanley's hierarchy, as well as his
conflicted position as a Fund trustee, and the supine posture of
the Fund's Board of Trustees, Purcell sets the corporate
governance tone for the Fund.  As Purcell's statement quoted in
paragraph 2, supra, makes clear, Morgan Stanley's hierarchy and
their hand-picked fund trustees act as if they are oblivious to
their responsibilities to the clients and investors of Morgan
Stanley and its affiliates, including the defendants. The absence
of arm's-length negotiations with a richly rewarded but
underperforming Board has resulted in both the Adviser and
Distributor being vastly over compensated, in breach of their
duties under ICA Section 36(b).

4.    The Fund is a Massachusetts business trust and its
investment objective, as described by defendants, is "long-term
capital growth consistent with an effort to reduce volatility."

Jurisdiction and Venue

5.    This action is brought pursuant to ICA
Section 36(b), 15 U.S.C. § 80a-36(b).  Subject matter
jurisdiction exists under, inter alia, 15 U.S.C. § 80a-43, 15
U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

6.    Venue is properly laid in this District because
many of the acts, transactions, and conduct constituting the
violations of law complained of occurred herein.  The Adviser,
the Distributor, and the Fund maintain offices in this District.

7.    In connection with the acts, conduct, and other wrongs complained of herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephone communications.

Parties

8.    Plaintiffs, Chana Yampolsky and David Yampolsky, both residing in New York City, bought shares of the Fund on February 2, 2000, and have held shares continuously thereafter.

9.    Defendant Adviser is a Delaware corporation, with offices at 1221 Avenue of the Americas, New York, New York 10020. The Adviser is a wholly-owned subsidiary of Morgan Stanley.  The Adviser provides administrative services and manages the investment of the Fund's assets, including the placing of orders for the purchase and sale of portfolio securities.  The Adviser's publicly-disclosed compensation from the Fund for such services is paid monthly and calculated based upon the Fund's daily net asset value as follows:

| Annual Rate | Net Asset Value Of Fund |
|---|---|
| 0.625% | up to first $250,000,000 |
| 0.500% | thereafter to $2,500,000,000 |
| 0.475% | thereafter to $3,500,000,000 |
| 0.450% | thereafter to $4,500,000,000 |
| 0.425% | over $4,500,000,000 |

In addition to the foregoing compensation, the Adviser receives compensation from broker-dealers in the form of "soft dollars" and is the beneficiary of other kick-back arrangements in which

4

the assets of the Fund are used for the benefit of Morgan Stanley and its affiliates rather than the Fund's investors.  During the years 2000, 2001, and 2002, the Adviser publicly disclosed compensation from the Fund of $54,429,087, $39,011,595, and $27,848,219, respectively.  The Adviser does not publicly disclose the value of the "soft dollar" compensation and other under-the-table benefits it receives but plaintiffs believe they are significant.  Accordingly, plaintiffs cannot determine the Adviser's total compensation in the absence of discovery.

10.  Defendant Distributor is a Delaware corporation, also has offices at 1221 Avenue of the Americas, New York, New York 10020 and is also a wholly-owned subsidiary of Morgan Stanley.  In addition to amounts received from contingent deferred sales charges and front-end sales charges, the Fund accrued for the benefit of the Distributor pursuant to a Rule 12b-1 plan, an aggregate of $52,232,037 during 2002.

11.  The compensation received by the defendants, as well as other Morgan Stanley affiliates, from the Fund and other funds operated by Morgan Stanley affiliates, is so great, that Morgan Stanley is being investigated by the SEC, National Association of Securities Dealers, and state regulators for violations of rules preventing their employees from receiving incentives to aggressively market Morgan Stanley funds and discourage investment in mutual funds sponsored by entities

unrelated to Morgan Stanley, irrespective of the needs of the
client.    Recently, Morgan Stanley acknowledged that it provided
Massachusetts regulators with inaccurate information in
connection with an investigation into Morgan Stanley's mutual
fund sales practices.

Claim-ICA Section 36(b)

12.    The Adviser and the Distributor, and each of them,
have a fiduciary duty with respect to the receipt of compensation
for services, or of payments of a material nature, paid by the
Fund or investors in the Fund.

