# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MARCUS DUMOND, et al.,

        Plaintiffs,

    v.

MASSACHUSETTS FINANCIAL SERVICES
CO. and MFS FUND DISTRIBUTORS, INC.,

        Defendants.

C.A. No. 04-11458 (GAO)

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Jeffrey B. Rudman (BBO #433380)
William H. Paine (BBO #550506)
Jonathan A. Shapiro (BBO #567838)
Matthew A. Stowe (BBO #650473)
Elizabeth J. Mone (BBO # 650794)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000

*Attorneys for Defendants Massachusetts Financial Services Company and MFS Fund Distributors, Inc.*

June 24, 2005

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      Rule 8(a) Requires Plaintiffs To Plead A Factual Basis For Their Claims. .........................2

II.     Rule 8(a) Requires Plaintiffs To Plead A Factual Basis As To Why The Fees Charged By MFS Were "So Disproportionately Large" Given The Services MFS Rendered. ...............................................................................................................5

III.    Plaintiffs Do Not State A Claim Against MFS Because Claims Have Been Stated Against MFS's Competitors. .......................................................................................7

IV.     This Complaint Is Missing The Factual Allegations Necessary To State A Claim...........10

V.      The Complaint Here Is Unlike Those Sustained by Other Courts.....................................15

        A.      This Complaint Is Weaker Than Those That Have Been Dismissed. ...................15

                1.      <u>Migdal</u>. ....................................................................................................15

                2.      <u>Sheldon Krantz</u>. ......................................................................................17

                3.      <u>Yampolsky</u>. ..............................................................................................17

        B.      The Cases That Plaintiffs Cite Are Not "Virtually Identical."............................18

                1.      <u>Wicks</u>. ......................................................................................................18

                2.      <u>Richard Krantz</u>. ......................................................................................20

                3.      <u>Strigliabotti</u>. ...........................................................................................21

                4.      <u>Jones</u>. .......................................................................................................21

                5.      <u>Miller</u>. ......................................................................................................23

*Introduction*

If the pleaded conclusion that "MFS's fees are excessive" could pass muster under Rule 8(a), then the Complaint would state a claim. But because pleaded conclusions are not enough, and because the allegations of the Complaint provide no notice as to why the fees charged by *MFS* compare unfavorably to the services *MFS* provided, the Complaint in this case must be dismissed. As their Complaint relates to *MFS*, plaintiffs do little more than insert MFS's name into the legal conclusions set out by the court in Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923 (2d Cir. 1982), when considering claims under § 36(b). These conclusions in turn are the only support for the more general conclusion that MFS's fees are unlawfully "excessive." Nowhere is there even a simple statement of the sort of well-pleaded facts that Rule 8(a) requires.

Rule 8(a) does not allow plaintiffs to avoid pleading facts about the MFS funds on whose behalf they sue, and instead to plead conclusions about the mutual fund industry in general, other investment advisers, and MFS Funds not at issue. The *only* allegations concerning the relationship between fees charged by MFS to the specific funds at issue and the services provided (which is what this case is about) are legal conclusions of the sort that the First Circuit recently reaffirmed cannot be credited under Rule 8(a). This is not enough, and plaintiffs cannot change that result with unsupportable say-so that this case must go forward because their Complaint is similar to others that courts have not dismissed.

In short, if this exceptionally thin case is permitted to go forward, then any plaintiff who can cobble together some industry comments and some generic corporate information, while sprinkling its complaint with words like "excessive" and "economies of scale," can embark on a

§ 36(b) fishing expedition. Courts of Appeals in three Circuits have recognized that such a result would not be in accord with the law.

## I.    Rule 8(a) Requires Plaintiffs To Plead A Factual Basis For Their Claims.

Plaintiffs argue that after <u>Swierkiewicz v. Sorema, N.A.</u>, 534 U.S. 506 (2002), Rule 8(a) effects no perceptible barrier to discovery fishing expeditions. They assert that requiring them to plead facts about the fees charged to the *funds at issue* in this "excessive fee" case would be an "unmistakable . . . heightened pleading standard." Opp. at 3. They assert that articles and political commentary about the mutual fund industry, and allegations about practices of other fund complexes or about MFS funds not at issue in this case, are enough to state a claim that MFS was paid excessive fees for managing the particular funds they seek to represent. They claim they have no burden to set forth any "detailed facts" about the funds actually at issue in this case or the specific fees charged to them in exchange for specific services, and having taken the position that any fact is "detailed," they thus need plead no facts at all. Opp. at 5. Their argument misapprehends Rule 8(a), <u>Swierkiewicz</u>, and subsequent First Circuit precedent.

Rule 8(a) requires that in all cases (except those where a heightened pleading standard applies) the complaint must set forth "a short and plain statement of the claim" that gives defendants "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a); <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957). In <u>Swierkiewicz</u>, the Supreme Court addressed what that standard means in the federal employment discrimination context and held that it does not require the complaint to set forth facts establishing every element of the McDonnell Douglas *prima facie* test where plaintiff could prevail in certain circumstances without proving every such element. <u>See</u> <u>Swierkiewicz</u>, 534 U.S. at 509-10. The complaint in <u>Swierkiewicz</u> satisfied Rule 8(a).

-2-

In <u>Swierkiewicz</u>, the plaintiff claimed age discrimination on the basis that his employer (an insurance company) replaced him with a younger, less qualified employee to "energize" the office.  <u>Id.</u> at 508.  In support of the claim the Complaint (*i*) "detailed the events leading to his termination," (*ii*) "provided relevant dates," and (*iii*) "included the ages and nationalities" of key individuals "involved with his termination."  <u>Id.</u> at 514.  These allegations were factual in nature and enough to state a claim under Rule 8(a).  The Court did *not* suggest that the complaint would have been sufficient had the plaintiff-specific allegations been omitted in favor of generic allegations that the insurance industry at large tends to discriminate, that other insurers had discriminated against their employees, or even that defendant had once discriminated against a different employee.