13.    The Adviser and the Distributor, and each of them,
breached such fiduciary duty by receiving unreasonably high
compensation and other payments.

Nature and Quality of Services Provided to Fund Investors

14.    The primary service provided by the Adviser is the
investment of the Fund's assets.    The results of the Adviser's
investments have been substandard, at best.    During 2002, the
Funds B Shares (approximately 83% of all of the Fund's
outstanding shares at December 31, 2002 were B Shares) incurred a
26.94% after-tax loss, compared with a 22.09% loss by the
Standard & Poor's 500 Index ("S&P 500 Index").    Over the past
five years, the Fund's B Shares have incurred an average annual
after-tax loss of 3.67%, compared with an average annual loss of
0.58% by the S&P 500 Index.    Over the past ten years, the Fund's

B Shares have realized an average after-tax gain of 4.95%, compared with an average annual gain of 9.35% by the S&P 500 Index -- almost twice as high.

15.   In absolute terms, the Fund's performance has been equally dismal.  During 2002, the Fund had total investment revenue (from dividends and interest) of $63,451,996.  Its expenses, chiefly the Rule 12b-1 payments to the Distributor, the fee to the Adviser, and other payments to affiliates of the Adviser and Distributor, aggregated $91,286,230, or 144% of revenues.  On top of this, the Fund's investment portfolio declined by an enormous $1,260,834,120 during 2002.  Yet 2002 was actually much better than 2001 when, under the stewardship of the Adviser, the Fund lost an astronomical $2,369,470,836.

16.   Aside from being a testament to the political power of the asset management industry, it is difficult to understand what benefit the payment of the Rule 12b-1 fees to the Distributor confers on the Fund.  The typical rationalization for the existence of Rule 12b-1 fees is the larger the fund, the lower the expense ratio (i.e., the ratio of expenses to assets).  That rationalization does not stand up to the facts here.  The Fund paid the Distributor $49,885,449 in respect of Class B Shares for 2002.  Yet the Fund's Class B assets declined by 37% during the period, the Fund's expense ratio increased by only 0.06%, and the $49,885,449 paid to the Distributor accounted for

almost 55% of the Fund's total expenses during 2002. Clearly, the cost of the Rule 12b-1 fees paid to the Distributor far outweighed any speculative benefit to the Fund from the Distributor's activities.

Profitability to Defendants

17. Plaintiffs are unaware of any public information concerning the profitability of the Fund to the Adviser, the Distributor, or Morgan Stanley so that concrete information on this issue must await discovery. However, the sheer enormity of just the Rule 12b-1 fees and the advisory fees (an aggregate of more than $80,000,000 in 2002) suggests that the Fund must generate significant profits to defendants.

18. When "soft dollar" compensation and other under-the-table benefits are added to the reported compensation described in the preceding paragraph, a logical inference is that the Fund generates unreasonably high profits to defendants.

19. For example, the Fund's portfolio turnover rate in the years 1998 through 2002 was 321%, 378%, 425%, 380%, and 306%, respectively. Accordingly, and on average, the Fund, during the years 1998 through 2002, bought and sold a stock within approximately three and one-half months. Such frequent trading, in addition to resulting in adverse tax consequences, is inconsistent with the Fund's stated investment objective of "long-term capital growth consistent with an effort to reduce

volatility" but is fully consistent with defendants using the Fund's assets to generate brokerage commissions in order to maximize "soft dollar" compensation and other under-the-table benefits at the expense of the Fund and its investors.

Fall-out Benefits

20.   "Fall-out benefits" have been defined by the Second Circuit as "financial benefits . . . in the form of commissions on non-Fund securities business generated by Fund customers and interest income on funds (known as the 'float') held by the Broker from the date when a redemption check is issued by the Fund to its customer until the date it clears." Gartenberg v. Merrill Lynch Asset Mgm't, Inc., 694 F.2d 923, 932 (2d Cir. 1982).  As defendants do not release publicly any information concerning fall-out benefits, in the absence of discovery, plaintiffs cannot plead any facts concerning fall-out benefits.