The First Circuit has emphasized that <u>Swierkiewicz</u> has by no means made Rule 12(b)(6) a "toothless tiger" and that a complaint subject to notice pleading standards "should at least set forth minimal facts as to *who did what to whom, when, where, and why*."  <u>Educadores Puertorriquenos en Accion v. Hernandez</u>, 367 F.3d 61, 68 (1st Cir. 2004) (emphasis added) (vacating and remanding in accordance with application of Rule 8 pleading standard applicable to employment discrimination cases); <u>see also</u> <u>Boucher v. Northeastern Log Homes, Inc.</u>, 2005 WL 758470, at *19 n.38 (D. Me. Mar. 8, 2005) (allowing summary judgment and noting that <u>Swierkiewicz</u> did not alter the First Circuit's long standing Rule 8(a) jurisprudence).[1]  The First Circuit also admonished district courts not to accept any reading of <u>Swierkiewicz</u> that would downgrade Rule 8(a) standards to "nonexistent requirements."  <u>Educadores Puertorriquenos en</u>

---

[1]     <u>See also</u> <u>Cooley v. Great S. Wood Preserving</u>, 2005 WL 1163608 (11th Cir. May 18, 2005) ("[T]he Supreme Court in <u>Swierkiewicz</u> *did not even remotely suggest* that a pleading could survive dismissal when it consisted of only the barest of conclusory allegations without notice of the factual grounds on which they purport to be based. Indeed, [p]leadings must be something more than an ingenious academic exercise in the conceivable, and unsupported conclusions of law or of mixed law and fact are not sufficient to withstand a dismissal under Fed. R. Civ. P. 12(b)(6).") (citations and quotations omitted) (emphasis added).

<u>Accion</u>, 367 F.3d at 68.  Additionally, "in considering motions to dismiss courts should continue to 'eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets.'" <u>Educadores</u>, 367 F.3d at 68 (citation omitted).[2]

That *facts* specific to the claim asserted (rather than bald assertions and conclusions) must be pleaded is clear from the illustrative pleading appended as Form 9 to the Federal Rules of Civil Procedure, which was discussed in both <u>Swierkiewicz</u> and <u>Educadores</u>.  <u>See</u> 534 U.S. at 513 n.4; 367 F.3d at 67-68.  Form 9 is a complaint for negligence in which the plaintiff states, "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway."  <u>Swierkiewicz</u>, 534 U.S. at 513 n.4.

This illustrative complaint – which identifies the defendant, and sets forth what he did, when, where, and the circumstances of the alleged negligence – is consistent with the First Circuit's requirement that a complaint must set forth facts about "who did what to whom, when, where, and why."  <u>Educadores</u>, 367 F.3d at 68.  When a car hits a pedestrian crossing Boylston Street these facts are enough to plead negligence because experience suggests that it is acceptably probable that a driver is negligent when he runs over a pedestrian.  <u>Compare</u> <u>Cooperman</u>, 171 F.3d at 47-48 (stating that a conclusion is not a "fact" for pleading purposes unless "the suggested inference rises to what experience indicates is an acceptable level of probability").  But it is not the case that a fee is probably excessive because plaintiffs say so, or because self-appointed experts believe that this is often true in the industry at large.  Nothing in the illustrative Form 9 complaint suggests that a plaintiff could state a claim for negligence by

---

[2]        The First Circuit thus continues adherence to the traditional rule that "minimal requirements are not tantamount to nonexistent requirements."  <u>Cooperman v. Individual, Inc.</u>, 171 F.3d 43, 47 (1st Cir. 1999) (citations and quotations omitted).  Therefore, "[t]o survive a motion to dismiss, plaintiffs must set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory."  <u>Id.</u>

alleging that drivers on Boylston Street in general are known to be negligent, that a driver other than defendant was negligent on Boylston Street, or that defendant once hit a pedestrian other than plaintiff on a different street in Boston.  Nor does this example suggest that the factual allegations necessary to plead a more complicated claim, or a claim more removed from common experience, need fit in a single sentence.

A complaint lacking pleaded facts supporting the conclusion that the defendant at issue harmed the plaintiff at issue (or in this case, the 11 MFS Funds at issue) cannot be saved simply by reciting every element of the operative claim and inserting defendants' names, regardless of how many times those elements are repeated or rephrased.  As the First Circuit held last year, "[s]imply parroting the language of a statutory cause of action, without providing some factual support, is not sufficient to state a claim." U.S. v. Melrose-Wakefield Hosp., 360 F.3d 220, 240 (1st Cir.), cert. denied, 125 S.Ct. 59 (2004)) (dismissing retaliation claim where, as here, complaint was devoid of any "factual predicate concrete enough to support [] conclusory statement[s]").

## II.    Rule 8(a) Requires Plaintiffs To Plead A Factual Basis As To Why The Fees Charged By MFS Were "So Disproportionately Large" Given The Services MFS Rendered.

Plaintiffs claim that the advisory and distribution fees that MFS charged 11 MFS funds (on behalf of which the Complaint is asserted) were unlawfully excessive in violation of Section 36(b) of the Investment Company Act.  Compl. ¶¶ 10,11.  As plaintiffs acknowledge, MFS could only be liable under Section 36(b) if the fees charged to those 11 Funds were "so disproportionately large that [they] bore[] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  Compl. ¶ 39 (quoting Gartenberg, 694 F.2d at 928).  Plaintiffs explicitly rely on this Gartenberg conclusion, as well as six other legal conclusions that the Second Circuit discussed when considering whether the fees charged

in that case were too "disproportionate" to the "services rendered."   See id. at ¶ 39-40;

Gartenberg, 694 F. 2d at 929-30; see also Wicks v. Putnam Inv. Mgmt., LLC, 2005 WL 705360

(D. Mass. Mar. 28, 2005).

   It is, of course, not enough to recite the Gartenberg "factors" or the broader conclusion

that the fees charged were too high.   Plaintiffs acknowledge that Gartenberg is not a pleading

case (and contrary to their argument defendants have never contended that it is).   Compare Opp.

at 6 with Def. Mem. at 4-6.   The First Circuit has made plain that pleading conclusions is not

enough.   Melrose-Wakefield Hosp., 360 F.3d at 240.   More critically, however, plaintiffs seek to

ignore the holdings of the multiple Courts of Appeals that affirmed dismissal of  Section 36(b)

lawsuits for failure to state a claim.   These are pleading cases, and they illuminate the pleading

defects of plaintiffs' Complaint.   See Sheldon Krantz v. Prudential Invs. Fund Mgmt., LLC, 305

F.3d 140 (3d Cir. 2002); Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321 (4th Cir. 2001);

Verkouteren v. Blackrock Fin. Mgmt, Inc., 1999 WL 511411 (S.D.N.Y. July 20, 1999), aff'd 208

F.3d 204 (2d Cir. 2000).

   In those cases, the Courts of Appeals for three Circuits considered what Rule 8(a)

requires plaintiffs to put in their Complaint and they were uniform in their answer.   See id.  To

state a claim, plaintiffs "must allege facts" that, if proven, are "sufficient to show" that the fee

charged to the funds that plaintiffs own were "so disproportionate[]" to the services rendered to

those particular funds that the former "bears no reasonable relationship" to the latter.   See

Migdal, 248 F. 3d at 327.   This requires a "meaningful" comparison of the fees (starting with

their amount) against the "particular services" that the defendants provided.   See id.; Sheldon

Krantz, 305 F. 3d at 143.   Significantly, in all three of these cases the Courts of Appeals affirmed

dismissal of § 36(b) claims as inadequately pleaded.   Apparently, no appellate court has ever

reversed a dismissal of a § 36(b) claim on pleading grounds, or held that such claims can be sustained absent the meaningful comparison mandated in <u>Migdal</u>.