Economies of Scale

21.   The asset management industry is one of the few businesses in which participants act as if there are no economies of scale.  In fact, the participants act as if the reverse is true.  Arthur Levitt, former Chairman of the SEC, testified before Congress on March 19, 1997, that notwithstanding the enormous amount of monies that have been cascading into mutual funds, "the fee structure of those funds appears to be going up,

9

not down." Levitt Tells Senate Appropriations Panel Concern About Mutual Fund Fee Structure, 29 Sec. Reg & L. Rep. (BNA), 370 (Mar. 21, 1997).

22.  After noting, in October 1996, that "total assets under management now stand at more than $3 trillion [total assets under management have since increased to about $7 trillion], compared with about $450 billion at the beginning of the decade and just $49 billion in 1980," and charting the increase in management fees over the past decades, one commentator stated as follows:

> Given the industry's explosive growth, it's hard to explain why management fees have also gone up on a percentage basis.  The money-management business is a textbook case of an industry with tremendous operating leverage.  It's not capital-intensive, and once assets hit a certain size, each additional dollar that comes in the door can be managed at little additional cost.  If anything, management fees should be going down.

Amy Arnott, "The Rising Tide" (Morningstar Inc. 1996). Morningstar, Inc. ("Morningstar") is a leading publisher of analytical information relating to the investment company industry.

23.  Studies conducted by The Wharton School of the University of Pennsylvania and the SEC during the 1960s criticized as exorbitant the average 0.50% advisory fee charged at that time.  In 1960, the entire fund industry consisted of 161

funds and had total assets under management of only
$17,025,700,000. The Fund, by itself, at December 31, 2002, had
assets of $4,723,398,687, or almost 28% of the entire fund
industry's assets in 1960.

24.  Yet the Adviser's fees, as described <u>supra</u>,
coupled with the Rule 12b-1 fees paid to the Distributor (Rule
12b-1 fees did not exist during the 1960s) far exceed the fees
found exorbitant during the 1960s. The Fund, consequently, is a
paradigm of what former SEC Chairman Levitt described as a
counter-intuitive example of a lack of economies of scale.

<u>Comparative Expense Ratios and Advisory Fees</u>

25.  As the Second Circuit has observed, "the existence
in most cases of an unseverable relationship between the adviser-
manager and the fund it services tends to weaken the weight to be
given to rates charged b                    imilar funds."
<u>Gartenberg v. Merri</u>                   <u>Asset Mgm't, Inc.</u>, 694 F.2d at 929.

26.  However, even in an industry marked by bloated
expense ratios and fee gouging, the Fund stands out. During
2002, and for the privilege of having the net asset value of
their Class B Shares reduced from $23.56 to $18.12, or 23%, the
holders of Class B Shares were subjected to an expense ratio of
1.67%, or 10.6% higher than the already bloated industry expense
ratio average of 1.51%.

27.  As far as the Adviser's fees are concerned, and as described supra, a substantial portion of the Adviser's revenue from the Fund is in the form of "soft dollar" compensation and other under-the-table arrangements.  To the extent that the Adviser selects brokers because of sales of Fund shares or shares of other Morgan Stanley funds, any excess commissions paid are required, by Rule 12b-1, to be separately reported as distribution expenses.  The Fund makes no such disclosure.  Accordingly, as the total fees received by the Adviser is not publicly disclosed, any comparison with similar funds cannot be made until after discovery.  However, the disclosed management fee of 0.48%, by itself, is greater than fees charged by Vanguard or Fidelity, the  operators of the two largest mutual fund groups for comparable funds.

Trustees' Approval

28.  The United States Supreme Court, in Burks v. Lasker, 441 U.S. 4761 (1979), after describing the inherent conflict of interest between an investment adviser and an investment company, noted that "the cornerstone of the ICA's efforts to control conflicts of interest . . . is the requirement that at least 40% of a fund's board be composed of independent outside directors."  441 U.S. at 482.  (Footnote omitted.)  In other words, the independent directors (trustees in the instant action) are to serve as "watchdogs" for investors as "the

structure and purpose of the ICA indicate that Congress entrusted
to the independent directors . . . the primary responsibility for
looking after the interests of the fund's shareholders." Id. at
484-85 (footnote omitted).