What little plaintiffs do say about <u>Migdal</u> and <u>Krantz</u> is found on pages 11 and 12 of the Opposition.  Plaintiffs principally argue that these appellate decisions have been "effectively overruled" by <u>Swierkiewicz</u>  because, according plaintiffs, the Third and Fourth Circuits applied a "heightened fact pleading standard."  Opp. at 11.  This is wrong.  <u>Migdal</u> and <u>Krantz</u> explicitly affirmed dismissal of those complaints because they omitted the "facts" necessary to satisfy the Rule 8(a) standard.  <u>See</u> <u>Sheldon Krantz</u>, 305 F.3d at 144 (affirming dismissal of § 36(b) claim and rejecting argument that requiring plaintiffs to plead facts supporting their claim would impose a "'heightened standard' of pleading"); <u>Migdal</u>, 248 F.3d at 325-28 (dismissing § 36(b) claims because conclusory allegations, standing alone, are not enough under Rule 8(a)) (citing <u>DM Research v. Coll. of Am. Pathologists</u>, 170 F.3d 53, 55 (1st Cir. 1999)).  By rejecting Section 36(b) complaints that lacked sufficient factual allegations, the <u>Migdal</u> and  <u>Krantz</u> courts held plaintiffs to the *same* Rule 8(a) standard that the First Circuit reaffirmed in <u>Educadores</u> – and said was not "heightened."  <u>See</u> <u>Educadores</u>, 367 F.3d at 68 (where, as here, plaintiffs failed to plead facts, complaint properly dismissed as a result of "an application of Rule 8(a)(2), *not a heightened pleading standard*") (emphasis added).[3]

## III.    Plaintiffs Do Not State A Claim Against MFS Because Claims Have Been Stated Against MFS's Competitors.

Plaintiffs also argue that this Complaint "easily satisfies" Rule 8 because this Court sustained a § 36(b) claim against Putnam (in <u>Wicks</u>) and some other courts have sustained "other claims" against other mutual fund companies "based on virtually identical" allegations.  Opp. at

9, 10, 14, 23, 24.  It is not true that the other complaints were "virtually identical" to this one. And to the extent that this Complaint is in material respects the same as complaints about the fees charged by others, it illustrates why Rule 8(a) requires plaintiffs to plead sufficient facts regarding particular defendants.   There are more than *seven thousand* mutual funds in America, managed by *hundreds* of advisers.  According to the documents attached to plaintiffs' complaint, those funds have widely divergent pricing policies, different cost structures, and pursue different types of investment strategies that require different levels of expertise and effort.  A money manager would never have fair notice of the claims against *him or her* if "virtually identical" generic allegations about other funds or the mutual fund industry as a whole were enough to state a claim against *him or her.*  For the most part, that is what these plaintiffs provide.

Plaintiffs cannot state claims against every mutual fund or mutual fund complex by pleading generic indictments of the mutual fund industry.  Such omnibus allegations say nothing about the comparison required by § 36(b) of the fees charged and services provided by the fund in question.  See Migdal, 248 F.3d at 327.  The precious few allegations of the Complaint about MFS make plain that MFS charges a range of fees and provides services to funds having vastly different sizes and objectives.  A lowest-common-denominator pleading approach, focused on what some see as requiring broad industry reform, permits plaintiffs effortlessly to file numerous complaints that are in some respects "virtually identical."  But Rule 8 does not exist to excuse plaintiffs from doing their homework and allow them to substitute the generic for the specific. Nor are the courts the appropriate forum to address perceived industry-wide problems.  That broad pursuit is for Congress or industry regulators.

---

[3]    Plaintiffs' theory that the adverse Migal and Krantz decisions have been overruled also ignores the cases they cite under those standards.  See Strigliabotti v. Franklin Resources, Inc., 2005 WL 645529 (N.D. Cal. Mar. 7, 2005); Jones v. Harris Associates, L.P., 2005 WL 831301 (N.D. Ill. Apr. 7, 2005); Miller v. Mitchell Hutchins Asset Mgmt., Inc., No. 01 CV-192-DRH (S.D. Ill. Mar. 6, 2003).  See also Verkouten, 1999 WL 511411, aff'd 208 F.3d 204 (2d Cir. 2000).

For the most part, the intersections among allegations that appear in this Complaint and those that previously have been evaluated are indeed generic (citations to law review articles, commentary from Warren Buffet and John Bogle, and hopelessly generic allegations about investors "plagued" by excessive fees). These are generic observations that on their face could apply to any mutual fund company, and thus do not plead sufficient facts to state a claim against any particular one. Yampolsky v. Morgan Stanley Inv. Advisers, Inc., 2004 WL 1065533, at * 1 (S.D.N.Y. May 12, 2004). Tellingly, all of the supposedly "identical" complaints to which these plaintiffs refer go beyond the generic allegations by alleging facts *about the funds in question*. See infra at III.B. Here, however, plaintiffs allege almost nothing about the funds they own or the services MFS rendered, making this Complaint most like that dismissed in Yampolsky.

For example, in Strigliabotti, a case upon which plaintiffs heavily rely, the public admission in 1992 by a Franklin Resources executive in the *San Francisco Chronicle* that Franklin Resources benefited from economies of scale may have been a meaningful allegation against that company. But that "identical" newspaper sound bite adds nothing to a Complaint that (supposedly) challenges the fees paid more than a decade later by the 11 MFS funds that these plaintiffs own. Compare Strigliabotti Compl ¶ 59 with Compl. ¶ 53. In other words, where it matters, the Complaints are *not* identical.

More fundamentally, plaintiffs cannot defeat a motion to dismiss by attaching other complaints. To state a claim, plaintiffs must plead a comparison of MFS's fees to MFS's "particular" services, not a comparison of pleadings from different jurisdictions against different mutual funds that paid fees to different advisers. Compare Migdal, 248 F.3d at 327. Defendants address below the complaints against which plaintiffs compare themselves, and identify with respect to each the significant distinctions from this Complaint. See infra III.B. In the first

instance, however, defendants respectfully submit that the Court's analysis should focus on what plaintiffs allege in *this* complaint against MFS.