29.   ICA Section 15(c), 15 U.S.C. § 80a-15(c), provides
that every agreement between a fund and its adviser or principal
underwriter, must be approved by a vote of a majority of the
independent trustees.  To emphasize the importance of independent
trustee approval, ICA Section 15(c) provides that the independent
trustees must vote "in person at a meeting called for the purpose
of voting on such approval."  ICA Section 15(c) also provides
that "[i]t shall be the duty of the [trustees] . . . to request
and evaluate, and the duty of an investment adviser . . . to
furnish, such information as may reasonably be necessary to
evaluate the terms of any [advisory] contract."

30.   In addition, "the expertise of the independent
trustees of a fund, whether they are fully informed about all
facts bearing on the adviser-manager's service and fee, and the
extent of care and conscientiousness with which they perform
their duties are important factors to be considered in deciding
whether they and the adviser-manager are guilty of a breach of
fiduciary duty in violation of § 36(b)." Gartenberg v. Merrill
Lynch Asset Mgm't, Inc., 694 F.2d at 930.

13

31.  Notwithstanding the structural protections built into the ICA, investment advisers and their affiliates have been able to engage in widespread fee-gouging.

32.  The principal reason for the subversion of the ICA is that the independent trustees have largely been co-opted by the adviser, are no longer independent "watchdogs," and have ceased to be able to distinguish the interests of the adviser and its affiliates from the interests of the investors.

33.  Jack Bogle, founder of the Vanguard Group, one of the largest mutual fund complexes in the world, responded during an interview conducted by Morningstar to the indicated question as follows:

> Q.  We've talked about how the industry could do a better job.  How about the fund directors?
>
> A.  Well, fund directors are, or at least to a very major extent, sort of a bad joke.  They've watched industry fees go up year after year, they've watched expense ratios go up year after year, they've added 12b-1 fees.  I think they've forgotten, maybe they've never even been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund advisor.  It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

"Morningstar interviews . . . Jack Bogle, Founder of the Vanguard Group," by Kathryn Haines and Russ Kinnel, www.morningstar.net, posted June 5, 1998.

14

34.   In the October 1998 issue of Mutual Funds, published by Time, Inc., Mr. Bogle again noted that "Mutual fund fees are exorbitantly excessive."   J. Bogle, "Fund Fees Are Beyond Excessive," Mutual Funds at p. 80 (Time, Inc., October 1998).   Mr. Bogle went on to explain the reason why mutual fund fees are "exorbitantly excessive," stating:

> Simply put, the substantial economies of scale in this business are not being passed along to shareholders in the form of lower expenses.  To the contrary, many fund management firms are earning extraordinary -- and, I would argue, excessive -- profits on a growing pot of assets.
>
> I find it almost unconscionable that an "independent" fund director, who is bound by law and fiduciary duty to represent shareholders, would continue to approve almost whatever fee is proposed to the fund board by the fund manager.  Fund boards should be considering fee rate reductions.

Id.

35.   A root cause of the transformation of the position of trustee from "watchdog" to that of a sinecure, is the recent growth of huge mutual fund complexes and the practice of offering the same individuals multiple trusteeships, i.e., trusteeships of more than one fund managed by the same investment adviser.  (In the 20-year period from 1981-2001, the number of funds increased from 665 to 8,307.)  The "Fund Director's Guidebook," compiled by eminent practitioners representing the asset management industry, cautions that

15

the increased responsibility and workload as
well as potential conflicts that accompany
service on a number of boards must be
considered when an individual serves on the
board of more than one fund with the same or
related sponsors.

Task Force - A.B.A. Sec. Bus. L., <u>Fund Director's Guidebook</u>, 52

<u>The Bus. Law.</u> 229, 240 (1996).