## IV.     This Complaint Is Missing The Factual Allegations Necessary To State A Claim.

The Complaint purports to challenge the fees charged to eleven specific funds and services provided to those funds, but does not supply even "minimal facts" about what *fees* were charged to the *11 funds at issue* or what *services* were performed by MFS to earn those fees.  The relationship between the fees charged to *these* funds in exchange for the work done for *these* funds is all that this case can be about.  Because the Complaint lacks *any* pleaded facts about these specific fees, funds, and services, it must be dismissed.  See Migdal, 248 F. 3d at 327 ("[C]ourt must examine the relationship between the fees charged and the services rendered.").  Otherwise, Rule 8(a) will be rendered a "nonexistent requirement."  Educadores, 367 F.3d at 68.[4]

Remarkably, plaintiffs say they have "exceeded" what is necessary to state a claim, even though they filed a Complaint that contains almost *no facts* about the fees charged to any of the eleven MFS funds, the services provided to those MFS funds, or the relationship between the fees and those services.  See Opp. at 6.  Specifically, plaintiffs state that the Complaint "alleges a factual basis" for a Section 36(b) claim, and they leave no mystery as to what they mean by that.  They cite twenty-six paragraphs of the Complaint where the supposed factual basis resides.  See id. at 8 (citing Compl. ¶¶ 9-10, 14-17, 25, 41-42, 47-48, 54-65, 70-72).  In fact, these paragraphs yield precious little that is factual.

In a Complaint alleging that the specific fees charged to eleven specific funds were so disproportionate as to foreclose the possibility of arm's length bargaining, the core pleaded facts

---

[4]     Plaintiffs are not excused from satisfying Rule 8(a) simply because they say that "many of the 'facts'" necessary to satisfy Rule 8(a) "are uniquely within [MFS's] knowledge."  (Opp. at 5).  Even if plaintiff "does not have access to . . . information because the data is uniquely within Defendants' control," "Plaintiff still must allege sufficient facts" to state a claim.  In re Pharm. Industry Average Wholesale Price Litig., 2004 WL 2387125 (D. Mass. Oct. 26, 2004) (dismissing claims under Rule 8(a)).

concerning those specific fees for specific services are (*i*) that one of the funds that plaintiffs own (the MFS Mid-Cap Fund) paid a fee of 75 basis points to MFS (Compl. ¶ 58); and (*ii*) that MFS buys and sells stocks, bonds, and other securities for all the Funds (<u>id.</u> ¶ 41).  The Complaint says nothing about the fees charged to the other 10 funds, and fails to say anything whatsoever about the quality of the services rendered to any fund in exchange for the challenged fees.

Indeed, in the Opposition plaintiffs do not pretend to have alleged facts for the particular funds for which they sue.  Instead, plaintiffs admit that "the Complaint refers to the Funds collectively" and ask the Court to credit the "example" they base on a fund they do not even own (the Massachusetts Investors Trust, or "MIT").  <u>See</u> Opp. at 17.  As a consequence, the Complaint fails entirely to address the relationship between fees and services, and the pleaded *facts* do not support the conclusion that MFS's fees to these eleven funds were at all high (much less an "acceptable" inference that they were so disproportionate to the services rendered that they could not have been the product of arm's length bargaining).  <u>See</u> <u>Migdal</u>, 248 F.3d 327 (dismissing complaint where, as here, plaintiffs did not plead "sufficient facts about the services").

It is worth reviewing in some detail the twenty-six paragraphs of the Complaint that plaintiffs say provide the factual basis for the Section 36(b) claim.  Opp. at 8.[5]  Five of these twenty-six paragraphs consist of "information and belief" that all of the Fund Trustees (none of whom were identified) "do not understand" the fees and/or alternatively were provided "virtually no information" about the fees and/or were not independent.[6]  <u>Compare</u> Compl. ¶¶ 17, 65, 70-72. <u>with</u> <u>Educadores</u>, 367 F.3d at 68 ("[C]ourts should continue to 'eschew any reliance on bald

---

[5]     Plaintiffs' have dropped their claim under Section 12(b).  Opp. at 1 n.2.

assertions, unsupportable conclusions, and opprobrious epithets[.]"); <u>Sheldon Krantz</u>, 305 F.3d at 144 ("[O]nly by alleging facts that, if proved, would render the directors interested will plaintiff be able to overcome the presumption to the contrary[.]").  Plaintiffs' unvarnished speculation that it was "impossible" for the Trustees to set a reasonable fee and that it is "self evident" that there was "no real negotiation" adds nothing of substance.  <u>See</u> Opp. at 21 & n.11.  There certainly is no factual basis for plaintiffs to ask the Court to assume that the MFS Funds' Trustees did not have "sufficient information" to do their job because plaintiffs have attached to the Complaint a SEC report that most trustees in fact do.  <u>See</u> SEC Report at 11 (attached to Compl. as Exh. B) (concluding that "most fund directors request data and other information they need" to perform their roles as directors).

Six other paragraphs simply declare the unsupported conclusion that MFS must have benefited from economies of scale because "in the past twenty years" computer technology improved while MFS grew as a business and increased fees.  Compl. ¶¶ 14-15, 25, 47-48, 55. The *ipse dixit* that MFS enjoyed these economies of scale is a bald conclusion unsupported by any facts; it no more than parrots a <u>Gartenberg</u> factor and actually is contradicted by the GAO report they attach to their Complaint.  <u>See</u> GAO Report at 37-38 (attached to Compl. as Exh. C) (new technologies utilized by mutual funds "have raised costs").  Moreover, that "advances in computing and communications technologies" may have "reduced the costs of servicing mutual funds" is of no consequence here because plaintiffs do not challenge the servicing fees in their

---

[6]    Rule 8(a) requires plaintiffs to plead facts or conclusions supported by facts.  <u>See</u> <u>Cooperman</u>, 171 F.3d at 47-48.  An unsupported conclusion that the plaintiff says he believes to be true fits into neither category.  Indeed, plaintiffs' repetitive reliance on "information and belief" – for example, repeating that qualifier *five times* in ¶ 70 alone – should be seen as a "danger sign that the plaintiff engaged in a fishing expedition."  <u>Migdal</u>, 248 F.3d at 326 (quoting <u>DM Research</u>, 170 F.3d at 55).

Complaint; they claim only that advisory fees and distributions fees were excessive.[7]  Compl. ¶ 15.  Even if they did, they do not explain why the MFS fee structure, which provides decreasing percentage fees as funds increase in size, does not account for these concerns.  See Def. Mem. at 7-15.  No matter how many times in the Complaint and the Opposition plaintiffs repeat and rephrase the conclusion that MFS enjoyed economies of scale, that does not state a claim because – aside from the fact that a single Gartenberg factor does state a § 36(b) claim – courts reject the allegation that because a fund "increased dramatically in size, economies in scale must have been realized."  Kalish v. Franklin Advisers Inc., 742 F. Supp. 1222, 1238 (S.D.N.Y. 1990), aff'd, 928 F.2d 590 (2d Cir. 1991).  The Complaint offers nothing more.