36.   The National Association of Corporate Directors is

a non-profit organization, the membership of which includes more

than 1,700 executive officers who serve on, or deal with,

corporate boards.   It has issued the following guidelines when

considering candidates for board membership:

> [T]he Commission recommends that boards in
> general consider the following guidelines for
> different categories of candidates:
>
> [a]   CEOs and other senior executives of
> public corporations:  Boards should prefer
> individuals who hold no more than one or two
> public-company directorships (including the
> position to be offered) in addition to
> membership on their own company board.
>
> [b]   Other individuals with full-time
> positions:  Boards should prefer individuals
> who hold no more than three or four public-
> company directorships (including the position
> to be offered) in addition to membership on
> their own organization's board.
>
> [c]   Other individuals:  Boards should
> prefer individuals who hold no more than five
> or six public-company directorships
> (including the position to be offered).

16

National Ass'n of Corp. Directors, <u>Report of the NACD Blue Ribbon Commission on Director Professionalism</u>, at 12 (1996) (footnote omitted).

     37.  The relationship between fee-gouging and multiple directorships was documented in a study of trustee compensation for 82 of the largest fund families.  "[T]he study revealed a disturbing pattern:  <u>The more money trustees get, the more shareholders pay in expenses</u>.  This unexpected link between trustees' salaries and fund-family expenses raises serious questions about the role independent trustees play in protecting shareholders."  Michael Mulvihill, "A Question of Trust" (Morningstar, Inc. 1996) (emphasis added).

     38.  The defendants are poster-children for the excesses that have plagued the mutual fund industry.

     39.  The Fund has an eight-member Board of Trustees. Three of the trustees are acknowledged affiliates of the defendants:

     (a)  As set forth <u>supra</u>, Purcell is Chairman of the Board of Directors and Chief Executive Officer of Morgan Stanley.  He is also a director of the Distributor.

     (b)  Charles A. Fiumefreddo is the former Chairman and Chief Executive Officer of both the Adviser and the Distributor.

     (c)  James F. Higgins is a Senior Adviser to Morgan Stanley and a director of the Distributor.

40. The remaining five trustees are not directly employed by either defendant, but serve on multiple boards of Morgan Stanley funds (the "Fund Complex") and receive substantial compensation therefrom:

| Name of Trustee | 2002 Total Cash Compensation Received From Fund Complex | Number of Funds |
|---|---|---|
| Michael Bozic | $159,650 | 123 |
| Edwin J. Garn | $159,650 | 123 |
| Wayne E. Hedien | $158,950 | 123 |
| Manuel H. Johnson | $226,063 | 123 |
| Michael E. Nugent | $293,475 | 200 |

41. The foregoing cash compensation is greater than the collective investment these individuals have in the Fund. In fact, Messrs. Bozic, Hedien, and Johnson have no investment in the Fund.

42. In addition to the foregoing cash compensation, the "independent" directors also are eligible to receive lucrative retirement benefits. The estimated annual retirement benefits, based on current compensation, in respect of just 49 of the Morgan Stanley funds, for Messrs. Bozic, Garn, Hedien, Johnson, and Nugent, are $47,838, $47,838, $40,842, $70,050, and $62,646.

43. In addition to serving as a trustee for 123 registered investment companies operated by Morgan Stanley

18

affiliates, Mr. Bozic is also a director of Weirton Steel
Corporation.  In addition to serving as a trustee for 123
registered investment companies operated by Morgan Stanley
affiliates, Mr. Garn is Vice Chairman of Huntsman Corporation, a
director of Franklin Covey, BMW Bank of North American, Inc.,
United Space Alliance, and Nuskin Asia Pacific, as well as a
member of the boards of various civic and charitable
organizations.  In addition to serving as a trustee for 123
registered investment companies operated by Morgan Stanley
affiliates, Mr. Hedien is a director of The PMI Group Inc., Vice
Chairman of The Field Museum of Natural History, and a director
of various other businesses and charitable organizations.  In
addition to serving as a trustee for 123 registered investment
companies operated by Morgan Stanley affiliates, Mr. Johnson is
Senior Partner of Johnson Smick International Inc., a director of
NVR, Inc., and Chairman of the Financial Accounting Foundation.
In addition to serving as a trustee for 200 registered investment
companies operated by Morgan Stanley affiliates, Mr. Nugent is
General Partner of Triumph Capital, L.P., and director of various
business organizations.