Six other of the twenty-six paragraphs that (supposedly) contain the factual basis of this lawsuit allege on "information and belief" that MFS's fees must be too high because MFS received "fall-out benefits."  See Compl. ¶¶ 16, 60-65.  As set forth in defendants' opening brief, that allegation is so generic that it could be said of every mutual fund regardless of the size of the fees it charges or the quality of the services rendered.  See Mem. at 12-14.  Moreover, the only fall-out benefit that plaintiffs describe with any detail (but still on information and belief) – that MFS benefited from use of "soft dollars" – is not a basis for a § 36(b) claim because, as even plaintiffs appear to concede, use of soft dollars is protected by the safe harbor set forth in § 28(e) of the Securities Exchange Act of 1934.  Compare id. (citing 15 U.S.C. § 78bb(e)(1)) with Opp. at 20.  Unable to point to any allegation that MFS's lawful use of soft dollars falls outside of the safe harbor, plaintiffs attempt to argue that MFS's "not illegal" use of soft dollars could "still support Plaintiffs' claim" for breach of fiduciary duty under § 36(b).  See Opp. at 14.  This

---

[7]     It is clear that the Complaint challenges only the advisory and distribution fees.  See, e.g., Compl. ¶¶ 10-11, 73-84; Opp. at 1 ("advisory and distribution fees).  The Complaint does not mention servicing fees, the administrative servicing provided by MFS, nor MFS's administrative services agreement.  Not having challenged the servicing fee, and not having claimed that MFS's administrative services agreement is void, plaintiffs' request

argument is flatly wrong.  Under the statutory safe harbor, MFS cannot "be deemed to have . . .

breached a fiduciary duty under State or Federal law" – a category that includes § 36(b) – by

virtue of lawful soft dollar arrangements.  See 15 U.S.C. § 78bb(e)(1).

     None of the remaining allegations supplies any of the facts necessary to state a claim.

For example, neither the Freeman & Brown study commenting on the mutual fund industry at

large (Compl. ¶ 56) nor Eliot Spitzer's Senate testimony about Putnam and Alliance mutual

funds (Compl. ¶ 57) says anything about MFS's fees, the services it provides for those fees, or

most importantly, the proportionality of those fees to those services.  See Yampolsky, 2004 WL

1065533, at * 2 (dismissing § 36(b) complaint where, as here, plaintiffs failed to allege facts

concerning "these defendants" but instead relied on same "speculation, inference and generalized

observations about the securities industry" alleged here).

     Similarly hollow are plaintiffs' fact-free conclusions that the fees MFS charges to the

funds are "much higher" than the fees it charges to institutional clients.  Compl. ¶¶ 9, 10, 42, 59.

When MFS pointed out that the only fact plaintiffs pleaded in this regard shows that MFS

charged an institutional client *less* than the funds, compare Mem. at 12 with Compl. ¶ 58,

plaintiffs retreated to the argument that they "do not have ready access to specific data" that

would support a claim that MFS charged higher fees to the funds.  See Opp. at 19.  That is a

good reason not to bring a claim, and is no reason to permit one to continue.  See In re Pharm.

Industry, 2004 WL 2387125, at *2 (even if data are within defendants' control, plaintiff "still

must allege sufficient facts" to state a claim); Yampolsky, 2004 WL 1065533, at *1 (dismissing

§ 36(b) claim where, as here, plaintiff argued that he could not plead factual allegations without

---

for relief – the return of "all fees" – is overbroad and should be limited to the fees they actually challenge.  See
Compl. ¶ 93.

discovery).  These plaintiffs have not alleged such facts, and their allegations concerning funds

not at issue in this case (Compl. ¶¶ 54, 58) do not fix the problem.

In short, plaintiffs have failed to supply any of the core facts necessary to state a claim

under § 36(b).  The Complaint simply lacks facts about the fees MFS charges to the funds at

issue, the services MFS provides, and the relationship between the fees and services.  If Rule

8(a) means anything at all, it means that plaintiffs cannot circumvent the requirement that they

allege core facts to support their claim by instead stringing together bald conclusions and rank

speculation in a Complaint based on insubstantial observations about the mutual fund industry

and repetition of the <u>Gartenberg</u> factors.

## V.    The Complaint Here Is Unlike Those Sustained by Other Courts.

Plaintiffs make much of recent decisions regarding § 36(b), but the Opposition makes too

much of every § 36(b) case it cites.

### A.    This Complaint Is Weaker Than Those That Have Been Dismissed.

Plaintiffs have no answer to the Second, Third, and Fourth Circuits' decisions in

<u>Verkouteren</u>, <u>Sheldon Krantz</u>, <u>Migdal</u>, or the Southern District of New York's decision in

<u>Yampolsky</u>.  Indeed, they do not even address <u>Verkouteren</u>.  The notion that <u>Migdal</u>, <u>Sheldon</u>

<u>Krantz</u> and <u>Yampolsky</u> are "easily distinguishable" is belied by any reasonable reading of the

published decisions or the complaints they dismissed**.**

#### 1.    <u>Migdal</u>.

It simply is not true that the complaint dismissed in <u>Migdal</u> was missing the "level of

detailed actual allegations" included in plaintiffs' Complaint.  Opp. at 12.  To the contrary, the

"boiler plate" rejected by the District Court and the Court of Appeals in <u>Migdal</u> was more

detailed than what plaintiffs here are asking this Court to sustain.  In <u>Migdal</u>, the plaintiff: (*i*)

specified the fees that they claimed were excessive (.85% for International Stock Fund and .75%

-15-

for Growth Stock Fund); (*ii*) alleged the performance benchmark for those funds (Morgan

Stanley Capital Index and S&P 500); and (*iii*) alleged that competitive funds using the *same*

benchmarks charged investors fees as low as one half the amount paid by plaintiffs (Vanguard

International Fund - .57%; Vanguard U.S. Growth - .42%; TIAA – CREF International Equity

Fund - .49%). See Migdal Sec. Am. Compl. ¶¶ 11-12 (attached to Opp. as Exh. F). Migdal held

that those allegations were "not particularly meaningful precisely because [plaintiff] does not

address the particular services offered by defendants." Migdal, 248 F.3d at 327. This Complaint

is even thinner. These plaintiffs do not even allege the fee that MFS charged for 10 of the funds

they own; and with respect to the one fund for which they allege the fee (Mid-Cap), plaintiffs

repeat the Migdal plaintiffs' mistake by not alleging "sufficient facts about the services that

defendants offered in return." Compare Migdal, 248 F.3d at 327 with Compl. ¶¶ 56-59.