    44.  "Independence" is not a function of an
individual's pedigree or resume.  According to former SEC
Chairman Levitt, in a May 15, 1998 speech, independence "comes
from individual directors . . . doing their jobs aggressively."

http://www.sec.gov/news/speech/speecharchive/1998/spch212.txt.
In view of the enormous number of trusteeships held, the
trustees' significant and time-consuming other activities, as
well as the substantial compensation these individuals receive
from their Morgan Stanley-related activities, they have neither
the time nor the inclination to aggressively protect the
interests of the Fund's public investors by gathering and
analyzing the necessary information and by negotiating at arm's-
length with the Adviser and the Distributor over their respective
compensation.

        45.   The excessive number of boards upon which the
Fund's trustees serve, coupled with their other activities and
concomitant assembly-line, truncated board meetings, effectively
prevents the "independent" trustees from being able to fulfill
their statutory role as watchdogs for the public investors.
Rather, the Fund's board is effectively controlled by the Adviser
and its affiliates and merely rubber-stamps proposals of
defendants.  Alternatively, and in view of their substantial
compensation, each "independent" trustee is the functional
equivalent of an employee of Morgan Stanley and its affiliates.
As a result, each of the trustees is an "interested person"
within the meaning of ICA Sections 2(a)(3)(C) and (D),
2(a)(19)(A)(i), and 2(a)(19)(B)(i), 15 U.S.C. §§ 80a-2(a)(3)(C)
and (D), 80a-2(a)(19)(A)(i), and 80a-2(a)(19)(B)(i).

                                20

46. In addition to the trustees' approval of the Adviser's and Distributor's unreasonable compensation being nothing other than a rubber-stamp response, ICA Section 10(a), 15 U.S.C. § 80a-10(a), requires that at least 40% of the members of the board of directors of every registered investment company not be "interested persons," i.e., be independent of the investment adviser and its affiliates. ICA Section 15(c), 15 U.S.C. § 80a-15(c), provides, in pertinent part, that it is "unlawful for any registered investment company having a board of directors to enter into" a contract or agreement with an investment adviser or distributor, "unless the terms of such contract or agreement . . . have been approved by the vote of a majority of directors, who are not parties to such contract or agreement or interested persons of any such party . . . ." As more than 60% of the directors of the Fund are "interested persons" within the meaning of the ICA, the advisory and distribution agreement could not have been approved as required by Section 15(c) of the ICA. Accordingly, such agreements are invalid and the excessive compensation paid to the Adviser and the Distributor wrongly received.

47. By reason of the foregoing, the Adviser and the Distributor have breached their fiduciary duty to the Fund by accepting unreasonably high compensation pursuant to non-arm's-length agreements. Plaintiffs seek, pursuant to Section 36(b)(3)

21

of the ICA, the "actual damages resulting from the breach of fiduciary duty" by the Adviser and the Distributor, up to and including, "the amount of compensation or payments received from" the Fund and investors therein.

**WHEREFORE**, plaintiffs demand judgment pursuant to Section 36(b) as follows:

1.     declaring that the Adviser and the Distributor violated Sections 10(a), 15(c), and 36(b) of the ICA, and that the advisory and distribution agreements are void _ab initio_;

2.     awarding damages against the Adviser and the Distributor, consisting of all fees paid to each of them by the Fund and investors therein beginning one year before this action was instituted, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

3.     such other and further relief as may be just and
proper.

Dated:     July 31, 2003

                                   Wechsler Harwood LLP

                        By: _____
                                   Joel C. Feffer (JF-2608)
                                   Daniella Quilt (DQ-1963)
                                   488 Madison Avenue
                                   New York, New York 10022
                                   (212) 935-7400

                                   Bull & Lifshitz, LLP
                                   Joshua M. Lifshitz
                                   18 East 41st Street, 11th Floor
                                   New York, New York 10017
                                   (212) 213-6222

                                   Attorneys for Plaintiffs

23