      The Migdal plaintiffs also alleged that they received sub-par investment advice because

their funds underperformed their benchmarks (at various times by 2.02%, 3.80%, 5.13%, 3.62%,

and 3.76%) and at least made an effort to show that they were paying above-market prices for

below-market services. See Migdal Sec. Am. Compl. ¶29-30 (attached to Opp. as Exh. F).

Migdal correctly held that poor investment returns during a given period may not be a

meaningful pleading of the quality of the fund manager (because even the best stock pickers

have bad spells and no one can predict where the market economy is headed). See Migdal, 248

F.3d at 327. But here, plaintiffs do not say anything about the quality of MFS's investment

advice, much less how it impacted the funds they owned. Compare Opp. at 16.

      Finally, in Migdal, plaintiffs challenged the Board of Directors as having been

"interested" under the ICA, specifically alleging that the funds had not held annual meetings in

five years and that absent those meetings the shareholders had no ability to vote out the board or

the adviser.  <u>See</u> Migdal Sec. Am. Compl. at ¶ 24.  Here, plaintiffs do not even attempt to claim

that the MFS Board was interested (which should end the analysis) nor dispute that the

shareholders could have voted the board out of office.  <u>See</u> Opp. at 21.  Thus, plaintiffs are

correct that <u>Migdal</u> was dismissed and affirmed because those plaintiffs did not plead enough to

state a claim for excessive fees, but they cannot avoid the same result here because their

Complaint pleads even less.

       2.    <u>Sheldon Krantz</u>.

Plaintiffs may be correct that the <u>Sheldon Krantz</u> complaint was even less substantial

than that dismissed in <u>Migdal</u>, but it was still more substantial than this one.  In <u>Sheldon Krantz</u>,

plaintiffs challenged the "independent" character of the board with separate allegations about

each of 8 trustees (identified by name), the allegedly rich compensation they received at the

expense of investors (alleged in dollars), and attempted to plead a basis as to why the adviser's

fees were not negotiated at arms' length as required by law (due to truncated and superficial

Board meetings).  <u>See</u> <u>Sheldon Krantz</u> Compl. at ¶¶ 28-29 (attached to Opp. as Exh. G).  These

plaintiffs admit they "do not challenge" the MFS Funds' Trustees as "interested" and do no more

than proffer "information and belief" that they say "assures" that never-identified Trustees "[did]

not understand" what they were doing.  <u>See</u> Compl. ¶¶ 70-71.  One can only imagine their basis

for such speculation.  The Court of Appeals affirmed the dismissal in <u>Sheldon Krantz</u> because in

that case the inadequate allegations under a single <u>Gartenberg</u> factor – conscientiousness of the

board – did not state a claim under Rule 8(a).  <u>See</u> <u>Sheldon Krantz</u>, 305 F.3d at 143-144.  These

plaintiffs do not even provide an inadequate factual basis for one of the factors.

       3.    <u>Yampolsky</u>.

Plaintiffs also have not "far surpassed" the pleading rejected in <u>Yampolsky</u>.  <u>See</u> Opp. at

14.  Plaintiffs' claim that there were "no allegations" in <u>Yampolsky</u> about the "relationship

between the fees charged and services rendered" ignores ¶ 26 of that complaint, which alleges that defendants charged 10.6% more than industry standards in a year when the fund lost 23% of its value. (Attached to Opp. at Ex. H) Unlike here, the Yampolsky plaintiffs also compared the fee charged (.48%) to that charged by comparable funds managed by Vanguard and Fidelity. See Yampolsky Compl. ¶ 27. The Yampolsky plaintiffs also attempted to challenge the process by which those fees are negotiated by alleging that the trustees were biased and overworked given the shear volume of those trustees' commitments (identifying with names and numbers the various mutual funds and corporate boards on which they sat). See Yampolsky Compl. at ¶ 35. Those meaningless allegations were not enough to let the Yampolsky plaintiffs proceed, and it is hard to see how these plaintiffs have in any way outdone them.

**B.    The Cases That Plaintiffs Cite Are Not "Virtually Identical."**

Plaintiffs say the Court should sustain the Complaint against MFS because it sustained a § 36(b) Complaint against Putnam in Wicks and because a few (supposedly) "virtually identical" complaints have been sustained against *other* mutual fund companies. Opp. at 23. In fact, the complaints in Wicks, Richard Krantz, Strigliabotti, Jones, and Miller are not useful to plaintiffs because every one of those complaints was more substantial than this one.

1.    Wicks.

Plaintiffs' Complaint does not "easily survive[]" this motion because in March this Court sustained a Section 36(b) claim against Putnam in Wicks. See Opp. at 1, 3, 8-9. In Wicks, the Court reviewed the complaint under the Rule 8(a) standard, and concluded that it contained "allegations sufficient" under Educadores. The Complaint against MFS, however, does not survive that First Circuit standard, nor should this Court's review of this Complaint be any different because of its prior review of a different complaint in a different case.

-18-

Defendants do not know which allegations the Court deemed sufficient in <u>Wicks</u>, and are disinclined to speculate. It is not, however, accurate to say that the <u>Wicks</u> complaint is virtually (or even somewhat) identical to that against MFS. <u>Compare</u> Opp. at 11, 23 <u>with</u> <u>Wicks</u> Compl. ¶¶ 69, 70, 72, 82, 86, 94, 98, 103, 104, 107, 108, 110, 111, 122. There are many allegations in <u>Wicks</u> that were specifically addressed to each of the nine funds owned by those plaintiffs, and those plaintiffs provided a meaningful basis upon which to assess the relationship between the services that Putnam performed for those funds and the fees that Putnam received. <u>See</u> <u>Wicks</u> Compl. at ¶¶ 82-87, 101-105. It did so with factual allegations, including:

- Putnam allegedly "liquidated, renamed or merged 44 mutual funds, in large part due to poor performance," thereby avoiding disclosure of the "poor track record." Plaintiffs' funds allegedly included those that "significantly underperformed" the S&P 500, and declined in value 33% in 2001, and 32% in 2002. <u>See</u> <u>id.</u> at ¶¶ 103-104.

- Putnam allegedly performed "identical" services for institutional clients, using the same "resources and advisory personnel" for far lower fees than charged plaintiffs, as set forth in a chart comparing fees charged to Pennsylvania Retirement System to the specific fees charged by Putnam to the specific funds that plaintiffs owned. <u>See</u> <u>id.</u> at ¶¶ 83-87 & Exh. No. 9.

As noted <u>supra</u>, plaintiffs here make only conclusory allegations concerning "comparative fee structures" and allege nothing at all about the "quality" of MFS's work. The complaint in <u>Wicks</u> also alleged that Putnam received "fallout" benefits:

- Putnam allegedly caused the funds to pay favored brokers just under $400 million for soft dollar "kickbacks." As a result, the funds allegedly did not obtain "best execution for those trades" and overpaid brokers by $227 million." <u>Id.</u> at ¶¶ 92-94.

That allegation of "fallout benefits" is not virtually identical to anything in *this* Complaint.

<u>Compare</u> Compl. ¶ 61 (alleging "information and belief" that various "arrangements" benefit MFS, but "increased costs to the shareholders" with no further details);

¶ 62 (alleging "information and belief" that Defendants received "kickbacks" and received them

either "directly or indirectly" but no further details); ¶ 63 (alleging "information and belief" that
MFS received "further fallout benefits" from never-described "arrangements" to "loan out the
securities"); ¶ 65 (alleging "information and belief" that MFS did not provide "sufficient
information" about "these and other fallout benefits," but never alleging what information was
provided or what information was due). Simply put, Wicks was a much better complaint.

### 2.    Richard Krantz.

Richard Krantz is plaintiffs' best case, but their reliance on it is misplaced for several
reasons. See Richard Krantz v. Fidelity Mgmt. & Research Co., 98 F. Supp. 2d 150 (D. Mass.
2000). *First*, Richard Krantz was not well reasoned and was decided in 2000 without the benefit
of Migdal, Sheldon Krantz, and Verkouteren, the only three appellate court decisions construing
the proper pleading standard under Section 36(b). *Second*, Richard Krantz sustained a complaint
that contained allegations somewhat more substantial than those pleaded here.[8] *Third*, although
is true that the plaintiff in Richard Krantz supported his thin economies-of-scale allegation with
reference to the "efficiencies caused by computer advances," Richard Krantz, 98 F. Supp. 2d at
159, that allegation is not enough to state a claim here (particularly in light of these plaintiffs'
other allegations). These plaintiffs' allegations referring to the advent of computers are different
from those in Richard Krantz because in this case plaintiffs attached to their Complaint a GAO
Report on Mutual Fund Fees stating that new technology has "*raised costs.*" See GAO Report at
37 (Attached to Compl. at Exh. C) (emphasis added). This cuts against the contrary logic that
both sets of plaintiffs have sought to peddle – that computers necessarily should have driven total

---

[8]       There, the complaint contained some factual allegations with respect to two Fidelity funds, and specifically
alleged the advisory fees paid by each fund. See Richard Krantz, 98 F. Supp. 2d at 159. Here, by contrast, these
plaintiffs sue on behalf of 11 funds, but only allege the fees paid by one of them. See Compl. ¶ 58. In addition,
plaintiff Richard Krantz set forth at least some allegations about the quality about services by "highlight[ing] the
Fidelity Value Fund's poor performance." Richard Krantz, 98 F. Supp. 2d at 159. These plaintiffs, however, say
nothing about the quality of services provided to the Funds, other than that they are "straightforward." See Compl.
¶ 41; MFS Mem. at 8.

fees down (despite their cost and despite any and all factors tending to drive costs up).  Indeed, it cannot be true that any fee is excessive if it has not come down since advisers began investing in computers.

         3.     <u>Strigliabotti.</u>

Plaintiffs' analogy to the "economies of scale," and "profitability" allegations in <u>Strigliabotti</u> is particularly distorted.  That Complaint contained factual allegations against Franklin Resources far more substantial than plaintiffs have alleged against MFS:

- Franklin Resources's vice president admitted (in the *San Francisco Chronicle*) that "we benefit from economies of scale" and that as the size of the fund complex "grows, the cost of servicing . . . does not grow proportionally."  <u>See</u> <u>Strigliabotti</u> Compl. ¶ 59

- Franklin's fees allegedly increased by "more than 400 times" during a period when assets under management increased only "150 times."  <u>See</u> <u>id.</u> at ¶ 61.

- Franklin's fee revenue allegedly increased at a rate that far outpaced cost increases – resulting in a 31.5% return on sales that for six years in a row was the highest of *any* publicly-traded company in Northern California and resulted in a profit margin that had nearly doubled from 14% to 26% percent.  <u>See</u> <u>id.</u> at ¶ 60 (emphasis added).

In light of those allegations, the quality of the <u>Strigliabotti</u> pleading is not "virtually identical" to this one.  These plaintiffs have not alleged that fee revenue grew at any rate for any fund at issue; the *only* details alleged that compare fees to fund size are with respect to MIT – which is one of the 129 MFS Funds that plaintiffs *do not* claim to own – and says nothing about the 11 that they do.  Plaintiffs' threadbare allegations about MFS's profitability is hard to understand (and is based in part on Canadian dollars) and actually shows that its *margins shrunk* in the period prior to the lawsuit.  <u>See</u> Compl. ¶14.

         4.     <u>Jones.</u>

Plaintiffs also are incorrect that that the court in <u>Jones</u> sustained a "practically identical complaint."  <u>Compare</u> <u>Jones</u>, 2005 WL 831301.  Although both complaints contain the <u>verbatim</u> "information and belief" pejorative that the "funds at issue are plagued by discriminatory over

-21-

charging," in <u>Jones</u> there was a factual basis for the claim that defendants charged plaintiffs more for managing their funds (Oakmark Funds) than they charged others for comparable funds:

- Defendants allegedly charged the Oakmark Equity and Income Fund an effective fee of .732% but provided the same services to the CDC Nvest Growth and Income Fund for .355% -- which plaintiffs allege resulted in an overcharge of $29 million per year.  <u>See</u> Jones Compl. ¶ 38(a).

- Defendants allegedly charged the Oakmark Select Fund (a mid-cap fund) an effective fee of .857% but provided the same services to the MassMutual Focused Value Fund (another mid-cap fund) for .4055% -- which resulted in an overcharge of more than $25 million/year.  <u>See</u> <u>id</u>. at ¶ 38(b).

- Defendants allegedly charged the Oakmark International Fund an effective fee of .945% but provided the same services to the MassMutual Overseas Fund .503% -- which plaintiffs allege resulted in an overcharge of more than $18 million/year.  <u>See</u> <u>id</u>. at ¶ 38(c).

Plaintiffs claim to have "made the same sort of allegations" in this Complaint, but none exists in the nine paragraphs they cite.  <u>Compare</u> Opp. at 10 (citing ¶¶ 9-10, 14-15, 54, 56-59). Only one of those paragraphs even mentions a fund that plaintiffs own (Mid-Cap), and although plaintiffs do identify the fee for that one fund, they say nothing about the services provided to that fund, nor compare the fee and the (never-alleged) services to those of any other funds. Compl. ¶ 58.  Plaintiffs do refer to one institutional client (the Public Employee Retirement System of Idaho "PERSI") as being analogous to the Funds (simply because it invests in "equities"), but do not allege any factual basis upon which it would be appropriate to compare it to any of the diverse funds they own (which also invested in bonds and government securities). Compl. ¶ 58   Indeed, several of those paragraphs referred to by plaintiffs do not even mention MFS. <u>See, e.g.</u>, Compl. ¶ 56 (discussing Freeman & Brown study); ¶ 57 (excerpt from New York Attorney General Eliot Spitzer's testimony concerning his "survey of two fund complexes," neither of which was MFS).  The only other MFS Funds mentioned are those that plaintiffs do not own (MIT, New Discovery, and Global Total Return).  Compl. ¶ 58, 59.

     5.    <u>Miller.</u>

Plaintiffs do not help themselves by citing <u>Miller</u>, where the Court explicitly scrutinized the § 36(b) claims under the <u>Migdal</u> standard that these plaintiffs claim is irrelevant.  <u>Compare</u> <u>Miller v. Mitchell Hutchins Asset Mgmt. Inc.</u>, No. 01-CV-192-DRH at 5-6 (S.D. Ill. Mar. 6, 2003) (must "plead facts" that fee was "so disproportionately large" given services rendered) <u>with</u> Opp. at 12 (asserting that <u>Migdal</u> has been "effectively overruled').  Moreover, it is not true (not even close to true) that this Complaint is "strikingly similar" to the Second Amended Complaint sustained in <u>Miller</u>.  Plaintiffs here cannot point to anything approaching the "details" and "sufficient facts" from which the <u>Miller</u> Court concluded its decision.

*First*, the <u>Miller</u> plaintiffs alleged that the fees were disproportionate to the "quality" of investment advice rendered because, *inter alia*, (*i*) the funds owned by plaintiffs allegedly included among the worst performing in the industry (Alliance Premier Growth and Alliance Quasar Fund in 92nd and 80th performance percentiles, respectively) (Miller Compl. ¶ 47); and (*ii*) one defendant/adviser's work was "so bad" that it gave up and instead outsourced the job (<u>Id.</u> at ¶ 49).  By contrast to the three pages of allegations of that complaint that actually allege the quality of the Alliance funds at issue (by, for example, identifying and distinguishing among the defendants and the funds at issue there), plaintiffs here concede they do not allege anything about the quality of MFS's investment advice.  <u>See</u> Opp. at 22.  The only allegation of "quality" in this Complaint lives in a single paragraph that *does not say anything* about any particular fund; in that paragraph plaintiffs contend that it is their "information and belief" that a conflict exists that is "manifest" in higher fees and "other losses and expenses," all of which plaintiffs say "directly impact the quality."  <u>Compare</u> Compl. ¶ 43.

*Second*, in <u>Miller</u>, plaintiffs alleged facts regarding the defendants' profitability and receipt of economies of scale.  For example, plaintiffs alleged that defendants continued to

collect the same fee (.80%) even after outsourcing certain functions, discontinuing internal research, and reducing headcount by one-half.   See Miller Compl. ¶¶ 51-52.  Those plaintiffs also alleged that defendants' fees grew at twice the rate of fund growth (18.1% v. 36.8%).  See id. at 62.  By contrast, plaintiffs here plead only that MFS's fees are "grossly disproportionate" but never plead what fees they paid, or what economies of scale were achieved in their funds. Compl. ¶ 55.

Third, in Miller plaintiffs alleged facts which, taken as true, plead a lack of conscientiousness or independence on the part of the Board, including by alleging (*i*) that distribution plans were approved during meetings that lasted approximately 10-15 minutes (Miller Compl. ¶ 94); (*ii*) that the Board failed to adjust fees for specifically identified index funds that were essentially unmanaged (id. at ¶ 95); (*iii*) that in setting fees the Board failed to consider the tremendous cost savings the adviser achieved by outsourcing functions (id.); and (*iv*) that the Board lacked information because the adviser hid the details (id. at ¶ 90, 93-94).  By comparison, here plaintiffs say it was "obvious" that the Trustees were not conscientious and rest on their "information and belief" that the Trustees "d[id] not understand."  Compl. ¶¶70-71.

Finally, plaintiffs should not pretend that their complaint is "strikingly similar" to the "comparative fee structure" allegations in Miller, which include:

- A chart indicating that defendant/adviser charged more than *eight times more* to manage plaintiffs' Alliance US Growth Fund than to manage a comparable growth fund (effective fee of .93% v. 11%). See Miller Compl. ¶ 68.

- Comparison of the fees assessed on plaintiffs' funds to those charged for 7 institutional customers, with factual allegations demonstrating that plaintiffs paid as much as 6-7 times more (and on average 2-3 times more). See id. at ¶ 71

- Allegations about each of the institutional accounts, identifying the size of the fund, investment strategy, and specific fees and breakpoints.  See id. at ¶¶  70-76.

-24-

In striking contrast to those *seven pages* of allegations, plaintiffs here present four "comparative fee structure" paragraphs. See Compl. ¶¶ 56-59. As discussed supra, two of those four paragraphs do not even mention MFS, and therefore are not factual allegations comparing any MFS Fund to anything else. See id. at ¶¶ 56-57. Although Paragraph 58 actually does address MFS, it does not plead that *these* plaintiffs paid an excessive fee because it compares one institutional account (PERSI) to an MFS Fund that plaintiffs do not own (MIT) and only one fund that they do (Mid-Cap). See id. at ¶ 58. In Paragraph 59 plaintiffs backpedal by acknowledging that the fees "many not appear excessive" from the (irrelevant) comparison in the prior paragraph (because PERSI pays a higher rate than that charged for MIT), and then cite to some disparaging remarks about that MFS fund once made by the CEO of an MFS competitor. Compl. ¶ 58. Those paragraphs are hardly "strikingly similar" to the allegations made by the Miller plaintiffs.[9]

---

[9]     Plaintiffs also do not save their additional § 36(b) claims (Counts II and III), which should be dismissed as duplicative of Count I, and because they suffer the same pleading deficiency, i.e., no meaningful factual allegations. Compare Opp. at 22-25 with Mem. at 16-17.

**Conclusion**

For the foregoing reasons, plaintiffs' Complaint should be dismissed with prejudice.

Respectfully submitted,


/s/ Jonathan A. Shapiro
Jeffrey B. Rudman (BBO #433380)
William H. Paine (BBO #550506)
Jonathan A. Shapiro (BBO #567838)
Matthew A. Stowe (BBO #650473)
Elizabeth J. Mone (BBO # 650794)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Tel:  (617) 526-6000
Fax: (617) 526-5000

Attorneys for Defendants Massachusetts
Financial Services Co. and MFS Fund
Distributors, Inc.


Dated:  June 24, 2005